UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADAM JAMISON,
                            :

            Petitioner,

                            :        15 Civ. 6716 (PKC) (AJP)

       -against-

                            :       **REPORT AND RECOMMENDATION**

THOMAS GRIFFIN,
                            :

            Respondent.

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable P. Kevin Castel, United States District Judge:**

           Pro se petitioner Adam Jamison seeks a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, challenging his conviction for first degree robbery, second degree attempted assault, and

second degree criminal trespass.  (Dkt. No. 2: Pet. ¶¶ 1-5.)  Jamison raises a large number of

objections to the state court proceedings, of the everything but the kitchen sink variety.  (Id. ¶ 13.)

For the reasons set forth below, Jamison's petition should be DENIED.

## FACTS

**Background: The Crime**

           At approximately 10:30 A.M. on October 2, 2007, Justino Hernandez entered a

Bronx apartment building located at 1166 Grand Concourse.  (Ex. 19:[1/] Jamison 1st Dep't Br. at 15-

16; Ex. 21: State 1st Dep't Br. at 7.)  An African-American man wearing a red shirt (later identified

as Jamison) and a Hispanic man holding a duffel bag followed Hernandez into the building.

(Jamison 1st Dep't Br. at 15-16; State 1st Dep't Br. at 7.)  Jamison threatened Hernandez with a

---

[1/]      References to Exhibits are to the exhibits to the Chamoy Affidavit (Dkt. No. 14).

crowbar in the building stairwell while the Hispanic man ripped Hernandez' chain from his neck and fled.  (Jamison 1st Dep't Br. at 16-17; State 1st Dep't Br. at 7-9.)  As Jamison fled, he struck security guard Kenroy Mitchell with the crowbar.  (Jamison 1st Dep't Br. at 17; State 1st Dep't Br. at 8.)

Hernandez chased Jamison to 1056 Sherman Avenue.  (Jamison 1st Dep't Br. at 18; State 1st Dep't Br. at 9-10.)  Jamison entered Richard Kaane's apartment, changed into Kaane's green shirt and exited the building.  (Jamison 1st Dep't Br. at 18-20; State 1st Dep't Br. at 11-13.) Hernandez recognized Jamison and pointed him out to police as the perpetrator.  (Jamison 1st Dep't Br. at 20; State 1st Dep't Br. at 12.)  Jamison was arrested; his accomplice was not apprehended. (Jamison 1st Dep't Br. at 22; State 1st Dep't Br. at 13.)

**Pretrial Proceedings**

Jamison was arraigned on two felony complaints on October 6, 2007 in Bronx Supreme Court.  (Dkt. No. 18: Arraignment Transcript.)  The first complaint accused Jamison of committing crimes against Hernandez, Mitchell and Kaane at 1166 Grand Concourse and 1056 Sherman Avenue on October 2, 2007 between approximately 10:30 AM and 10:50 AM.  (Ex. 2: 10/2/07 Compl.)  The second, unrelated complaint accused Jamison and another man of committing a burglary the same day between "approximately 10:09 AM and . . . 10:30 AM" inside 230 E. 167th Street, Apartment 3J, in the Bronx.  (Ex. 13: 1/20/10 CPL § 440.10 Motion Ex. A-2: 10/3/07 Compl.)  The second complaint was based, in part, on a surveillance video that allegedly depicted Jamison and an accomplice in the building.  (Id.)  The prosecution later dismissed the second complaint because the surveillance tape was insufficient to establish Jamison's identification. (Chamoy Aff. ¶ 17.)

Two indictments followed on October 18, 2007 and November 5, 2007 (Ex. 3: 10/18/07 Indictment; Ex. 4: 11/5/07 Indictment) related to the incidents at 1166 Grand Concourse

and 1056 Sherman Avenue that were later consolidated (Dkt. No. 22: 11/26/07 Hearing Transcript 2). Jamison was granted leave to proceed pro se. (Dkt. No. 21: 11/5/07 Hearing Transcript at 4.)

Jamison filed an omnibus motion on December 3, 2007 seeking, among other things, to suppress any identification or physical evidence. (Ex. 5: 12/3/07 Omnibus Motion.) A Wade suppression hearing and pretrial proceedings were held on August 4, 2008 before Justice David Stadtmauer. (Dkt. No. 26: 8/4/08 Proceedings Transcript ("P.") 1-2.) Justice Stadtmauer sought to ensure that Jamison had "an understanding of some of the dangers involved" in self-representation before being allowed to continue pro se. (P. 3.) Justice Stadtmauer noted that, given his criminal history, Jamison was classified as a violent predicate felon who faced "serious charges" that carried the "possibility of consecutive sentences." (P. 4-5.) Justice Stadtmauer further stated that in his years on the bench he could not remember a time when a pro se litigant was acquitted, that criminal law is "very complex," and that Jamison's court-appointed attorney, Angel Perez, was "experienced and highly capable." (P. 9-13.)

Jamison responded that he had tried four cases pro se and obtained acquittals in each, and that he wished to represent himself despite the court's warnings. (Jamison: P. 18-19.) Justice Stadtmauer held:

> Under those circumstances it's my judgment that Mr. Jamison understands exactly what I've explained to him. The record is clear that all the issues and the potential dangers involved have been explained to him, and I find that Mr. Jamison has made a knowing and intelligent waiver of his right to counsel in this matter, and he'll be permitted to go forward and represent himself pro se.

(P. 20-21.) Justice Stadtmauer directed attorney Perez to help Jamison conduct his defense, including explaining the "nuances of trial procedure" and "various aspects of the law that . . . he may not understand." (P. 21.)

**The Suppression Hearing**

The court proceeded to the Wade hearing at which Officer Vincenti Guzman and Sergeant Victor Poejo testified.  (Dkt. Nos. 25, 27, 28: 8/4/08-8/6/08 Wade Hearing Transcripts ("H.") 4.)  Officer Guzman was on patrol in the Bronx on the morning of October 2, 2007. (Guzman: H. 8.)  He stopped at1056 Sherman Avenue when he was "flagged down and directed" to the address by a "crowd of people."  (Guzman: H. 9-10.)  Officer Guzman also received a radio transmission that identified a "tall black male in about his early 40s," "wearing a red t-shirt," who "had just robbed somebody with a crowbar."  (Guzman: H. 10, 18-19.)  When he arrived at 1056 Sherman Avenue, Justino Hernandez told Officer Guzman that he had just been robbed of his chain by someone armed with a crowbar.  (Guzman: H. 11, 22.)  Hernandez provided no other information about the perpetrator.  (Id.)

The two stood about ten feet from the building's main entrance when, approximately seven minutes later, Jamison walked out the front door and Hernandez "pointed to him and said, 'that's him, that's him.'"  (Guzman: H. 11, 12, 14, 23.)  Officer Guzman did not suggest to Hernandez that Jamison was the perpetrator, or otherwise draw Hernandez' attention to Jamison.  (Guzman: H. 13.)  Jamison was arrested wearing a shirt different from the one identified in the police radio communication.  (Guzman: H. 10, 15.)  Officer Guzman learned that Jamison "had gone into somebody's apartment, and at that point changed his shirt and then walked out the front of the building."  (Guzman: H. 15.)  The shirt belonged to a tenant in the building in whose apartment a crowbar was found.  (Guzman: H. 16.)

On October 2, 2007, Sergeant Poejo responded to a "radio run of a man robbed" at 1166 Grand Concourse in the Bronx.  (Poejo: H. 45.)  Kenroy Mitchell told Sgt. Poejo that "he was assaulted by a male black, blue shorts and a bald head, and chunky."  (Poejo: H. 45-46, 62.)

Mitchell was transported by ambulance to Lincoln Hospital's Emergency Room (Poejo: H. 46-47, 66-67), as was Jamison (Poejo: H. 53). Sgt. Poejo told Mitchell at the hospital that they were "going to do a showup" to determine if Mitchell could spot the perpetrator. (Poejo: H. 46-47, 54.) Mitchell was instructed to look around to see if he could identify the man who hit him. (Poejo: H. 47, 52, 54.) Sgt. Poejo did not suggest a particular person to Mitchell, although there were two uniformed officers near Jamison. (Poejo: H. 47-48, 60-61.) As Sgt. Poejo and Mitchell traveled through the emergency room, Mitchell noticed Jamison and said, "'that's the guy right there.'" (Poejo: H. 49.) About fifteen to twenty minutes elapsed from the time Sgt. Poejo initially responded to 1166 Grand Concourse to when Mitchell identified Jamison. (Poejo: H. 49.)

Jamison testified that around 10:40 a.m. on October 2, 2007, he left his residence at 1278 Grand Concourse, passed 1166 Grand Concourse, and was walking past 1056 Sherman Avenue when he was apprehended by police and severely beaten. (Jamison: H. 71-73, 82-84, 86-87, 90-91, 95-100.) Jamison was not fully conscious but recalled officers saying "bring the complainant over," at which time Hernandez identified Jamison as the perpetrator. (Jamison: H. 73, 98-99.) Jamison was further beaten until he was knocked unconscious and taken to Lincoln Hospital. (Jamison: H. 73, 99, 105-06.) Jamison was placed in an area "strictly designated for individuals that are arrested. No other pedestrians, no civilians, are allowed to go to this area." (Jamison: H. 74.) The green shirt was Jamison's, given to him by his brother. (Jamison: H. 91-93.)

When testimony concluded, Jamison challenged the prosecution's CPL § 710.30 notice in connection with his identification suppression motion. (Jamison: H. 142-47.) The prosecution had provided Jamison with a notice of identification pursuant to CPL § 710.30(1)(b) at his October 6, 2007 arraignment. (Dkt. No. 18: Arraignment Transcript at 4; see Ex. 3: Notice & Voluntary Disclosure Form.) The notice described two identifications witnessed by Officer Jose

Gonzalez at 1056 Sherman Avenue on October 2, 2007 at 10:50 a.m. by means of a "Corporeal Non-Lineup." (Notice & Voluntary Disclosure Form; see also Arraignment Transcript at 4.) The prosecution amended the notice on January 30, 2008 to include another identification conducted by Sgt. Poejo on October 2, 2007 at 11:15 a.m. at Lincoln Hospital, also by means of a "corporeal non-lineup." (Ex. 9: 1/30/08 CPL § 710.30 Notice.)

Jamison argued that Officer Gonzalez (rather than Officer Guzman) was listed in the initial notice, that the amended notice was untimely and prejudiced his defense, and that both notices refer to a police-arranged identification, but not a point-out. (Jamison: H. 154-58.) A.D.A. Newton Mendys responded, "The purpose of the [§ 710.30] notice is to provide the defense with sufficient information so they can timely move to suppress, which is exactly what [Jamison] did." (H. 180.) The prosecution asserted that Jamison suffered no prejudice because the notices provided all the information required and were not misleading because they only mentioned a corporeal non-lineup without specifically describing whether the identifications were a show-up or point-out. (H. 180-81.)

Justice Stadtmauer found that Officer Guzman's and Sgt. Poejo's testimony was "credible and reliable," and that the "issues raised by the defense . . . concerning the notice are inapposite." (H. 183.) Justice Stadtmauer held that the notice was sufficient and resulted in a "full and adequate hearing . . . to test the constitutionality of the identification procedures." (H. 183-84.) Justice Stadtmauer ruled that "[c]lear and convincing evidence" showed that the identification procedure "used by the police was in no way suggestive and totally reliable" and provided probable cause for Jamison's arrest. (H. 184-85.) "An on-the-scene show-up," the court noted, "which is close in time and proximity to the crime is sanction[e]d by the Courts." (H. 184.) Justice Stadtmauer accordingly denied Jamison's motion. (H. 185.)

Jamison renounced his pro se status following the hearing and Perez was assigned as his counsel.  (Dkt. No. 26: P. 93-94.)  The prosecution requested information about any possible defense witnesses and Perez responded that he might call any "police officers who were involved in the transportation of the defendant to the hospital, and/or may have been at the hospital at the time that the defendant was identified by one of the complaining witnesses, . . . the A.D.A. who initially did the write up . . . [and] the 911 operator."  (P. 267-69.)

**Jamison's Trial**

Jamison's jury trial began on August 12, 2008 before Justice Stadtmauer.  (Dkt. Nos. 29, 30, 32: Trial Transcripts ("Tr.") 1-2.)

### The Prosecution's Case

Hernandez was outside of 1166 Grand Concourse at around 10:00 a.m. on October 2, 2007, where he encountered a Hispanic individual and a man "of color" (later identified as Jamison) wearing a red shirt, standing approximately four feet away, who asked the time.  (Hernandez: Tr. 173-76, 180-82, 216, 242, 246-47.)  Hernandez responded, became suspicious of the pair and entered 1166 Grand Concourse.  (Hernandez: Tr. 174, 182-83.)  The individuals told Hernandez to hold the door but he replied, "no, because you guys don't live here."  (Hernandez: Tr. 174, 182-83.)  Hernandez continued to the second floor and the two men were let into the building by another resident.  (Hernandez: Tr. 174-75, 183.)

The men followed Hernandez up the stairwell and Jamison asked his accomplice for a crowbar.  (Hernandez: Tr. 175, 180, 183-84, 247.)  The Hispanic individual removed a crowbar from a blue bag and handed it to Jamison.  (Hernandez: Tr. 186, 247.)  Jamison threatened to kill Hernandez as he raised the crowbar.  (Hernandez: Tr. 175, 184, 186, 217.)  When Hernandez raised his arms to fend off Jamison, the Hispanic individual grabbed Hernandez' chain from his neck.

(Hernandez: Tr. 175, 186, 248.)  Hernandez identified Jamison at trial as the man armed with the crowbar (Hernandez: Tr. 176, 217, 255-56), in part because Jamison asked Hernandez for some change a week prior to the robbery on "167th and Grand Concourse" (Hernandez: Tr. 213-14).  The robbery occurred about two to three minutes after Hernandez initially encountered the perpetrators outside the building.  (Hernandez: Tr. 257-58.)

As the robbery was in progress, Edgar Bashir entered the building lobby and heard a "tremendous scuffle" upstairs, and a man calling out for help followed by a "lot of feet running downstairs."  (Bashir: Tr. 467-68.)  Bashir did not witness the robbery itself.  (Bashir: Tr. 504.)  Bashir called 911 around 10:30 a.m., backed out of the building and waved at Mitchell, the building security guard, who was across the street.  (Mitchell: Tr. 319; Bashir: Tr. 468-69.)  When Mitchell reached the entrance, a Hispanic man ran through the doors and away from the building.  (Mitchell: Tr. 319-20, 362; Bashir: Tr. 469-70, 474.)  Mitchell did not pursue the man because he heard Hernandez cry out for help; Mitchell, facing the door, saw Jamison in a red sweater swinging a crowbar at his forehead as Jamison ran from the lobby.  (Hernandez: Tr. 188-89; Mitchell: Tr. 320, 326-29, 362-63, 372-73; Bashir: Tr. 469-70, 499.)  Bashir called 911 a second time at about 10:47 a.m. to obtain medical attention for Mitchell.  (Bashir: Tr. 485.)  Both 911 calls were played for the jury.  (Tr. 483-85.)  Mitchell was transported to Lincoln Hospital by ambulance between thirty and forty-five minutes later.  (Mitchell: Tr. 332, 364-65.)

Hernandez chased Jamison from a distance of about fifteen feet as he fled with the crowbar.  (Hernandez: Tr. 189-92, 259.)  Jamison twice turned to face Hernandez as they ran, telling Hernandez to "[g]o back."  (Hernandez: Tr. 191-93, 258-59.)  The chase ended when Hernandez saw Jamison enter 1056 Sherman Avenue about ten to fifteen minutes later; Hernandez "never lost sight of" Jamison prior to that point.  (Hernandez: Tr. 190, 193-94, 259.)  Police arrived while Hernandez

waited in front of the building.  (Hernandez: Tr. 194.)  Meanwhile, inside his apartment at 1056 Sherman Avenue, Kaane awoke to a noise and saw an African-American man wearing a red shirt standing by the window in his living room.  (Kaane: Tr. 543-44, 582-83.)  Kaane returned to his bedroom and locked the door; after several minutes Kaane emerged, saw police in the building, and informed Officer Todd Campbell that someone had broken into his apartment.  (Kaane: Tr. 546-48; Campbell: Tr. 518.)

No more than fifteen minutes elapsed from the time Jamison entered 1056 Sherman Avenue to the time he emerged wearing a green shirt.  (Hernandez: Tr. 193-95, 216, 251, 253.) Hernandez told police, "'That's him,'" as he saw Jamison walking away.  (Hernandez: Tr. 193, 256.) Jamison was arrested.  (Hernandez: Tr. 195, 256.)  Officer Campbell took Kaane downstairs to identify Jamison, who was seated in the back of a police cruiser.  (Kaane: Tr. 552-53; Campbell: Tr. 519-20, 524-25.)  Although he was unable to see Jamison's face, Kaane identified the green shirt Jamison was wearing as his own.  (Kaane: Tr. 553, 576, 585.)  Kaane returned to his apartment where officers found a red shirt and a crowbar.  (Kaane: Tr. 555-57, 566-67; Campbell: Tr. 520-21, 525-26.)

Officers Tasha Barnes and Gonzalez transported Jamison to the police precinct. (Gonzalez: Tr. 38-39, 130-32; Barnes: Tr. 292, 303.)  Police did not find a gold chain,  crowbar, or any of Hernandez' property on Jamison.  (Gonzalez: Tr. 142-43.)  An ambulance was called to take Jamison to Lincoln Hospital because he began to suffer seizures at the precinct.  (Gonzalez: Tr. 40-42, 131-32; Barnes: Tr. 292-93, 303-04.)  Officer Barnes recovered the green shirt Jamison wore at the time of his arrest.  (Barnes: Tr. 294-96.)

At the hospital about forty-five minutes after the robbery, the police informed Mitchell that they had someone they wanted him to identify.  (Mitchell: Tr. 337, 366-67, 369, 371.)

Mitchell was taken to observe Jamison and positively identified him as the perpetrator.  (Mitchell: Tr. 337-38.)  Mitchell also identified Jamison at trial.  (Mitchell: Tr. 321.)  Mitchell had noticed Jamison and his accomplice standing outside the building with a bag before the robbery.  (Mitchell: Tr. 321-22.)  October 2, 2007 was a "clear," "bright" day and as Mitchell smoked a cigarette, he noticed Jamison and his accomplice remain outside "for a long while."  (Mitchell: Tr. 322, 342.)  When Mitchell left the building to visit the store across the street, he saw Jamison a second time (Mitchell: Tr. 324), and then "clearly" a third time during the assault (Mitchell: Tr. 341-42).

The various items of property recovered were logged and stored with the property clerk at the police precinct.  Before he was transported to the hospital, Mitchell found a bag in the lobby of 1166 Grand Concourse containing "a crowbar and some shirts" which he turned over to police.  (Mitchell: Tr. 336-37, 340.)  Sgt. Poejo told Officer Franklin Rodriguez that there was a dark colored bag in the lobby of 1166 Grand Concourse, and he should place it in his patrol car.  (Rodriguez: Tr. 159-60.)  Officer Rodriguez transported the bag to the precinct where he "personally gave it to the arresting officer," Officer Gonzalez.  (Rodriguez: Tr. 161, 163-65.)  Neither the bag nor its contents ever left Officer Rodriguez' possession until he handed it to Officer Gonzalez.  (Id.)  Officer Rodriguez did not look inside the bag at any time.  (Rodriguez: Tr. 159-61, 166.)  Officer Gonzalez received the bag and its contents ("clothing items and a crowbar") and placed the items in a sealed plastic bag.  (Gonzalez: Tr. 54-56, 68, 143-44.)  The items were stored with the property clerk logged under voucher numbers N845775 and N845776.  (Gonzalez: Tr. 54-55, 67-69.)

The red shirt and crowbar remained in Officer Campbell's custody until he gave them to Officer Gonzalez at the precinct.  (Gonzalez: Tr. 78-79, 84, 147-48; Campbell: Tr. 522-23.)  The green shirt never left Officer Barnes' possession until she returned to the precinct and handed it to Officer Gonzalez.  (Gonzalez: Tr. 79, 147-48; Barnes: Tr. 294-96.)  Officer Gonzalez received the

crowbar and red shirt from Officer Campbell and the green shirt from Officer Barnes at the precinct where he logged the items under voucher N846200.  (Gonzalez: Tr. 78-82, 147-48.)  Officer Gonzalez took the items to the Police Department Lab to be tested.  (Gonzalez: Tr. 86.)

Judy Chin, a latent fingerprint criminalist, received the evidence in a sealed "security envelope" that included voucher N846200.  (Chin: Tr. 267-68.)  Chin examined the envelope seals to ensure they were intact and confirmed that the attached voucher corresponded to the evidence. (Chin: Tr. 269.)  After completing latent fingerprint testing, Chin separately sealed the evidence and evidence swabs she collected and sent both packages to the Office of Chief Medical Examiner ("OCME").  (Chin: Tr. 271-72.)  Asako Ishii, an OCME criminalist, received the crowbar, red shirt and green shirt with voucher N846200.  (Ishii: Tr. 428-29, 443-44.)  Ishii ensured that the package was properly sealed, and that the property was properly stored.  (Ishii: Tr. 430, 444-45.)

Chin and Ishii testified as expert witnesses about the forensic testing conducted on the items.  (Chin: Tr. 261, 264; Ishii: Tr.  417, 422.)  No DNA profile or fingerprints were obtained from the red shirt or crowbar.  (Chin: Tr. 269-70; Ishii: Tr. 440-42.)  Jamison was found to be the main DNA contributor on the green shirt.  (Ishii: Tr. 439, 449-50.)  At trial, Hernandez, Mitchell and Kaane identified the crowbar and the red shirt.  (Hernandez: Tr. 215-17; Mitchell: Tr. 343-45; Kaane: Tr. 566-67.)  Hernandez and Kaane also identified the green shirt at trial.  (Hernandez: Tr. 216; Kaane: Tr. 567.)

### The Defense

The defense rested without calling any witnesses.  (Tr. 620.)

### Jamison's Motions

At the close of the prosecution's case, Jamison's counsel moved to dismiss all counts on the basis that the prosecution had not proved a prima facie case.  (Tr. 590.)  Justice Stadtmauer

dismissed count three of the indictment (second degree robbery) because there was no evidence that Hernandez sustained any physical injury. (Tr. 590.) Justice Stadtmauer denied the motion in all other respects. (Tr. 590-93.)

Jamison's counsel also moved to dismiss for failure to prove the charges beyond a reasonable doubt. (Tr. 606-10.) Justice Stadtmauer held that the prosecution had elicited sufficient evidence to warrant a finding of guilty beyond a reasonable doubt "with respect to each and every count in the indictment." (Tr. 610.) Justice Stadtmauer nonetheless noted that the case involved two consolidated indictments totaling seventeen counts, sixteen of which survived Jamison's motion to dismiss at the close of the prosecution's case. (Tr. 611-12; see Ex. 3: 10/18/07 Indictment; Ex. 4: 11/5/07 Indictment.) The jury would be unduly burdened should they be forced to wade through a "maze of seemingly redundant crimes," which, Justice Stadtmauer stated, was one reason the New York legislature enacted CPL § 300.40. (Tr. 612.) Justice Stadtmauer submitted only the following counts to the jury: (1) first degree robbery; (2) second degree robbery; (3) second degree assault; (4) attempted second degree assault; (5) second degree burglary; and (6) second degree criminal trespass. (Tr. 613-15.)

### Jamison's Summation

Jamison's counsel emphasized the lack of physical evidence connecting Jamison to the crime (e.g., no fingerprints or DNA on the red shirt or crowbar, no surveillance video), as well as the unduly suggestive identification procedures involving Hernandez and Mitchell. (Tr. 627-29, 637, 646-47, 652.) Jamison's counsel argued that "at the time he was allegedly identified, the police officers had Mr. Jamison in custody already, surrounded by police officers." (Tr. 627.) Jamison's counsel further argued that Jamison "had officers surrounding him and that he had handcuffs on" at the hospital and urged the jury to discount the identification because "the police suggested to Mr.

Mitchell who to identify." (Tr. 647.) Jamison's counsel also asked the jury to acquit on the robbery charges due to Hernandez' lack of credibility, as well as on the assault charges due to lack of physical injury to Mitchell. (Tr. 629-31, 638-40, 660-61.)

### The Prosecution's Summation

The prosecution highlighted Hernandez and Mitchell's positive identification of Jamison shortly after the crime, and the severity of Mitchell's injuries. (Tr. 667-71, 682.) The prosecution noted the importance of Kaane's familiarity with the green shirt Jamison changed into after the robbery. (Tr. 676-78.) The forensic evidence, the prosecution argued, was not meant to be proof of Jamison's guilt; rather, it was offered to eliminate speculation and the absence of such evidence had no bearing. (Tr. 678-79.) Finally, the prosecution argued that the temporal and physical proximity of the three crimes indicated that they were interrelated and thus proved Jamison's guilt. (Tr. 682-85.)

## Verdict & Sentence

On August 25, 2008, the jury found Jamison guilty of first degree robbery, second degree attempted assault, and second degree criminal trespass. (Tr. 756-59.)

Jamison filed three pro se motions under CPL § 330.30 to set aside the jury's verdict. (Ex. 12: CPL § 330.30 Orders.) Justice Stadtmauer denied the first motion on February 23, 2009, and the second and third on April 30, 2009. (Id.)

On April 30, 2009, Justice Stadtmauer sentenced Jamison as a predicate felon to fifteen years' imprisonment for first degree robbery and a consecutive term of two to four years for second degree attempted assault, as well as a year for criminal trespass. (Dkt. No. 33: Sentencing Transcript at 5, 23.)

**Post-Sentence Motions and Appeal**

On May 19, 2009, Jamison filed a notice of appeal and was assigned counsel from the Center for Appellate Litigation.  (Chamoy Aff. ¶ 25.)

On January 20, 2010, Jamison filed a pro se motion to vacate his conviction pursuant to CPL § 440.10 based on a host of issues involving the prosecution's alleged suppression of exculpatory evidence and ineffective assistance of counsel.  (Ex. 13: 1/20/10 CPL § 440.10 Motion.) Justice Stadtmauer denied the motion on December 22, 2010.  (Ex. 18: 12/22/10 Order.)  By order dated May 5, 2011, the First Department granted Jamison leave to appeal from the denial of the § 440 motion, and consolidated it with his direct appeal.  (Chamoy Aff. ¶ 33.)

Jamison's counseled direct appeal raised three issues: (1) whether the prosecution's failure to turn over video evidence showing Jamison at a different location at the time of the robbery violated due process; (2) whether the prosecution's failure to serve adequate notice of Mitchell's show-up identification at Lincoln Hospital should have resulted in preclusion of Mitchell's identification testimony; and (3) whether Jamison's trial counsel was ineffective when he failed to reopen the suppression hearing based on the trial testimony of Hernandez and Mitchell.  (Ex. 19: Jamison 1st Dep't Br.)  Jamison also filed a supplemental pro se appellate brief on November 9, 2011 raising four other issues.  (Ex. 20: Jamison Supp. Pro Se 1st Dep't Br.)

The First Department affirmed Jamison's conviction on June 19, 2012, holding:

> By failing to make any effort to obtain an allegedly exculpatory videotape after the People informed him of it and offered to make it available to him, defendant abandoned the claim that the People failed to disclose it.  The People disclosed the existence of this tape at defendant's arraignment, but defendant made no mention of the tape before or during trial, except for a general reference to videotapes made in a discovery motion.  Defendant never alerted the court to any claim that this videotape had not been produced. In any event, the record refutes defendant's assertion that the tape may have been exculpatory.

> Any deficiency in the People's CPL 710.30(1)(b) notice became irrelevant when defendant moved to suppress the identification testimony and received a full hearing on the fairness of the identification procedure.
>
> Defendant's argument that his lawyer was ineffective in failing to move to reopen the suppression hearing based on the trial testimony of two identifying witnesses is unavailing because this evidence would not have resulted in a different suppression ruling. Based on the accounts of the identifications given at trial, both identifications would have still constituted constitutionally permissible showups.
>
> We have considered defendant's pro se arguments, including his additional claims of ineffective assistance, and find them to be without merit.

People v. Jamison, 96 A.D.3d 571, 571-72, 946 N.Y.S.2d 569, 569-70 (1st Dep't 2012) (citations omitted).

Jamison's appellate counsel sought leave to appeal to the New York Court of Appeals and enclosed copies of the consolidated direct brief filed with the First Department, as well as Jamison's pro se supplemental and reply briefs. (Ex. 23: 7/19/12 Letter.) Counsel specifically asked the Court of Appeals to "consider and review all issues outlined in [Jamison's] consolidated direct brief and pro se supplemental brief." (Id. at 1.) Jamison submitted an additional pro se letter seeking leave to appeal on August 2, 2012. (Ex. 23: 8/2/12 Letter.) On September 26, 2012, the Court of Appeals denied leave to appeal. People v. Jamison, 19 N.Y.3d 1026, 953 N.Y.S.2d 559 (2012).

In the interim, on January 11, 2012, Jamison moved pro se a second time to vacate his conviction pursuant to CPL § 440.10. (Ex. 24: 1/11/12 CPL § 440.10 Motion.) Jamison again argued that the prosecution had withheld exculpatory information, including handwritten notes from one of the prosecutors that allegedly cast doubt on the timing of the witness identifications, property clerk vouchers, and Hernandez' history of psychiatric treatment. (Id.) Justice Livote denied the § 440 motion on September 28, 2012, finding no evidence that a Brady violation had occurred with

respect to any of the materials.  (Ex. 27: 9/28/12 Order.)  Justice Livote denied Jamison's motion to

reargue on February 4, 2013.  (Ex. 31: 2/4/13 Order.)  On February 28, 2013, Jamison sought leave

to appeal from the September 28, 2012 and February 4, 2013 orders denying his motion to vacate

and motion to reargue.  (Ex. 32: 2/28/13 Letter.)  On July 16, 2013, the First Department denied

leave to appeal.  (Chamoy Aff. ¶ 46.)

On September 6, 2012, Jamison moved pro se to set aside his sentence pursuant to

CPL § 440.20(1) on the grounds that he was unlawfully adjudicated a second violent felony offender

and that his sentence was otherwise unlawful.  (Chamoy Aff. ¶ 47.)  Justice Livote denied the

motion on May 17, 2013, and the First Department denied leave to appeal on January 14, 2014.

(Chamoy Aff. ¶¶ 48-50.)

On February 18, 2014, Jamison moved pro se a third time to vacate his conviction

pursuant to CPL § 440.10, alleging various instances of prosecutorial misconduct including the

introduction of false evidence and the failure to disclose exculpatory evidence.  (Ex. 33: 2/18/14

CPL § 440.10 Motion.)  Justice Dawson denied the motion on September 16, 2014.  (Ex. 43: 9/16/14

Order.)  The First Department denied leave to appeal on February 24, 2015.  (Chamoy Aff. ¶¶ 56-

57.)

On December 1, 2014, Jamison moved pro se a fourth time under CPL § 440.10

claiming, among other things, actual innocence and ineffective assistance of trial counsel.  (Ex. 45:

12/1/14 CPL § 440.10 Motion.)  Justice Dawson denied the motion on June 19, 2015.  (Ex. 49:

6/19/15 Order.)  The First Department denied leave to appeal on November 17, 2015.  (Chamoy Aff.

¶¶ 61-62.)

Jamison filed his present federal habeas corpus petition on August 10, 2015.  (Dkt.

No. 2.)

## ANALYSIS

### I.     THE AEDPA REVIEW STANDARD

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[2]

---

[2]     See also, e.g., Cullen v. Pinholster, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398 (2011); Knowles v. Mirzayance, 556 U.S. 111, 121, 129 S. Ct. 1411, 1418 (2009); Evans v. Fischer, 712 F.3d 125, 132 (2d Cir.), cert. denied, 134 S. Ct. 238 (2013); Portalatin v. Graham, 624 F.3d 69, 78-79 (2d Cir. 2010) (en banc), cert. denied, 562 U.S. 1303, 131 S. Ct. 1691 (2011); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'" (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, (continued...)

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[3/]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523.[4/]  The relevant Supreme Court jurisprudence

---

[2/]     (...continued)
122 S. Ct. 1611 (2002))).

[3/]     Accord, e.g., Evans v. Fischer, 712 F.3d at 132-33; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[4/]     Accord, e.g., Woods v. Donald, 135 S. Ct. 1372, 1376 (2015); Marshall v. Rodgers, 133 S. Ct. 1446, 1447 (2013) (per curiam); Lafler v. Cooper, 132 S. Ct. 1376, 1390 (2012) ("A decision is contrary to clearly established law if the state court 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'"); Howes v. Fields, 132 S. Ct. 1181, 1187 (2012) ("In this context, 'clearly established law' signifies 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'"); Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from this Court regarding [this issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 661, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); Assadourian v. Brown, 493 F. App'x 223, 225 (2d Cir. 2012) ("[H]abeas relief is only warranted where a state court unreasonably applies clearly established Supreme Court law . . . ."); Portalatin v. Graham, 624 F.3d at 79 ("To qualify as 'clearly established' for the purposes of federal habeas review, a rule of law must be embodied in the 'holdings, as opposed to the dicta,' of Supreme Court precedent."); Georgison v. Donelli, 588 F.3d 145, 153-54 (2d Cir. 2009); Dunlap v. Burge, 583 F.3d 160, 164 (2d Cir.), cert. denied, 558 U.S. 1037, 130 S. Ct. 642 (2009); Hargett v. Giambruno, 291 F. App'x 402, 403 (2d Cir. 2008); Howard v. Walker, 406 F.3d at 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003), cert. denied, 541 U.S. 1047, 124 S. Ct. 2171 (2004); Yung v. Walker, 341 F.3d 104, 109-10 (2d Cir. 2003); Parsad v. Greiner, 337 F.3d at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S.
(continued...)

is that in effect at the time of the state court's adjudication on the merits (in New York, usually the decision of the Appellate Division), not at the time of a subsequent decision (e.g., the New York Court of Appeals) denying leave to appeal.  Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011); accord, e.g., Jackson v. Conway, 763 F.3d 115, 134 (2d Cir. 2014), cert. denied, 135 S. Ct. 1560 (2015).

"That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d at 42.[5/] "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' It therefore cannot form the basis for habeas relief under AEDPA." (citation omitted)); DelValle v. Armstrong, 306 F.3d at 1200.[6/]

---

[4/]   (...continued)
909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

[5/]   Accord, e.g., Marshall v. Rodgers, 133 S. Ct. at 1449 ("[T]he lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from this Court's cases can supply such law."); Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied, 555 U.S. 1176, 129 S. Ct. 1312 (2009).

[6/]   See also, e.g., Glebe v. Frost, 135 S. Ct. 429, 431 (2014) ("As we have repeatedly emphasized, however, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"); White v. Woodall, 134 S. Ct. 1697, 1702 & n.2 (2014) ("[C]learly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the] Supreme Court's decisions . . . . [A] lower court may not consult its own precedents rather than those of [the] Supreme Court, in assessing a habeas claim governed by § 2254." (quotations omitted)); Marshall v. Rodgers, 133 S. Ct. at 1450-51 ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the
(continued...)

As to the "contrary to" clause:

> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . .  A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[7/]

In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the

---

[6/]   (...continued)
particular point in issue is clearly established by Supreme Court precedent, it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct." (citations omitted)).

[7/]   Accord, e.g., Lafler v. Cooper, 132 S. Ct. at 1390; Cullen v. Pinholster, 563 U.S. at 181, 131 S. Ct. at 1398; Knowles v. Mirzayance, 556 U.S. at 122, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court." (quotation omitted)); Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 538 U.S. at 73-74, 123 S. Ct. at 1173-74; Evans v. Fischer, 712 F.3d at 132; Portalatin v. Graham, 624 F.3d at 79; Bierenbaum v. Graham, 607 F.3d 36, 47-48 (2d Cir. 2010), cert. denied, 562 U.S. 1303, 131 S. Ct. 1693 (2011); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009), cert. denied, 562 U.S. 955, 131 S. Ct. 320 (2010); Dunlap v. Burge, 583 F.3d at 164; Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; DelValle v. Armstrong, 306 F.3d at 1200; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[8/]  However,

"[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct.

at 1522.  The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different

from an <u>incorrect</u> application of federal law." <u>Id.</u>[9/]  Rather, the issue is "whether the state court's

application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>,

529 U.S. at 409, 120 S. Ct. at 1521.[10/]  "Objectively unreasonable" is different from "clear error."

---

[8/]　　Accord, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 563 U.S. at 182, 131 S. Ct. at 1399; <u>Waddington</u> v. <u>Sarausad</u>, 555 U.S. 179, 190, 129 S. Ct. 823, 831 (2009); <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Jackson</u> v. <u>Conway</u>, 763 F.3d at 134-35; <u>Evans</u> v. <u>Fischer</u>, 712 F.3d at 133; <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d at 48; <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 87 (2d Cir.), <u>cert. denied</u>, 558 U.S. 1063, 130 S. Ct. 739 (2009); <u>Jones</u> v. <u>West</u>, 555 F.3d 90, 96 (2d Cir. 2009); <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1257, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[9/]　　See also, <u>e.g.</u>, <u>Woods</u> v. <u>Donald</u>, 135 S. Ct. at 1376; <u>Cullen</u> v. <u>Pinholster</u>, 563 U.S. at 202, 131 S. Ct. at 1411; <u>Renico</u> v. <u>Lett</u>, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010); <u>Waddington</u> v. <u>Sarausad</u>, 555 U.S. at 190, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002))); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Watson</u> v. <u>Greene</u>, 640 F.3d 501, 508 (2d Cir.), <u>cert. denied</u>, 132 S. Ct. 335 (2011); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of the federal law was not unreasonable."); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d at 87-88; <u>Jones</u> v. <u>West</u>, 555 F.3d at 96; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

[10/]　　Accord, <u>e.g.</u>, <u>McDaniel</u> v. <u>Brown</u>, 558 U.S. 120, 132-33, 130 S. Ct. 665, 673 (2010);
(continued...)

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  This is a

"'substantially higher threshold'" than incorrectness.  Renico v. Lett, 559 U.S. at 773, 130 S. Ct. at

1862; accord, e.g., Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015) ("Because the highly deferential

AEDPA standard applies, we may not overturn the [state court's] decision unless that court applied

[clearly established federal law] 'in an "objectively unreasonable" manner.'"); White v. Woodall, 134

S. Ct. at 1702 ("And an unreasonable application of [Supreme Court] holdings must be objectively

unreasonable, not merely wrong; even clear error will not suffice." (quotations omitted)); Knowles

v. Mirzayance, 556 U.S. at 123, 129 S. Ct. at 1420.  Federal habeas relief is precluded "so long as

'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v.

Richter, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011); accord, e.g., White v. Wheeler, 136 S. Ct.

456, 460 (2015); Davis v. Ayala, 135 S. Ct. at 2199; Woods v. Donald, 135 S. Ct. at 1376; White

v. Woodall, 134 S. Ct. at 1702 (A "'state prisoner must show that the state court's ruling on the claim

being presented in federal court was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded

disagreement.'"); Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013); Metrish v. Lancaster, 133 S. Ct.

---

[10]/     (...continued)
     Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S.
     at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853; Lockyer
     v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti, 537 U.S. at 25-27,
     123 S. Ct. at 360-61; Assadourian v. Brown, 493 F. App'x at 224; Watson v. Greene, 640
     F.3d at 508; Portalatin v. Graham, 624 F.3d at 79; Dunlap v. Burge, 583 F.3d at 165; Davis
     v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert.
     denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v.
     Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122;
     Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303
     F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d
     at 128-29.

1781, 1786-87 (2013).  "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings.'"  <u>Cullen</u> v. <u>Pinholster</u>, 563 U.S. at 181, 131 S. Ct. at 1398 (citations omitted).[11]

"[T]he range of reasonable judgment can depend in part on the nature of the relevant rule."  <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2149.[12]  "Even if the state court issued

---

[11]     Accord, <u>e.g.</u>, White v. Wheeler, 136 S. Ct. at 460 (AEDPA "'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'"); Davis v. Ayala, 135 S. Ct. at 2198;  <u>Woods</u> v. <u>Donald</u>, 135 S. Ct. at 1376; <u>White</u> v. <u>Woodall</u>, 134 S. Ct. at 1702 (AEDPA standard is "difficult to meet" (quotations omitted)); <u>Burt</u> v. <u>Titlow</u>, 134 S. Ct. 10, 16 (2013) ("AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."); <u>Metrish</u>, v. <u>Lancaster</u>, 133 S. Ct. at 1787; <u>Greene</u> v. <u>Fisher</u>, 132 S. Ct. at 43; <u>Contreras</u> v. <u>Artus</u>, 778 F.3d 97, 106 (2d Cir. 2014); <u>Jackson</u> v. <u>Conway</u>, 763 F.3d at 135; <u>Jean</u> v. <u>Greene</u>, 523 F. App'x 744, 749 (2d Cir. 2013), <u>cert. denied</u>, 136 S. Ct. 173 (2015); <u>Santone</u> v. <u>Fischer</u>, 689 F.3d 138, 147 (2d Cir.), <u>cert. denied</u>, 133 S. Ct. 390 (2012).

[12]     The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2149; <u>accord</u>, <u>e.g.</u>, <u>White</u> v. <u>Woodall</u>, 134 S. Ct. at 1705-06 (rejecting circuit cases that created an "unreasonable-refusal-to-extend rule"); <u>Nevada</u> v. <u>Jackson</u>, 133 S. Ct. at 1994; <u>Parker</u> v. <u>Matthews</u>, 132 S. Ct. at 2155 ("Particularly because the <u>Darden</u> standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations,' the Sixth Circuit had no warrant to set aside the Kentucky Supreme Court's conclusion." (citation omitted)); <u>Harrington</u> v. <u>Richter</u>, 562 U.S. at 101, 131 S. Ct. at 786; <u>Renico</u> v. <u>Lett</u>, 559 U.S. at 776, 130 S. Ct. at 1864; <u>Knowles</u> v. <u>Mirzayance</u>, 556 U.S. at 123, 129 S. Ct. at 1420 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); <u>Chrysler</u> v. <u>Guiney</u>, 806 F.3d 104, 118 (2d Cir. 2015); <u>Contreras</u> v. <u>Artus</u>, 778 F.3d at 110; <u>Jackson</u> v. <u>Conway</u>, 763 F.3d at 135; <u>Watson</u> v. <u>Greene</u>, 640 F.3d at 508-09; <u>Portalatin</u> v. <u>Graham</u>, 624 F.3d at 79; <u>Ortiz</u> v. <u>N.Y.S. Parole in Bronx, N.Y.</u>, 586 F.3d at 157; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at
(continued...)

a decision 'contrary to' clearly established Supreme Court law, a petitioner 'cannot obtain relief . . . unless application of a <u>correct</u> interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" <u>Cousin</u> v. <u>Bennett</u>, 511 F.3d 334, 339 (2d Cir.), <u>cert. denied</u>, 553 U.S. 1096, 128 S. Ct. 2910 (2008) (citation omitted).

 Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>accord</u>, <u>e.g.</u>, <u>Hardy</u> v. <u>Cross</u>, 132 S. Ct. 490, 491 (2011); <u>Cullen</u> v. <u>Pinholster</u>, 563 U.S. at 181, 131 S. Ct. at 1398; <u>Felkner</u> v. <u>Jackson</u>, 562 U.S. 594, 598, 131 S. Ct. 1305, 1307 (2011) (per curiam) ("On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" (citation omitted)).[13] "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to th[e] record in an objectively unreasonable manner." <u>Acosta</u> v. <u>Artuz</u>, 575 F.3d 177, 184 (2d Cir. 2009) (citations omitted); <u>accord</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 563 U.S. at 181, 131 S. Ct. at 1398 ("The petitioner carries the burden of proof."); <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d at 154.  As the Supreme Court explained:

> If this standard is difficult to meet, that is because it was meant to be. . . . [§ 2254(d)] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.  It goes no further. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

---

[12] (...continued)
166; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243.

[13] See also, <u>e.g.</u>, <u>Woods</u> v. <u>Donald</u>, 135 S. Ct. at 1376; <u>Renico</u> v. <u>Lett</u>, 559 U.S. at 773, 130 S. Ct. at 1862; <u>Bell</u> v. <u>Cone</u>, 543 U.S. at 455, 125 S. Ct. at 853; <u>Evans</u> v. <u>Fischer</u>, 712 F.3d at 132 ("We focus on the state appellate court's decision and, for issues adjudicated on the merits in state court, we apply a 'highly deferential standard for evaluating state-court rulings.'"); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d at 519.

> ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 562 U.S. at 102, 131 S. Ct. at 786-87; accord, White v. Wheeler, 136 S. Ct. at 460; Burt v. Titlow, 134 S. Ct. at 16.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies.

> [D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.  And as this Court has observed, a state court need not cite or even be aware of [Supreme Court] cases under § 2254(d).  Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.

Harrington v. Richter, 562 U.S. at 98, 131 S. Ct. at 784 (citations to Sellan v. Kuhlman, 261 F.3d at 312, & other cases omitted); accord, e.g., Johnson v. Williams, 133 S. Ct. 1088, 1094 (2013); Cullen v. Pinholster, 563 U.S. at 187-88, 131 S. Ct. at 1402; Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (state court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them"); Chrysler v. Guiney, 806 F.3d at 118; Grayton v. Ercole, 691 F.3d 165, 174 (2d Cir. 2012) ("Where, as here, 'a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'"), cert. denied, 134 S. Ct. 79 (2013); Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate

26

decision was an unreasonable application of clearly established Supreme Court precedent.'").[14/] "'[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.'" Cullen v. Pinholster, 563 U.S. at 188, 131 S. Ct. at 1402.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. at 99, 131 S. Ct. at 784-85.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. at 181, 131 S. Ct. at 1398; accord, e.g., Ryan v. Gonzales, 133 S. Ct. 696, 708 (2013); Greene v. Fisher, 132 S. Ct. at 44; Jackson v. Conway, 763 F.3d at 135.

Finally, in appropriate circumstances, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." Howard v. Walker, 406 F.3d at 122.

---

[14/]    See also, e.g., Grayson v. Ercole, 691 F.3d at 169-70 & n.3; Wade v. Herbert, 391 F.3d 135, 140, 142 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'" "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254." Moreover, "[i]f any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition-the word 'denied'-triggered AEDPA deference.").

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1); accord, e.g., Burt v. Titlow, 134 S. Ct. at 15; Lewis v. Conn. Comm'r of Corrs., 790 F.3d 109, 120 (2d Cir. 2015); Williams v. Ercole, 486 F. App'x 208, 211 (2d Cir.), cert. denied, 133 S. Ct. 635 (2012); Bierenbaum v. Graham, 607 F.3d at 48; Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220. "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Burt v. Titlow, 134 S. Ct. at 15; Lewis v. Conn. Comm'r of Corrs., 790 F.3d at 120; Williams v. Ercole, 486 F. App'x at 211; Bierenbaum v. Graham, 607 F.3d at 48 ("A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence."); Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008); Lynn v. Bliden, 443 F.3d at 246-47.

## II.   NO HEARING IS REQUIRED ON JAMISON'S PETITION

Jamison argues in his reply brief that an evidentiary hearing is required on his habeas petition.  (Dkt. No. 35: Jamison Reply Br. at 55.)  "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." Cullen v. Pinholster, 563 U.S. 170, 186, 131 S. Ct. 1388, 1401 (2011).  Specifically, the Supreme Court has instructed that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. at 181, 131 S. Ct. at 1398.  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro v. Landrigan, 550 U.S. 465, 474, 127 S. Ct. 1933, 1940 (2007); accord, e.g., Cullen v. Pinholster, 563 U.S. at 181, 131 S. Ct. at 1399.

Jamison does not explain why an evidentiary hearing is required in this case.  He states: "in the event this Court deems it to be necessary to further develop the record of this case, petitioner requests that he be afforded an evidentiary hearing on his federal habeas corpus petition." (Jamison Reply Br. at 57.)  No further factual development is necessary here; Jamison's claims can be resolved through the record developed in the state proceedings.  There is no need for, or basis for, an evidentiary hearing.

## III.   JAMISON'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS ARE MERITLESS

### A.   The Strickland v. Washington Standard On Ineffective Assistance Of Counsel

In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective: "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687, 104 S. Ct. at 2064.[15/]  This performance is to be judged by an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. at 688, 104 S. Ct. at 2064.[16/]  The "'purpose of the effective assistance guarantee of the Sixth Amendment is . . . simply

---

[15/]   Accord, e.g., Harrington v. Richter, 562 U.S. 86, 104, 131 S. Ct. 770, 787 (2011); Premo v. Moore, 562 U.S. 115, 121-22, 131 S. Ct. 733, 739 (2011); Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); Rivas v. Fischer, 780 F.3d 529, 546 & n.27 (2d Cir. 2015); Jackson v. Conway, 763 F.3d 115, 152-53 (2d Cir. 2014), cert. denied, 135 S. Ct. 1560 (2015); Bell v. Miller, 500 F.3d 149, 156-57 (2d Cir. 2007); Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[16/]   Accord, e.g., Harrington v. Richter, 562 U.S. at 104, 131 S. Ct. at 787; Wiggins v. Smith, 539 U.S. at 521, 123 S. Ct. at 2535; Bell v. Cone, 535 U.S. 685, 695, 122 S. Ct. 1843, 1850 (2002); Lopez v. Ercole, 588 F. App'x 39, 40 (2d Cir. 2014); Jackson v. Conway, 763 F.3d at 152; Henry v. Poole, 409 F.3d at 63.

to ensure that criminal defendants receive a fair trial.'  Thus, '[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct <u>so undermined</u> the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'"  <u>Cullen</u> v. <u>Pinholster</u>, 563 U.S. 170, 189, 131 S. Ct. 1388, 1403 (2011) (quoting <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 686, 689, 104 S. Ct. at 2063, 2065) (citation omitted).

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . .  [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

<u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[17]  Ineffective assistance claims "are quite often the law's equivalent of 'buyer's remorse' or 'Monday morning quarterbacking' . . . .  Decisions by criminal defense counsel are often choices among bad alternatives . . . ."  <u>Mui</u> v. <u>United States</u>, 614 F.3d 50, 57 (2d Cir. 2010); <u>accord</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 563 U.S. at 189, 131 S. Ct. at 1403; <u>Harrington</u> v. <u>Richter</u>, 562 U.S. at 105, 131 S. Ct. at 788 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'").  Petitioner's "burden is to show that counsel made errors so serious that counsel was

---

[17]    <u>Accord</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 563 U.S. at 189, 131 S. Ct. at 1403; <u>Harrington</u> v. <u>Richter</u>, 562 U.S. at 104-05, 131 S. Ct. at 787-88; <u>Bell</u> v. <u>Cone</u>, 535 U.S. at 698, 122 S. Ct. at 1852; <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d 36, 50-51 (2d Cir. 2010), <u>cert. denied</u>, 562 U.S. 1303, 131 S. Ct. 1693 (2011); <u>Rivas</u> v. <u>Fischer</u>, 780 F.3d at 547; <u>Lopez</u> v. <u>Ercole</u>, 588 F. App'x at 40-41; <u>Jackson</u> v. <u>Conway</u>, 763 F.3d at 153; <u>Bell</u> v. <u>Miller</u>, 500 F.3d at 156-57; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63; <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 315 (2d Cir. 2001).

not functioning as the counsel guaranteed to the defendant by the Sixth Amendment." Harrington

v. Richter, 562 U.S. at 104, 131 S. Ct. at 787 (quotations omitted).

Second, the defendant must show prejudice from counsel's performance. Strickland

v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064; accord, e.g., Cullen v. Pinholster, 563 U.S. at

189, 131 S. Ct. at 1403; Lopez v. Ercole, 588 F. App'x at 40; Jackson v. Conway, 763 F.3d at 153.

The "question is whether there is a reasonable probability that, absent the errors, the fact finder

would have had a reasonable doubt respecting guilt." Strickland v. Washington, 466 U.S. at 695,

104 S. Ct. at 2068-69. Put another way, the "defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." Id. at 694, 104 S. Ct. at 2068.[18/]

---

[18/]    See also, e.g., Cullen v. Pinholster, 563 U.S. at 189, 131 S. Ct. at 1403; Harrington v.
Richter, 562 U.S. at 104, 131 S. Ct. at 787; Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at
2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Lopez v. Ercole, 588 F. App'x at 40;
Jackson v. Conway, 763 F.3d at 153; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir.
2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Henry v. Poole, 409 F.3d at 63-64;
Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77
F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83 (1996).

"A reasonable probability is a probability sufficient to undermine confidence in the
outcome." Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g.,
Cullen v. Pinholster, 563 U.S. at 189, 131 S. Ct. at 1403; Harrington v. Richter, 562 U.S. at
104, 131 S. Ct. at 787; Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bierenbaum
v. Graham, 607 F.3d at 51. The phrase "reasonable probability," despite its language, should
not be confused with "'more likely than not.'" Strickler v. Greene, 527 U.S. 263, 289-91, 119
S. Ct. 1936, 1952-53 (1999); accord, e.g., Harrington v. Richter, 562 U.S. at 104, 131 S. Ct.
at 792; Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); Nix v.
Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("[A] defendant need not establish
that the attorney's deficient performance more likely than not altered the outcome in order
to establish prejudice under Strickland."); Strickland v. Washington, 466 U.S. at 694, 104
S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the
proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance
of the evidence to have determined the outcome."). Rather, the phrase "reasonable
probability" seems to describe a fairly low standard of probability, albeit somewhat more
(continued...)

The Supreme Court has counseled that these principles "do not establish mechanical rules." Strickland v. Washington, 466 U.S. at 696, 104 S. Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. Id.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland v. Washington, 466 U.S. at 695-96, 104 S. Ct. at 2069); accord, e.g., Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington v. Richter, 562 U.S. at 105, 131 S. Ct. at 788; see also, e.g., Cullen v. Pinholster, 563 U.S. at 189, 131 S. Ct. at 1403 ("The [Supreme] Court acknowledged that '[t]here are countless ways to provide effective assistance in any given case,' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'").

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. at 697, 104 S. Ct. at 2069.[19]

---

[18] (...continued)
likely than a "reasonable possibility." Strickler v. Greene, 527 U.S. at 291, 119 S. Ct. at 1953; cf. id. at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

[19] Accord, e.g., Smith v. Robbins, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000); Santone v. Fischer, 689 F.3d 138, 154 (2d Cir.) (ineffective assistance "'claim[s] must be rejected if the defendant fails to meet either the performance prong or the prejudice prong'"), cert. denied, 133 S. Ct. 390 (2012).

In addition, the Supreme Court has counseled that:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.[20]

"The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d at 199; accord, e.g., Cullen v. Pinholster, 563 U.S. at 190, 131 S. Ct. at 1403 ("We take a 'highly deferential' look at counsel's performance."); Rivas v. Fischer, 780 F.3d at 547; Bierenbaum v. Graham, 607 F.3d at 50-51; Bell v. Miller, 500 F.3d at 156-57. "'Surmounting Strickland's high bar is never an easy task.'" Harrington v. Richter, 562 U.S. at 105, 131 S. Ct. at 788 ("[T]he Strickland

---

[20]   See also, e.g., Harrington v. Richter, 562 U.S. at 107-08, 131 S. Ct. at 789-90 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Moreover, an "attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."); Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal." (citations omitted)); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820, 115 S. Ct. 81 (1994).

standard must be applied with scrupulous care" and "the standard for judging counsel's representation is a most deferential one.").

**B.**     **Strickland And The AEDPA Review Standard**

For purposes of this Court's AEDPA analysis, "the Strickland standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Aparicio v. Artuz, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).[21]  "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'"  Aparicio v. Artuz, 269 F.3d at 95 n.8.

Under AEDPA and Strickland, review is doubly deferential:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 562 U.S. 86, 105, 131 S. Ct. 770, 788 (2011) (citations omitted); accord, e.g., Cullen v. Pinholster, 563 U.S. at 190, 131 S. Ct. at 1403 ("Our review . . . is thus 'doubly deferential.'"); Premo v. Moore, 131 S. Ct. at 740-41; Bell v. Cone, 535 U.S. at 698-99, 122 S. Ct. at 1852 ("For [petitioner] to succeed, however, he must do more than show that he would have

---

[21]     See also, e.g., Cullen v. Pinholster, 563 U.S. 170, 189, 131 S. Ct. 1388, 1403 (2011); Premo v. Moore, 562 U.S. 115, 128, 131 S. Ct. 733, 743 (2011); Wiggins v. Smith, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535 (2003); Bell v. Cone, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852 (2002); Chrysler v. Guiney, 806 F.3d 104, 117-18 (2d Cir. 2015); Rivas v. Fischer, 780 F.3d 529, 546 & n.27 (2d Cir. 2015); Jackson v. Conway, 763 F.3d 115, 152 (2d Cir. 2014), cert. denied, 135 S. Ct. 1560 (2015); Cornell v. Kirkpatrick, 665 F.3d 369, 374-75 (2d Cir. 2011); Mosby v. Senkowski, 470 F.3d 515, 518-19 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

34

satisfied Strickland's test if his claim were being analyzed in the first instance, because under

§ 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment,

the state-court decision applied Strickland incorrectly.  Rather, he must show that the [state appellate

court] applied Strickland to the facts of his case in an objectively unreasonable manner." (citation

omitted)); Rivas v. Fischer, 780 F.3d at 547 (double deferential standard); Lopez v. Ercole, 588 F.

App'x 39, 40-41 (2d Cir. 2014) (same); Jackson v. Conway, 763 F.3d at 153 (same).[22/]  "[A]s a result

of the interaction between AEDPA and Strickland, the question before [the federal court] . . .

becomes 'whether there is any reasonable argument that [petitioner's] counsel satisfied Strickland's

deferential standard,' in which case" the petition should be denied.  Chrysler v. Guiney, 806 F.3d at

118 (quoting Harrington v. Richter, 562 U.S. at 105, 131 S. Ct. at 788).

    **C.**    **Application of the Strickland and AEDPA Standards to Jamison's Claims**

        **1.**    **Counsel's Failure to Seek to Reopen the Suppression Hearing**

Jamison argues that his trial counsel was required to reopen the suppression hearing

once it was discovered that the identification procedures used with Hernandez and Mitchell were

unduly suggestive and unreliable.  (Dkt. No. 2: Pet. ¶ 13.)  Jamison contends Officer Guzman's and

Sgt. Poejo's testimony at the suppression hearing differed from that of Hernandez and Mitchell at

trial.  (Id.; see also Dkt. No. 35: Jamison Reply Br. at 34-37, 40.)  The First Department denied this

claim on the merits, holding that the evidence adduced at trial would not have resulted in a different

suppression ruling, since the trial testimony established that "both identifications would have still

---

[22/]    See also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); Chrysler v. Guiney, 806 F.3d at 118; Santone v. Fischer, 689 F.3d 138, 154 (2d Cir.) ("'[T]he pivotal question' for the federal habeas court 'is whether the state court's application of the Strickland standard was unreasonable.'"), cert. denied, 133 S. Ct. 390 (2012); Mosby v. Senkowski, 470 F.3d at 519.

constituted constitutionally permissible showups." People v. Jamison, 96 A.D.3d 571, 572, 946 N.Y.S.2d 569, 570 (1st Dep't 2012); see page 15 above.

 Officer Guzman and Hernandez testified that Jamison was arrested after Hernandez noticed him walking away from 1056 Sherman Avenue and stated, "that's him." (See pages 4, 9 above). On cross examination at trial, however, Hernandez testified that it was only after he saw police detain Jamison that he made the identification. (Hernandez: Tr. 252.) On redirect, Hernandez clarified that it was after he identified Jamison that the arrest happened. (Hernandez: Tr. 256.) Sgt. Poejo testified that at Lincoln Hospital he escorted Mitchell to the emergency room and asked him to look around to see if he could identify the assailant. (See page 5 above.) Mitchell testified to a more suggestive encounter where the police stated that they had a particular suspect in mind and brought him near Jamison's bedside. (See pages 9-10 above.)

 A defendant's right to due process includes the right not to be the object of pretrial identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); accord, e.g., Perry v. New Hampshire, 132 S. Ct. 716, 720 (2012); Manson v. Brathwaite, 432 U.S. 98, 106 n.9, 114, 97 S. Ct. 2243, 2249 n.9, 2253 (1977); Neil v. Biggers, 409 U.S. 188, 198-200, 93 S. Ct. 375, 381-82 (1972).[23/]

---

[23/]  See also, e.g., United States v. Ward, 505 F. App'x 18, 23 (2d Cir. 2012), cert. denied, 133 S. Ct. 1512 (2013); McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 F. App'x. 69, 74 (2d Cir. 2011), cert. denied, 132 S. Ct. 1151 (2012); Dunlap v. Burge, 583 F.3d 160, 165 (2d Cir.), cert. denied, 558 U.S. 1037, 130 S. Ct. 642 (2009); Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir.), cert. denied, 558 U.S. 1063, 130 S. Ct. 739 (2009); Kennaugh v. Miller, 289 F.3d 36, 43-44 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251 (2002); United States v. Facey, No. 98-1196, 201 F.3d 433 (table), 1999 WL 1070012 at *2 (2d Cir. Nov. 10, 1999); United States v. Smith, No. 97-1273, 152 F.3d 921 (table), 1998 WL 398813 at *1 (2d Cir. June 5, 1998); Yearwood v. Keane, No. 95-2404, 101 F.3d 685 (table), 1996
(continued...)

In determining whether a pre-trial identification procedure is unduly suggestive, the reviewing court must consider the totality of the circumstances.  See, e.g., Perry v. New Hampshire, 132 S. Ct. at 725; Manson v. Brathwaite, 432 U.S. at 113-14, 97 S. Ct. at 2252-53; Neil v. Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382; Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967).[24/]

23/    (...continued)
WL 282134 at *1 (2d Cir. May 29, 1996); United States v. Thai, 29 F.3d 785, 807 (2d Cir.), cert. denied, 513 U.S. 977, 115 S. Ct. 456 (1994); United States v. Rosa, 11 F.3d 315, 330 (2d Cir. 1993), cert. denied, 511 U.S. 1042, 114 S. Ct. 1565 (1994); United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992), cert. denied, 510 U.S. 856, 114 S. Ct. 163 (1993); Sales v. Harris, 675 F.2d 532, 537-38 (2d Cir.), cert. denied, 459 U.S. 876, 103 S. Ct. 170 (1982); Brown v. Fisher, 13 Civ. 2071, 2015 WL 3619628 at *12-13 (S.D.N.Y. June 9, 2015); Stanley v. Smith, 12 Civ. 6362, 2014 WL 5039444 at *17 (S.D.N.Y. Sept. 26, 2014); Espiritu v. Haponik, 05 Civ. 7057, 2012 WL 161809 at *5 (S.D.N.Y. Jan. 19, 2012); United States v. Morgan, 690 F. Supp. 2d 274, 282 (S.D.N.Y. 2010); Fuller v. Schultz, 572 F. Supp. 2d 425, 442-43 (S.D.N.Y. 2008); Elliott v. Kuhlman, 97 Civ. 2987, 2004 WL 1375160 at *7 (S.D.N.Y. June 17, 2004); United States v. Joseph, 332 F. Supp. 2d 571, 581 (S.D.N.Y. 2004); Mendoza v. McGinnis, 03 Civ. 2598, 2004 WL 736894 at *5-6 (S.D.N.Y. Apr. 5, 2004); Arkin v. Bennett, 282 F. Supp. 2d 24, 32 (S.D.N.Y. 2003); Mitchell v. Walsh, 00 Civ. 5696, 2003 WL 22019736 at *12 (S.D.N.Y. Aug. 22, 2003); Garry v. Greiner, 01 Civ. 0848, 2003 WL 21436217 at *3 (S.D.N.Y. June 19, 2003); Valtin v. Hollins, 248 F. Supp. 2d 311, 317-18 (S.D.N.Y. 2003).

24/    See also, e.g., Conner v. Poole, 440 F. App'x 29, 31 (2d Cir. 2011), cert. denied, 132 S. Ct. 1015 (2012); Brisco v. Ercole, 565 F.3d at 88, 89; Wiggins v. Greiner, 132 F. App'x 861, 864-65 (2d Cir.), cert. denied, 546 U.S. 986, 126 S. Ct. 569 (2005); Raheem v. Kelly, 257 F.3d 122, 135 (2d Cir. 2001), cert. denied, 534 U.S. 1118, 122 S. Ct. 930 (2002); United States v. Shodeinde, No. 96-1512, 108 F.3d 1370 (table), 1997 WL 138701 at *2 (2d Cir. Mar. 21, 1997); United States v. Concepcion, 983 F.2d at 377; United States v. Reid, 527 F.2d 380, 384 (2d Cir. 1975); United States v. Montayne, 486 F.2d 263, 267 (2d Cir. 1973), cert. denied, 416 U.S. 962, 94 S. Ct. 1982 (1974); Brown v. Fisher, 2015 WL 3619628 at *12-13;  Aviles v. Capra, No. 13-CV-1153, 2014 WL 6085889 at *1 (E.D.N.Y. Nov. 13, 2014); Stanley v. Smith, 2014 WL 5039444 at *17; United States v. Williams, 999 F. Supp. 412, 414 (W.D.N.Y. 1998), aff'd, 192 F.3d 280 (2d Cir. 1999); Hodge v. Henderson, 761 F. Supp. 993, 1007 (S.D.N.Y. 1990), aff'd, 929 F.2d 61 (2d Cir. 1991).

In order to evaluate the constitutional permissibility of in-court identification testimony based on out-of-court pretrial identification procedures, the Supreme Court has adopted a two-step inquiry:

> [Step 1:] That inquiry "requires a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification.'"
>
> [Step 2:] If pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable. The court should consider the reliability of the identification in light of "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." For both pretrial and in-court identifications, the linchpin of admissibility is reliability. However, if impermissibly suggestive procedures are not employed, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury."

United States v. Wong, 40 F.3d 1347, 1359 (2d Cir. 1994) (citations omitted), cert. denied, 514 U.S. 1113, 115 S. Ct. 1968 (1995).[25/]

"While showup identifications are generally suspect and disfavored, at-the-crime-scene civilian showup identifications are not presumptively infirm." People v. Duuvon, 77 N.Y.2d 541, 543, 569 N.Y.S.2d 346, 347 (1991). The fruits of a showup identification will be excluded only if the identification "was both produced through an unnecessarily suggestive procedure and [was] unreliable." United States v. Bautista, 23 F.3d 726, 729 (2d Cir. 1994); accord, e.g., Brisco v. Ercole, 565 F.3d at 88-95. Whether an identification procedure was unnecessarily

---

25/   See, e.g.,  Perry v. New Hampshire, 132 S. Ct. at 724-25; United States v. Harris, 598 F. App'x 44 (2d Cir. 2015); Brisco v. Ercole, 565 F.3d at 88; United States v. Argentina, 173 F. App'x 90, 93 (2d Cir. 2006); Yearwood v. Keane, 1996 WL 282134 at *1; United States v. Thai, 29 F.3d at 807-08; United States v. Butler, 970 F.2d 1017, 1021 (2d Cir.), cert. denied, 506 U.S. 980, 113 S. Ct. 480 (1992).

suggestive depends on (1) the suggestiveness of the procedure and (2) the necessity of the procedure. United States v. Bautista, 23 F.3d at 730 (citing United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991)); see, e.g., Perry v. New Hampshire, 132 S. Ct. at 723-26; Conner v. Poole, 440 F. App'x at 31-32.[26/]  The focus of the inquiry is on the possibility of misidentification, not the conduct of the police, because a suggestive procedure "'does not in itself intrude upon a constitutionally protected interest.'"  Wray v. Johnson, 202 F.3d 515, 524 (2d Cir. 2000) (quoting Manson v. Brathwaite, 432 U.S. at 113 n.13, 97 S. Ct. at 2254 n.13).

       The First Department's decision was not contrary to or an unreasonable application of applicable Supreme Court precedent, nor an unreasonable determination of the facts.  Hernandez' inconsistent testimony would not have altered the trial court's suppression ruling because he immediately clarified his testimony on redirect.  (See page 35 above); see People v. Young, 261 A.D.2d 109, 110, 690 N.Y.S.2d 190, 190 (1st Dep't 1999) (motion to reopen properly denied where "testimony in question was based on the witness's misunderstanding of question, and . . . the witness's mistake was immediately rectified on further examination.").  Absent any other evidence to suggest that a police-conducted show-up in fact occurred or that the identification was otherwise unduly suggestive, Hernandez' identification was, as the First Department held, constitutionally valid.  See Richardson v. Superintendent of Mid-Orange Corr. Facility, 621 F.3d 196, 203 (2d Cir. 2010) ("No Supreme Court case has addressed a materially indistinguishable set of facts involving such an accidental, unarranged viewing.  Rather, every Supreme Court case addressing the

---

[26/]   See also, e.g., Hicks v. Bellnier, 43 F. Supp. 3d 214, 231 (E.D.N.Y. 2014); Candelario v. City of N.Y., 12 Civ. 1206, 2013 WL 1339102 at *4 (S.D.N.Y. Apr. 3, 2013), aff'd, 539 F. App'x 17 (2d Cir. 2013); Purdie v. Graham, 09 Civ. 8116, 2010 WL 3912732 at *9 (S.D.N.Y. Sept. 16, 2010); Jameson v. Grier, 01 Civ. 6678, 2002 WL 100642 at *19-20 (S.D.N.Y. Jan. 25, 2002) (Peck, M.J.).

suggestiveness of pretrial identifications in the due process context has involved police-conducted identification procedures."), cert. denied, 562 U.S. 1188, 131 S. Ct. 1019 (2011).  Jamison's counsel cannot be faulted for not moving to reopen the suppression hearing when there was little, if any, basis to do so.

The identification also was independently reliable.  Hernandez spoke to Jamison a week before the robbery, and the day of the robbery at a distance of four feet about two to three minutes before the crime happened.  (See pages 7-8 above.)  Hernandez saw Jamison's face again during the chase to 1056 Sherman Avenue.  (See page 8 above.)  His identification of Jamison occurred less than forty-five minutes later.  (See page 9 above.)  At trial, Hernandez was certain that Jamison was the African-American man wearing a red shirt who had robbed him.  (See page 8 above.)

The Court reaches the same conclusion regarding Mitchell's identification at Lincoln Hospital.  Even if the show-up identification was unduly suggestive, Jamison still must show that Mitchell's identification was unreliable.  United States v. Bautista, 23 F.3d at 729.  Like Hernandez, Mitchell had ample opportunity to view the perpetrators the day of the robbery.  Mitchell saw Jamison and his accomplice outside "for a long while" on the "clear," "bright" day in question.  (See page 10 above.)  When he left for the store, Mitchell saw Jamison a second time, and "clearly" a third time during the assault.  (See id.)  Mitchell estimated that less than an hour elapsed between the assault and the show-up at Lincoln Hospital.  (See page 9 above.)  Based on the totality of the circumstances, the First Department properly found that both identifications were constitutional.

Moreover, Jamison's counsel's decision not to move to reopen the suppression hearing appears to have been a strategic choice.  Jamison's counsel pursued a misidentification defense and argued to the jury on summation that both identifications were tainted.  (See pages 12-

13 above.)  Jamison's counsel argued to the jury (incorrectly or not) that Jamison was already in custody "surrounded by police officers" when Hernandez identified him.  (See page 12 above.)  He argued that Jamison "had officers surrounding him and that he had handcuffs on" at the hospital where police suggested to Mitchell that Jamison was the perpetrator.  (See pages 12-13 above.)  Thus, rather than seeking to exclude the evidence, counsel made a tactical decision to use the testimony to further the defense narrative.  Such strategic choices are "virtually unchallengeable."  Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.

Particularly under the doubly deferential AEDPA standard, counsel's decision not to move to reopen the suppression hearing does not constitute ineffective assistance.

## 2.    Counsel's Failure to Call Defense Witnesses

Jamison argues that his attorney was ineffective for failing to put on a defense case because "there were many defense witnesses that should have been" called at trial.  (Dkt. No. 2: Pet. ¶ 13.)  Reading Jamison's pro se petition liberally, the Court assumes that the "many" witnesses are those referenced in Jamison's supplemental pro se brief on direct appeal.  (See Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 62-65.)  The First Department found this claim meritless.  People v. Jamison, 96 A.D.3d 571, 572, 946 N.Y.S.2d 569, 570 (1st Dep't 2012); see pages 14-15 above.  Jamison further argued in his fourth CPL § 440.10 motion that his counsel should have called an expert in misidentification.  (Ex. 45: 12/1/14 CPL § 440.10 Motion at 20-22.)  Justice Dawson denied this claim as meritless.  (Ex. 49: 6/19/15 Order at 4.)[27]

---

[27]    Justice Dawson denied the motion pursuant to CPL § 440.30(4)(b) because Jamison had not set forth any factual allegations supporting his claim.  (Ex. 49: 6/19/15 Order at 4.)  While there is a split of authority as to whether the denial of a motion under § 440.30(4) constitutes an "independent and adequate" state procedural bar, the Court has held that such a decision operates on the merits.  See Skinner v. Duncan, 01 Civ. 6656, 2003 WL 21386032 at *27-28

(continued...)

The Second Circuit has held that "counsel's decision as to 'whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation.'" United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.), cert. denied, 522 U.S. 846, 118 S. Ct. 130 (1997)), cert. denied, 532 U.S. 1007, 121 S. Ct. 1733 (2001).  Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S. 958, 108 S. Ct. 357 (1987);[28/] see, e.g., United States v. DeJesus, 57 F. App'x 474, 478 (2d Cir.) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.' Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed."  Counsel's decision not to call a particular witness was grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with

_____

[27/]      (...continued)
(S.D.N.Y. June 17, 2003) (Peck, M.J.).

[28/]      Accord, e.g., Brown v. Brown, 05 Civ. 10434, 2006 WL 3405480 at *18 (S.D.N.Y. Nov. 27, 2006) (Peck, M.J.); Llanos v. Goord, 06 Civ. 0261, 2006 WL 1981749 at *19 (S.D.N.Y. July 14, 2006) (Peck, M.J.), R. & R. adopted, 555 F. Supp. 2d 454 (S.D.N.Y. 2008); Kanani v. Phillips, 03 Civ. 2534, 2004 WL 2296128 at *27 (S.D.N.Y. Oct. 13, 2004) (Peck, M.J.), R. & R. adopted, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005); Smalls v. McGinnis, 04 Civ. 0301, 2004 WL 1774578 at *19 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.);  Rodriguez v. Senkowski, 03 Civ. 3314, 2004 WL 503451 at *41 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); Gomez v. Duncan, 02 Civ. 0846, 2004 WL 119360 at *31 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.), aff'd, 317 F. App'x 79 (2d Cir. 2009); Montalvo v. Annetts, 02 Civ. 1056, 2003 WL 22962504 at *25 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); Skinner v. Duncan, 01 Civ. 6656, 2003 WL 21386032 at *37 (S.D.N.Y. June 17, 2003) (Peck, M.J.).

contact information for potential witnesses.") (citation omitted), <u>cert. denied</u>, 538 U.S. 1047, 123 S. Ct. 2110 (2003).[29/]

Moreover, "[g]enerally, the decision whether to pursue a particular defense is a tactical choice which does not rise to [the] level of a constitutional violation. . . . [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed . . . ,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial." <u>Jones</u> v. <u>Hollins</u>, 884 F. Supp. 758, 765-66 (W.D.N.Y. 1995) (citations omitted), <u>aff'd</u>, No. 95-2279, 89 F.3d 826 (table), 1995 WL 722215 (2d Cir. Nov. 30, 1995); <u>accord</u>, <u>e.g.</u>, <u>United States</u> v. <u>Schmidt</u>, 105 F.3d at 90 ("[T]he tactical decision of whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation."); <u>Lawson</u> v. <u>Caspari</u>, 963 F.2d 1094, 1096 (8th Cir. 1992) (Counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, especially where counsel "presented a theory of the case by pointing out the 'weaknesses in the state's case and rais[ing] serious questions about the credibility of the state's sole eyewitness.'"); <u>Harris</u> v. <u>Hollins</u>,

---

[29/]    <u>See also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Eyman</u>, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), <u>cert. denied</u>, 538 U.S. 1021, 123 S. Ct. 1949 (2003); <u>United States</u> v. <u>Luciano</u>, 158 F.3d 655, 660 (2d Cir. 1998), <u>cert. denied</u>, 526 U.S. 1164, 119 S. Ct. 2059 (1999); <u>United States</u> v. <u>Schmidt</u>, 105 F.3d 82, 90 (2d Cir.), <u>cert. denied</u>, 522 U.S. 846, 118 S. Ct. 130 (1997); <u>Lou</u> v. <u>Mantello</u>, No. 98-CV-5542, 2001 WL 1152817 at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.'") (quoting <u>Ruzas</u> v. <u>Sullivan</u>, 85 Civ. 4801, 1988 WL 83377 at *14 (S.D.N.Y. Aug. 2, 1988)); <u>Nieves</u> v. <u>Kelly</u>, 990 F. Supp. 255, 263-64 (S.D.N.Y. 1997) (Cote, D.J. & Peck, M.J.); <u>Rodriguez</u> v. <u>Mitchell</u>, 92 Civ. 2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

95 Civ. 4376, 1997 WL 633440 at *6 (S.D.N.Y. Oct. 14, 1997) (counsel not ineffective for not

securing alibi witnesses where counsel presented a vigorous defense).

Jamison argues that defense counsel should have called the following witnesses:

1)   Detectives Bart Pipcinski and Matthew Crowley, who oversaw the negative
     identifications by Hernandez and Mitchell of Jamison's suspected accomplice in the
     robbery, Angel Ortiz;

2)   Erma Ramos, "who selected [Jamison] from a photo-array as . . . having been
     actually and physically present at 230 East 167th Street visiting on October 2, 2007
     at 10:09 a.m. through 10:30 a.m.";

3)   the 911 operator who spoke to Bashir, "in order to show that [Bashir] was in fact
     being interrogated" by the 911 operator;

4)   Mr. Fonseca, the building security guard at 1188 Grand Concourse (the building
     adjoining 1166 Grand Concourse), who allegedly saw Jamison and his accomplice
     flee from 1166 Grand Concourse but failed to identify Jamison in a photo array; and

5)   An expert in misidentification.

(Jamison Supp. Pro Se 1st Dep't Br. at 62-66; 12/1/14 CPL § 440.10 Motion at 20-22.)

### a.   Pipcinski, Crowley and Ramos

Jamison's counsel explained at trial why he did not want to call Detectives Pipcinski

and Crowley, despite Jamison's request that he do so:

> I have been in discussions with the defendant concerning the possibility of calling
> a detective on the defense case. And this detective was a detective who conducted
> three—two photo arrays, one lineup of an alleged possible co-defendant. And that
> is a guy name[d] Angel Ortiz. And I told the defendant that I would not want to do
> that because it may open the door to the possibility of how that other defendant was
> arrested and what he was suspected of doing. And it may lead to the defendant being
> a suspect in other burglaries as well. I don't want to open that door and I don't want
> the jury to have any information at all concerning the possibility that the defendant
> may be a suspect in other crimes. . . . Also, the defendant asked me if I could at least
> inquire of the complainants whether they had, in fact, viewed these photo arrays and
> the lineup. And that they could not, in fact, identify this so-called Angel Ortiz. I
> don't think that that is relevant, the fact that somebody else who may or may not have
> been the co-defendant in this case, the alleged other robber, how that is relevant to
> this case.

(Tr. 96-98.)  When Jamison objected to his attorney's statement, Justice Stadtmauer noted that "what your attorney has just put on the record makes a lot of sense to me."  (Tr. 102.)  Justice Stadtmauer cautioned Jamison that there were "lots of ways" that such a defense strategy could "open the door" to the uncharged burglary, and that any witness's "failure to identify Mr. Ortiz does not in any way cast doubt on the ability of the witnesses who identify you on this case."  (Tr. 102-03.)

The same rationale applies to Erma Ramos, whose testimony could have revealed to the jury that Jamison was a suspect in another burglary, committed the same day about two blocks from 1166 Grand Concourse, at 230 E. 167th Street.  See, e.g., Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) ("We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside.'"), cert. denied, 546 U.S. 1184, 126 S. Ct. 1363 (2006); Pena-Martinez v. Duncan, 112 F. App'x 113, 115 (2d Cir. 2004) (Trial counsel's "decision not to call Laracuente as a witness was based on an interview he had with her in which he learned that . . . she would not provide testimony that would be helpful to him."); Llanos v. Goord, 06 Civ. 0261, 2006 WL 1981749 at *19 (S.D.N.Y. July 14, 2006) (Peck, M.J.) (counsel was not ineffective for failing to call witness whose testimony he felt would be harmful), R. & R. adopted, 555 F.Supp.2d 454 (S.D.N.Y. 2008); Stallings v. Woods, No. 04 CV 4714, 2006 WL 842380 at *21 (E.D.N.Y. Mar. 27, 2006) ("Defense counsel's decision not to pursue Garcia as a witness was plainly reasonable in the face of clear evidence that his testimony would have been highly incriminating. . . .  It is difficult to fathom how petitioner faults his attorney for failing to seek as a 'defense witness' someone who might well have identified him in court as one of the robbers."). Jamison's counsel's decision not to call Pipcinski, Crowley or Ramos was well within the ambit of reasonable trial strategy and does not constitute ineffective assistance of counsel, particularly under the doubly deferential AEDPA review standard.

### b.      The 911 Operator and Fonseca

Jamison's counsel's refusal to call the 911 operator or Fonseca also did not amount to ineffective assistance of counsel.  The 911 calls are self-explanatory and were played at trial for the jurors.  (See page 8 above.)  Bashir testified and was available for cross examination on the content of the calls, thus eliminating any Confrontation Clause issue.

Fonseca's testimony was of little value because while he could not identify Jamison, he was not a witness to the crime.  (Tr. 415; Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 64-65.)  Jamison claimed in his fourth CPL § 440.10 motion that Fonseca "had personally kn[own] . . . Jamison for many years," and thus "there would be no reason for him not having recognized" Jamison.  (Ex. 45: 12/1/14 CPL § 440.10 Motion at 9.)  Nevertheless, "counsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'"  United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000).  The First Department did not unreasonably apply Strickland or its progeny by finding Jamison's claim meritless.[30]

### c.      A Misidentification Expert

As with any other witness, "[t]here is no per se rule that requires trial attorneys to seek out an expert." Gersten v. Senkowski, 426 F.3d 588, 609 (2d Cir. 2005), cert. denied, 547 U.S. 1191, 126 S. Ct. 2882 (2006).  Even if the failure to call an expert in misidentification could be considered ineffective, the state court evidently concluded, not unreasonably, that no prejudice resulted.  Jamison's attorney cross-examined Hernandez and Mitchell at length and made their

---

[30]     To the extent Jamison raised the argument as to Fonseca a second time in his fourth CPL § 440.10 motion with additional facts, which Justice Dawson still found meritless, the Court reaches the same conclusion.  (Ex. 49: 6/19/15 Order at 4-5.)

46

allegedly suggestive and unreliable identifications a focal point of the defense and in summation. (See pages 12-13 above.)  Thus, while a misidentification expert may have been helpful to the defense, the testimony was not so vital that counsel was ineffective for failing to procure it.[31/]  The state court decision denying this claim was not an unreasonable application of Strickland.

### 3. The Jury Instructions

Jamison argues that the trial court made the following errors with regard to the jury instructions and, in turn, that his counsel was ineffective for failing to object:

1) the court amended the indictment to include attempted second degree assault, which was never presented to the grand jury;

2) the jury instructions did not define the terms "owner" of property, "appropriate" or "deprive," or what "dangerous instrument" was used during the crime;

3) the court failed to instruct the jury that physical injury to the victim is not an element of attempted assault;

4) the instructions as to "intent" and "reasonable doubt" were legally deficient; and

5) the court improperly instructed the jury that Jamison had acted in concert with another individual to commit the crimes when there was no evidence that the crimes were committed with an accomplice.

(Dkt. No. 2: Pet. ¶¶ 13D, 13E, 13G, 13I; Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 28-34, 68-78.)  The First Department found these claims meritless.  People v. Jamison, 96 A.D.3d 571, 572, 946 N.Y.S.2d 569, 570 (1st Dep't 2012); see pages 14-15 above.[32/]

---

[31/]     Jamison makes a companion argument that the trial court abused its discretion by not conducting an evidentiary hearing on the use of expert misidentification testimony.  (Pet. ¶ 13N.)  This argument is meritless because an evidentiary hearing was never requested on the use of expert testimony at any point during the trial court proceedings.  (Dkt. No. 15: State Opp. Br. at 42 n.13.)  There was no reason for the trial court to hold a hearing on an issue not before it.

[32/]     Jamison argued on appeal that his counsel was ineffective because he failed to object to the
(continued...)

Federal habeas relief is not available for errors of state law.  See, e.g., Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001).  Thus, "'[i]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.'"  Blazic v. Henderson, 900 F.2d 534, 540 (2d Cir. 1990).  Where the jury instruction quotes a state statute, the habeas petitioner bears a heavy burden, as the presence of some "'ambiguity, inconsistency, or deficiency'" in a jury instruction will not necessarily constitute a due process violation.  Waddington v. Sarausad, 555 U.S. 179, 190, 129 S. Ct. 823, 831 (2009) (quoting Middleton v. McNeil, 541 U.S. 433, 437, 124 S.Ct. 1830, 1830 (2004)).  A petitioner must show that the instruction was ambiguous and that a "reasonable likelihood" exists that the jury's application of the instruction relieved the prosecution of its burden to prove every element of the crime beyond a reasonable doubt.  Id.  The relevant question in this regard is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  Waddington v. Sarausad, 555 U.S. at 191, 129 S. Ct. at 832.  If the trial court omits an instruction entirely, "the respondent's burden is especially heavy" because

---

[32]/     (...continued)
foregoing instructions, or move to include additional instructions.  (Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 60-78.)  He did not, however, clearly challenge the actions of the trial court in proffering the allegedly erroneous instructions.  Thus, Jamison's ineffective assistance claims are exhausted, but any underlying challenge to the jury instructions is not.  See Rush v. Lempke, 500 F. App'x 12, 14 (2d Cir. 2012) ("In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." (quotations omitted))  Nevertheless, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).  Because the Court finds that Jamison's claims regarding the jury instructions do not amount to a violation of his federal rights and therefore are meritless, it addresses them below.

"[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737 (1977).

In the context of an ineffective assistance claim, "[g]enerally, this Court has concluded that counsel's failure to object to a jury instruction (or to request an additional instruction) constitutes unreasonably deficient performance only when the trial court's instruction contained 'clear and previously identified errors.' Conversely, when a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute deficient performance." Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) (citations omitted).

### a.     The Lesser-Included Offense

"[I]n addition to submitting the greatest offense which it is required to submit," CPL § 300.50(1) authorizes a court "in its discretion" to "submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater." If the court is authorized to submit the lesser included offense, "and is requested by either party to do so, it must do so." Id. § 300.50(2). Here, the trial court submitted the greater charge of second degree assault and the lesser-included charge of attempted second degree assault. (Tr. 613.) This was not error. See People v. Colantonio, 277 A.D.2d 498, 500, 715 N.Y.S.2d 764, 767 (3d Dep't 2000) (noting that "attempted assault in the second degree . . . [is] a lesser included offense of assault in the second degree."). The court found that there was a reasonable view of the evidence that Jamison committed attempted assault rather than the greater offense of assault. Jamison's counsel even argued during summation that Mitchell's injury (or lack thereof) did not suffice to constitute assault. (See page 13 above.)

It does not matter that the lesser included offense was omitted from the indictment. People v. Siler, 135 A.D.3d 453, 454, 21 N.Y.S.3d 893, 894 (1st Dep't 2016) ("To the extent that defendant sought to establish at trial that the crime was only an attempt, he assumed the risk that the People would exercise their statutory right to submission of an attempt charge."); People v. Basciano, 54 A.D.3d 637, 637, 864 N.Y.S.2d 20, 21 (1st Dep't 2008) ("Since the indictment necessarily contained the lesser included offense, there is no merit to defendant's arguments that the court constructively amended the indictment or that the People impermissibly changed their theory of prosecution."); People v. Udzinski, 146 A.D.2d 245, 254, 541 N.Y.S.2d 9, 15 (2d Dep't 1989) ("First of all, it has always been regarded as proper for the Trial Judge to submit to the jury crimes now defined as 'lesser included offenses' even though such offenses may not have been specifically charged in the indictment" (citation omitted)).  And, although it is not entirely clear whether either party explicitly requested the inclusion of attempted assault (see Tr. 613), the court was entitled to do so sua sponte.  People v. Edwards, 16 A.D.3d 226, 227, 792 N.Y.S.2d 394, 395 (1st Dep't 2005) ("The court's decision to submit assault in the second degree as a lesser included offense of assault in the first degree, on its own motion and over the objections of both the prosecution and defense, was a provident exercise of discretion.  The Criminal Procedure Law provides that submission of legally and factually qualifying lesser included offenses is mandatory when requested by a party, and otherwise discretionary." (citations omitted)); see also CPL § 300.50(1).

Jamison's counsel was not ineffective for failing to object to the inclusion of attempted assault because the trial court committed no legal error.  The Court also agrees with the State that Jamison's counsel may have had a strategic reason for wanting to include the lesser offense because it provided the jury with an alternative.  See People v. Turner, 5 N.Y.3d 476, 483, 806 N.Y.S.2d 154, 154 (2005) ("It is true that whether to object to the submission of a lesser

included offense is often a strategic decision that could reasonably be made either way. A defendant who thinks his chances of acquittal are small may welcome giving the jury an opportunity for a compromise verdict.").

> **b.   "Owner," "Appropriate," "Deprive" and "Dangerous Instrument"**

Jamison claims that the trial court was required to define "owner" of property, "appropriate" and "deprive," and  identify the "dangerous instrument" that was used during the crime.  The trial court was not required to define these terms because none of them represented a disputed issue in the case.  Jamison never suggested that he or someone else other than Hernandez owned the necklace, so a definition of "owner" was irrelevant.  Hernandez testified in great detail how he came to own the necklace that Jamison's accomplice ripped from his neck.  (Tr. 195-200); see, e.g., PL § 155.00(5) (defining "owner" as one with "a right to possession thereof superior to that of the taker, obtainer or withholder"); People v. Prato, 143 A.D.2d 205, 206, 531 N.Y.S.2d 821, 822 (2d Dep't 1988) ("To sustain a conviction for [first degree robbery] the People are required to prove only that the defendant forcibly stole property from a person with a superior right to possession than the defendant.  Pierre Charles, who testified to the forcible taking at trial, was an employee of the restaurant who had a right of possession to the money in the cash register superior to that of the defendant who had no right of possession whatsoever.").

It was not necessary to define "appropriate" or "deprive" because Jamison did not argue that the theft of the necklace was anything but a permanent, rather than temporary, deprivation.  See, e.g., Almonte v. Lee, 13 Civ. 6187, 2015 WL 3917451 at *15-16 (S.D.N.Y. May 20, 2015) (no reversible error in failing to define "appropriate" or "deprive" where defendant did "not suggest that there was a significant question about whether he intended to deprive the owners

of the [stolen item] of its use and possession permanently rather than temporarily"), R. & R. adopted, 2015 WL 3932162 (S.D.N.Y. June 25, 2015).  The lack of any expanded definitions therefore did not result in a misstatement of state law or a constitutional violation.

There could have been no question that the crowbar was the only "dangerous instrument" used in the robbery.  (See pages 7-9 above.)  There also was ample evidence that Jamison possessed the crowbar.  Jamison threatened Hernandez with the crowbar, used it on Mitchell, and ran with it to 1056 Sherman Avenue where it was retrieved in Kaane's apartment.  (See id.); cf., Lynch v. Dolce, 789 F.3d 303, 315-16 (2d Cir. 2015) (reversible error where trial court did not instruct jury that actual possession of a dangerous instrument was required element of first-degree robbery where "none of the witnesses saw a gun during the robbery," although defendant told victim he had a gun).  Indeed, commenting on the assault against Mitchell that happened moments after the robbery, Justice Stadtmauer stated that "there is no reasonable view of the evidence under which the jury can find that the crime was committed without a crowbar."  (Tr. 613.)

### c.  Physical Injury and Attempted Assault

The trial court was not required to explicitly inform the jury that physical injury was not an element of attempted assault.  Any ambiguity in this regard likely was helpful to Jamison, as the jury may have believed that the prosecution carried a more stringent burden of proof than it actually did.  (See Tr. 749-50.)  In any event, the court followed New York's pattern criminal jury instructions that track the relevant portions of New York's penal code.  (Compare PL §§ 110.00, 120.05(2), with Tr. 722-25.)  The trial court's instructions accurately stated the law.  No further instruction was required.  See, e.g., Constant v. Martuscello, 119 F. Supp. 3d 87, 141 (E.D.N.Y. 2015) (Weinstein, D.J.) ("When alleged erroneous jury instructions either stem or quote directly from the state statute or fail to infect the trial and conviction in a manner violating due process,

courts routinely deny habeas relief.") (citing cases)); <u>Tyler</u> v. <u>Conway</u>, No. 08-CV-6560, 2010 WL 5287513 at *7 (W.D.N.Y. Dec. 17, 2010) (no error where "the trial court's instruction defining intent was identical to the suggested instruction contained in New York's Pattern Criminal Jury Instructions"); <u>Campbell</u> v. <u>Fischer</u>, No. CV-04-3569, 2005 WL 2033465 at *7 (E.D.N.Y. June 30, 2005) ("Even though there is no official significance to the New York Criminal Jury Instructions, the trial court's instructions in many respects track quite closely the pattern instructions.").

### d.    **"Intent," "Reasonable Doubt" and "Acted in Concert"**

Jamison's additional challenge to the court's "intent," "reasonable doubt" and "acted in concert" instructions is meritless.  Jamison's proffered instruction on "intent" in connection with the robbery instruction was unnecessary because, as addressed immediately above, he never suggested, and no view of the evidence could support, that he or his accomplice intended only to temporarily deprive Hernandez of his necklace.  <u>See</u>, <u>e.g.</u>, <u>People</u> v. <u>Lamont</u>, 25 N.Y.3d 315, 319, 12 N.Y.S.3d 6, 8 (2015) ("The requisite mental state for robbery is the 'intent to permanently deprive the owner of that property.'"); <u>People</u> v. <u>Miller</u>, 87 N.Y.2d 211, 217, 638 N.Y.S.2d 577, 577 (1995) ("The culpable mental state is the intent to permanently deprive the owner of that property.  Whether the robber commits a first, second or third degree robbery offense, the requisite intent remains the same.").

Jamison claims that the trial judge should have instructed the jury that it was to conduct a "full and fair evaluation of the evidence" and that each juror should be "guided solely thereby" before agreeing with the others.  (Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 73-74.) Jamison erroneously argues that this missing language—part of the pattern "reasonable doubt" instruction omitted by the court (<u>compare</u> Tr. 701-04, <u>with</u> CJI2d Instructions of General Applicability: Reasonable Doubt at 2)—somehow reduced the prosecution's burden of proof.

(Jamison Supp. Pro Se 1st Dep't Br. at 74.)   The trial court instructed the jury that it "must find the defendant not guilty unless on the evidence presented at this trial you conclude that the People have proven the defendant guilty beyond a reasonable doubt." (Tr. 701.)  The court reminded the jury that it could not rest its decision on "baseless speculation" or be influenced "in any way by bias, prejudice, [or] sympathy." (Tr. 703.)  After giving the jury an otherwise complete reasonable doubt instruction, the court further instructed the jury that "[e]ach of you must decide the case for yourself but only after a fair and impartial consideration of the evidence with other jurors.  You should not surrender an honest view of the evidence simply because you want the trial to end or you're outvoted." (Tr. 730.)  Any harm in omitting the language cited by Jamison was negated by the court's remaining instructions that adequately informed the jury regarding their consideration of the evidence in the context of the prosecution's burden of proof.

Finally, it was not error to instruct the jury that Jamison had "acted in concert" with an accomplice to commit the crimes at 1166 Grand Concourse.  The court followed the pattern instruction and stated that Jamison's mere presence at the scene of the crime would not render him criminally liable for another's actions.   (Tr. 714; see also CJI2d Instructions of General Applicability: Accessorial Liability.)  The prosecution had to prove beyond a reasonable doubt that Jamison "solicited, requested, commanded, importuned or intentionally aided that person" with the mental state required for the commission of the crime.  (Tr. 714-15; see PL § 20.00.)[33]

---

[33]   To the extent Jamison may be arguing that there was no evidence of acting in concert as to the crimes at 1056 Sherman Avenue, the trial judge instructed the jury, correctly, that acting in concert did not apply to "the crimes relating to Richard Kaane's premises, the apartment for which the defendant is charged with committing a Burglary in the Second Degree or a Criminal Trespass in the Second Degree." (Tr. 713.)

54

Sufficient evidence was adduced at trial to support an accessorial liability charge. (See pages 7-8 above.)  Jamison was observed with his accomplice outside 1166 Grand Concourse, he followed Hernandez into the stairwell with his accomplice, and attacked Hernandez with a crowbar while his accomplice stole Hernandez' chain.  (See id.); see also, e.g., People v. Mejia, 297 A.D.2d 755, 756, 747 N.Y.S.2d 788, 788 (2d Dep't 2002) ("Intent can be established from an act itself or from the conduct of an accessory and the surrounding circumstances.  The defendant was present, observed the robbery in progress, and assisted his cohort in completing the robbery." (citations omitted)); People v. Ramos, 284 A.D.2d 136, 136, 726 N.Y.S.2d 36, 37 (1st Dep't 2001) ("Defendant's accessorial liability could be readily inferred from the totality of the evidence.").

\* \* \*

Jamison's jury instructions claims are meritless whether analyzed under Strickland or as a substantive challenge to the instructions themselves.  Because the jury instructions were an appropriate statement of the law, defense counsel's failure to object to certain instructions, or request additional instructions, was not ineffective assistance.  See Aparicio v. Artuz, 269 F.3d 78, 100 (2d Cir. 2001) ("Because, under the circumstances, the jury instructions were not improper, the failure of Petitioner's trial counsel to object or request an additional instruction was not objectively unreasonable.")  The First Department reasonably applied Strickland when it held Jamison's claims were meritless.

### 4.    Sufficiency of the Evidence

Jamison argues that his counsel was ineffective because he did not object that the evidence to support first degree robbery or attempted second degree assault was legally insufficient. (Dkt. No. 2: Pet. ¶ 13H; Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 70-73.)  The First Department

found this claim meritless.  People v. Jamison, 96 A.D.3d 571, 572, 946 N.Y.S.2d 569, 570 (1st

Dep't 2012); see pages 14-15 above.

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a

criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged.'" Jackson v. Virginia, 443 U.S. 307, 315,

99 S. Ct. 2781, 2787 (1979) (quoting In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073

(1970).  However, "a properly instructed jury may occasionally convict even when it can be said

that no rational trier of fact could find guilt beyond a reasonable doubt." Jackson v. Virginia, 443

U.S. at 317, 99 S. Ct. at 2788.  Accordingly, "in a challenge to a state criminal conviction brought

under 28 U.S.C. § 2254-if the settled procedural prerequisites for such a claim have otherwise been

satisfied-the applicant is entitled to habeas corpus relief if it is found that upon the record evidence

adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable

doubt." Jackson v. Virginia, 443 U.S. at 324, 99 S. Ct. at 2791-92.

> The petitioner bears a very heavy burden:
>
> [T]he standard for appellate review of an insufficiency claim placed a "very heavy burden" on the appellant.  Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt.  In making this determination, we must view the evidence in the light most favorable to the government, and construe all permissible inferences in its favor.

United States v. Carson, 702 F.2d 351, 361 (2d Cir.) (citations omitted), cert. denied, 462 U.S. 1108,

103 S. Ct. 2457 (1983).

> The habeas court's review of the jury's findings is limited:
>
> [T]his inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

> of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

Jackson v. Virginia, 443 U.S. at 318-19, 99 S. Ct. at 2789 (citations omitted).

   The Jackson v. Virginia "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson v. Virginia, 443 U.S. at 324 n.16, 99 S. Ct. at 2792 n.16; accord, e.g., Green v. Abrams, 984 F.2d 41, 44-45 (2d Cir. 1993) ("In considering a petition for writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime.").

   Jamison was convicted of first degree robbery under PL § 160.15(3) and attempted second degree assault under PL §§ 110.00 and 120.05(2).  (Tr. 756-57; see Ex. 3: 10/18/07 Indictment.)  A person is guilty of first degree robbery when "he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [u]ses or threatens the immediate use of a dangerous instrument."  PL § 160.15(3).  One can be liable for the criminal conduct of another "when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct."  PL § 20.00.  A person is guilty of second degree assault when, "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."  PL § 120.05(2).  "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."  PL § 110.00.

   There was ample evidence to support both convictions.  Hernandez testified that Jamison threatened to kill him with a crowbar while Jamison's accomplice ripped the chain from his

neck.  (See page 7 above.)  Hernandez chased Jamison from 1166 Grand Concourse and "never lost

sight of" him until they reached 1056 Sherman Avenue.  (See page 8 above.)  When he saw Jamison

emerge about fifteen minutes later, Hernandez stated to officers, "'That's him.'"  (See page 9 above.)

Hernandez was certain that Jamison was the perpetrator in part because they had a conversation a

week prior to the robbery.  (See page 8 above.)  Mitchell testified that he had an opportunity to view

Jamison three separate times the day of the robbery, positively identified him as the perpetrator at

Lincoln Hospital less than an hour later, and identified him again at trial.  (See pages 9-10 above.)

Mitchell, Hernandez and Bashir each offered a consistent narrative of the crowbar attack on Mitchell

and the perpetrators' flight from 1166 Grand Concourse.  (See pages 7-8 above.)  The lack of

incriminating fingerprint or DNA evidence from the crowbar and red shirt found in Kaane's

apartment does not diminish the sufficiency of the other evidence presented at trial.

   "[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to

support a conviction."  United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979), cert. denied, 441

U.S. 951, 99 S. Ct. 2179 (1979); see also, e.g., United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir.

1997) ("It is well settled that where, as here, the government's case is based primarily on eyewitness

testimony describing criminal activity, 'any lack of corroboration [with physical evidence] goes only

to the weight of the evidence, not to its sufficiency.  The weight is a matter for argument to the jury,

not a ground for reversal on appeal.'") (quoting United States v. Roman, 870 F.2d 65, 71 (2d Cir.

1989)); Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994) ("Although appellants emphasize the

lack of physical evidence connecting them to the murder and contend that the testifying witnesses

were not credible, 'a conviction may be based upon circumstantial evidence and inferences based

upon the evidence, and the jury is exclusively responsible for determining a witness' credibility.'"),

cert. denied, 514 U.S. 1054, 115 S. Ct. 1436 (1995).[34/]

       Here, as in prior cases, "'the jury's decision was largely a matter of choosing whether to believe [the defense's] version of the events or to believe the version offered by the State. The jury chose to believe the State's witnesses. . . . We cannot say that no rational [factfinder] could have found guilt beyond a reasonable doubt on all the evidence.'" Jamison v. Grier, 01 Civ. 6678, 2002 WL 100642 at *12 (S.D.N.Y. Jan. 25, 2002) (Peck, M.J.) (quoting Gruttola v. Hammock, 639 F.2d 922, 928 (2d Cir. 1981)); accord, e.g., Rodriguez v. Senkowski, 03 Civ. 3314, 2004 WL 503451 at *29 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); Besser v. Walsh, 02 Civ. 6775, 2003 WL 22093477 at *22 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), R. & R. adopted, 2003 WL 22846044 (S.D.N.Y. Dec. 2, 2003); Wilson v. Senkowski, 02 Civ. 0231, 2003 WL 21031975 at *11 & n.18 (S.D.N.Y. May 7, 2003) (& cases cited therein).

---

[34/]   See also, e.g., Simpson v. Portuondo, 01 Civ. 1379, 2001 WL 830946 at *9 (S.D.N.Y. July 12, 2001) (Peck, M.J.); Natal v. Bennett, 98 Civ. 1872 1998 WL 841480 at *6 (S.D.N.Y. Dec. 3, 1998) (Petitioner "emphasizes the lack of physical evidence connecting him to [the victim's] death and contends that [the prosecution's key witness's] testimony was both 'fraught with inconsistencies and motivated by the obvious desire to curry favor with the prosecutor for her boyfriend in his then pending case.' . . . It is well settled that 'a conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness's credibility.' . . . Ultimately, the jury heard the testimony at issue and resolved any issues of witness credibility in the prosecution's favor. It is not the province of a federal court on habeas review to reassess the credibility of a witness it has not observed."); Norwood v. Hanslmaier, No. 93 CV 3748, 1998 WL 178857 at *3-4 (E.D.N.Y. 1998) ("Petitioner argues that the evidence against him was insufficient to establish his guilt because the police failed to recover a weapon or any other physical evidence, they were unable to lift any identifiable fingerprints from [the crime scene] and . . . the sole eyewitness[] made a variety of inconsistent statements. Although petitioner's observations are correct, they do not establish that the evidence was constitutionally deficient.")

Even if there had been major inconsistencies in the witnesses' testimony (including Hernandez' testimony on direct that Jamison was placed in handcuffs after the point-out identification, his opposite testimony on cross examination, and his clarification on redirect), that would not change the result.  See, e.g., United States v. Vasquez, 267 F.3d 79, 91 (2d Cir. 2001) ("The jury chose to believe the witnesses' testimony despite any inconsistencies.  We will defer to the jury's assessment of credibility."), cert. denied, 534 U.S. 1148, 122 S. Ct. 1111 (2002); Gruttola v. Hammock, 639 F.2d at 928 (rejecting insufficiency claim, holding that jury was entitled to believe prosecution witnesses despite inconsistencies in their testimony); Means v. Barkley, 98 Civ. 7603, 2000 WL 5020 at *4 (S.D.N.Y. Jan. 4, 2000) ("The testimony of a single uncorroborated witness is sufficient to achieve a showing of guilt beyond a reasonable doubt . . . even if that witness's testimony is less than entirely consistent. . . .").[35/]  While Jamison argues for a different interpretation

---

[35/]   See also, e.g., Rodriguez v. Senkowski, 2004 WL 503451 at *29; Besser v. Walsh, 2003 WL 22093477 at *22; Wilson v. Senkowski, 2003 WL 21031975 at *11 & n.19 (& cases cited therein); Jamison v. Grier, 2002 WL 100642 at *12-13 (inconsistencies in witness testimony does not make evidence insufficient); Simpson v. Portuondo, 01 Civ. 1379, 2001 WL 830946 at *9 (S.D.N.Y. Jul.12, 2001) (Peck, M.J.); Carromero v. Strack, 98 Civ. 3519, 1998 WL 849321 at *5 (S.D.N.Y. Nov. 19, 1998) (Preska, D.J. & Peck, M.J.) (evidence sufficient where jury credited prosecution witnesses' testimony "despite some inconsistencies between their trial testimony and prior statements to the police and to the grand jury"); Davis v. Senkowski, No. 97-CV-2328, 1998 WL 812653 at *5 (E.D.N.Y. Aug. 6, 1998) ("The jury here chose to believe [the prosecution witness]'s testimony despite any inconsistencies in the evidence, and I will not reassess that decision."); Williams v. Bennet, 97 Civ. 1628, 1998 WL 236222 at *5 (S.D.N.Y. Apr. 20, 1998) (Baer, D.J. & Peck, M.J.) ("Williams relies on inconsistencies in his victim's trial testimony as compared to her statements to the police, the District Attorney's office and before the grand jury.  These inconsistencies were placed before the jury by the defense, which made them a central focus of its case.  The jury's decision to credit [the victim]'s testimony, despite its inconsistencies, over Williams' testimony, is fully supported by the record."); Taxiarhopolous v. Spence, No. CV 92-0790, 1992 WL 403112 at *4 (E.D.N.Y. Dec. 28, 1992) (The petitioner "cannot show that the evidence was insufficient to support conviction.  For example, he challenges the credibility of the main prosecution witness . . . , pointing to alleged inconsistencies in his testimony.  This, however, was an argument made to, and properly resolved by, the trial jury.").

60

of the evidence (Jamison Supp. Pro Se 1st Dep't Br. at 70-73), the jury was not required to credit Jamison's arguments. There was more than sufficient evidence to convict Jamison of first degree robbery and attempted second degree assault.[36/]

Jamison's counsel nonetheless moved to dismiss all counts on the basis that the prosecution had not put forth a prima facie case. (See page 11 above.) He moved a second time to dismiss all charges in the indictment because the prosecution had not proven its case beyond a reasonable doubt. (See page 12 above.) Jamison's counsel was not ineffective because he twice attempted to persuade the court that the prosecution had not met its burden of proof despite the record evidence to the contrary.[37/]

## IV.    JAMISON'S CLAIMS REGARDING THE TRIAL COURT'S ALLEGED ERRORS ARE MERITLESS

### A.    Jamison's Pro Se Status

Jamison argues that the court allowed him to proceed pro se pretrial without making any inquiry into the risks associated with doing so. (Dkt. No. 2: Pet. ¶ 13J; Ex. 20: Jamison Supp.

---

[36/]    Jamison makes a vague argument that the "Appellate Division's decision to affirm the state court judgment is unreasonable and without any support in facts or the law." (Pet. ¶ 14K.) In its very liberal interpretation of the petition, the Court will presume that Jamison is further arguing that no facts supported his conviction for any of the crimes, including second degree criminal trespass. To be convicted, Jamison must have "knowingly enter[ed] or remain[ed] unlawfully in a dwelling." PL § 140.15. The evidence established that Jamison broke into Kaane's apartment to escape the police. (See page 9 above.) The facts and law therefore supported all of Jamison's convictions; any other argument that the First Department's decision was erroneous is rejected as meritless for the reasons stated herein.

[37/]    Jamison additionally argues that defense counsel was ineffective for allowing an impostor witness to take the stand, that the trial court erred in allowing the testimony, and that the prosecution committed a Brady violation when it refused to turn over the witness' true identity. (Pet. ¶ 13; Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 75-77.) As evidence, Jamison notes that the criminal complaint refers to a "Richard Kouame" although the correct spelling of the witness' last name is "Kaane." (Jamison Supp. Pro Se 1st Dep't Br. at 75-77.) This argument is frivolous and warrants no further discussion.

Pro Se 1st Dep't Br. at 60-62.)  The First Department found this claim meritless.  <u>People</u> v. <u>Jamison</u>, 96 A.D.3d 571, 572, 946 N.Y.S.2d 569, 570 (1st Dep't 2012); <u>see</u> pages 14-15 above.

At a hearing on November 5, 2007, Jamison's first assigned attorney, Mary Peppito, informed Justice Byrne that Jamison wanted to proceed pro se.  (Dkt. No. 21: 11/5/07 Hearing Transcript at 2.)  Justice Byrne assigned attorney Perez to represent Jamison; Perez informed the court that Jamison had rejected counsel and "wants to go pro se."  (<u>Id.</u> at 3.)  Jamison stated to the court:

> I do not wish this man to be my attorney.  It has been made clear that I wish to proceed throughout the cases pro se, and I believe that's my right.  You cannot force counsel on me.  I do not wish this man standing next to me to be my attorney nor do I wish Miss Peppito who relieved herself to be my attorney.  I would like to address the Court of a right to proceed pro se.

(<u>Id.</u> at 3-4.)  Without further discussion, the court granted Jamison's application to proceed pro se. (<u>Id.</u> at 4.)  Perez nonetheless remained Jamison's legal advisor.  (<u>See</u> Dkt. No. 22: 11/26/07 Proceedings at 2-6.)  Prior to the suppression hearing on August 4, 2008, Justice Stadtmauer engaged in a lengthy colloquy with Jamison about the risks of proceeding pro se, ultimately finding that Jamison had made "a knowing and intelligent waiver of his right to counsel."  (<u>See</u> page 3 above.)

The Sixth Amendment guarantees a criminal defendant counsel at all critical stages of a prosecution, including pretrial hearings. <u>Dallio</u> v. <u>Spitzer</u>, 343 F.3d 553, 560 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 961, 1245 S. Ct. 1713 (2004).  A defendant, however, also has the right to proceed without counsel through a knowing and intelligent waiver.  <u>See</u> <u>Faretta</u> v. <u>California</u>, 422 U.S. 806, 814, 95 S. Ct. 2525, 2530 (1975).  The Supreme Court has not "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." <u>Iowa</u> v. <u>Tovar</u>, 541 U.S. 77, 88, 124 S. Ct. 1379, 1387 (2004); <u>see</u>, <u>e.g.</u>, <u>Dallio</u> v. <u>Spitzer</u>, 343 F.3d at 561

("The issue on this appeal is whether clearly established federal law dictates as a minimum constitutional prerequisite to a knowing and intelligent waiver of counsel that a court explicitly warn a defendant of the dangers and disadvantages of proceeding pro se. We conclude that it does not."). A "range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding" will instead dictate the type of colloquy in which the trial court must engage with the defendant before he is allowed to proceed pro se. Iowa v. Tovar, 541 U.S. at 88, 124 S. Ct. at 1387. Less rigorous warnings are required pretrial because the dangers of self-representation are not as great as during trial. Id. at 89-90, 124 S. Ct. at 1388.

Even if Justice Byrne erred in allowing Jamison to proceed pro se at the November 5, 2007 hearing without sufficient inquiry, any such error ended when Justice Stadtmauer discussed with Jamison the dangers of proceeding pro se prior to the August 4, 2008 suppression hearing. (See page 3 above.) Justice Stadtmauer unequivocally informed Jamison that it was dangerous to proceed pro se given the serious charges (which entailed lengthy prison terms should Jamison be convicted) and the complexity of criminal law. (See id.) Jamison confirmed that he understood those dangers and made a knowing and intelligent waiver of his right to counsel. (See id.) The inquiry fully complied with Supreme Court precedent.

The Court must determine whether the deprivation of counsel between November 5, 2007 and August 4, 2008 was per se reversible error or harmless. "The Supreme Court has held that violations of the Sixth Amendment right to counsel are per se reversible only when they amount to an [a]ctual or constructive denial of the assistance of counsel altogether, or when counsel was prevented from assisting the accused during a critical stage of the proceeding." Lainfiesta v. Artuz, 253 F.3d 151, 157 (2d Cir. 2001) (quotations & citations omitted). Otherwise, any errors are subject

to a harmless error analysis.  Id.; see also, e.g., Dallio v. Spitzer, 170 F. Supp. 2d 327, 337 (E.D.N.Y. 2001), aff'd, 343 F.3d 553 (2d Cir. 2003).  An error is harmless if it did not have "a substantial and injurious effect or influence in determining the jury's verdict."  Nappi v. Yelich, 793 F.3d 246, 250-51 (2d Cir. 2015) (quotations omitted); see also, e.g., Fry v. Pliler, 551 U.S. 112, 121, 127 S. Ct. 2321, 2328 (2007).  Habeas relief is not warranted unless the petitioner shows that the error resulted in "'actual prejudice.'"  Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722 (1993).

Between November 5, 2007 and August 4, 2008, Perez served as Jamison's legal advisor and thus Jamison was not actually or constructively denied counsel altogether, or prevented from obtaining the assistance of counsel.  (See Dkt. No. 21: 11/5/07 Transcript at 4; Dkt. No. 22: 11/26/07 Proceedings at 2-6; Dkt. No. 23: 7/28/08 Proceedings at 2-4; Dkt. No. 26: 8/04/08 Proceedings at 2-3); see also Faretta v. California, 422 U.S. at 834 n.46, 95 S. Ct. at 2541 n.46 ("Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.").  Jamison was pro se pretrial when, as acknowledged by the Supreme Court, the dangers of self-representation are fewer. Jamison does not cite to anything that occurred during this time that impaired his defense.  When Jamison finally revoked his pro se status, Perez was prepared to move forward as trial counsel.  (See page 7 above.)  The First Department's decision was not an unreasonable application of Supreme Court precedent because any error was harmless.

## B.    The Introduction of Hearsay and "Testimonial" Evidence

Jamison argues that the trial court improperly allowed the hearsay testimony of Edgar Bashir and paramedic Jamil Perez.  (Dkt. No. 2: Pet. ¶ 13.)  Bashir testified about his observations

on the day of the robbery and the two 911 calls he placed, after which the prosecution played both calls for the jury.  (See page 8 above.)  The calls were placed at approximately 10:30 a.m. and 10:47 a.m.  (See id.)  Bashir did not witness the robbery.  (See id.)  The first call described the perpetrators' flight from 1166 Grand Concourse after the robbery, and the second call was placed to obtain medical attention for Mitchell.  (See id.)  The 911 calls were admitted as Bashir's present sense impression and/or excited utterance.  (Tr. 461-62.)  Paramedic Perez testified that he transported Jamison to the hospital.  (Perez: Tr. 380-97.)  The prosecution questioned Perez about the contents of an ambulance report he helped draft.  (Id.)  The ambulance report was admitted as a business record.  (Tr. 390.)

Jamison challenged both witnesses' testimony on direct appeal, claiming that admission of the hearsay 911 calls violated the Confrontation Clause and his rights under the Fourteenth Amendment.  (Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 54-55.)  Jamison further objected to the "'hearsay nature'" of paramedic Perez' testimony "and the improper use of his hearsay medical notations contained in someone else's medical report," without raising a clear confrontation argument.  (Id. at 55.)  The First Department found both claims to be meritless.  People v. Jamison, 96 A.D.3d 571, 571-72, 946 N.Y.S.2d 569, 570 (1st Dep't 2012); see pages 14-15 above.

The Confrontation Clause of the Sixth Amendment affords the accused the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Sixth Amendment's Confrontation Clause is applicable in state criminal trials via the Fourteenth Amendment.  E.g., Crawford v. Washington, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359 (2004); Douglas v. Alabama, 380 U.S. 415, 418, 85 S. Ct. 1074, 1076 (1965); Pointer v. Texas, 380 U.S. 400, 404, 85 S. Ct. 1065,

1068 (1965).[38/]   The primary purpose of the Confrontation Clause is to prevent out-of-court

statements from being used against a criminal defendant in lieu of in-court testimony subject to

cross-examination.  E.g., Douglas v. Alabama, 380 U.S. at 418-19, 85 S. Ct. at 1076-77; see, e.g.,

Crawford v. Washington, 124 S. Ct. at 1373-69.[39/]

       The clause bars the "admission of testimonial statements of a witness who did not

appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for

cross-examination."  Crawford v. Washington, 541 U.S. at 53-54, 124 S. Ct. at 1365.  "Statements

are nontestimonial when made in the course of police interrogation under circumstances objectively

indicating that the primary purpose of the interrogation is to enable police assistance to meet an

ongoing emergency.  They are testimonial when the circumstances objectively indicate that there

is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or

prove past events potentially relevant to later criminal prosecution."  Davis v. Washington, 547 U.S.

---

[38/]    See also, e.g., Del Pilar v. Phillips, 03 Civ. 8636, 2004 WL 1627220 at *17 (S.D.N.Y. July 21, 2004) (Peck, M.J.), R. & R. adopted, 2006 WL 3735684 (S.D.N.Y. Dec. 15, 2006); Hernandez v. Filion, 03 Civ. 6989, 2004 WL 286107 at *14 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.), R. & R. adopted, 2004 WL 555722 (S.D.N.Y. Mar. 19, 2004); Skinner v. Duncan, 01 Civ. 6656, 2003 WL 21386032 at *31 (S.D.N.Y. June 17, 2003) (Peck, M.J.); Aramas v. Donnelly, 99 Civ. 11306, 2002 WL 31307929 at *11 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); James v. People of the State of N.Y., 99 Civ. 8796, 2001 WL 706044 at *9 (S.D.N.Y. June 8, 2001) (Peck, M.J.), R. & R. adopted, 2002 WL 31426266 (S.D.N.Y. Oct. 25, 2002); Mendez v. Artuz, 98 Civ. 2652, 2000 WL 722613 at *29 (S.D.N.Y. June 6, 2000) (Peck, M.J.), R. & R. adopted, 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000), aff'd, 303 F.3d 411 (2d Cir. 2002), cert. denied, 123 S. Ct. 1353 (2003); Avincola v. Stinson, 60 F. Supp. 2d 133, 153 (S.D.N.Y. 1999) (Scheindlin, D.J. & Peck, M.J.).

[39/]    See also, e.g., Cotto v. Herbert, 331 F.3d 217, 229 (2d Cir. 2003); Ryan v. Miller, 303 F.3d 231, 247 (2d Cir. 2002); Mitchell v. Hoke, 930 F.2d 1, 2 (2d Cir. 1991); Del Pilar v. Phillips, 2004 WL 1627220 at *17; Hernandez v. Filion, 2004 WL 286107 at *14; Skinner v. Duncan, 2003 WL 21386032 at *31; Aramas v. Donnelly, 2002 WL 31307929 at *11; James v. People, 2001 WL 706044 at *9; Mendez v. Artuz, 2000 WL 722613 at *29; Avincola v. Stinson, 60 F. Supp. 2d at 153.

813, 822, 126 S. Ct. 2266, 2273-74 (2006).  A 911 call generally is not used to establish or prove

past events, "but to describe current circumstances requiring police assistance."  Id. at 827, 126 S.

Ct. at 2276.  The conversation, however, could eventually produce testimonial statements once the

caller conveys the information needed to address the emergency at hand.  Id. at 828, 126 S. Ct. at

2277.  Similarly, business records generally are deemed non-testimonial because they have not been

created to prove a fact at trial.  Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324, 129 S. Ct. 2527,

2539-40 (2009) ("Business and public records are generally admissible absent confrontation not

because they qualify under an exception to the hearsay rules, but because-having been created for

the administration of an entity's affairs and not for the purpose of establishing or proving some fact

at trial-they are not testimonial.").

Whether the 911 calls were testimonial is irrelevant; Jamison's right to confrontation

was not violated because Bashir testified at trial.  The Supreme Court clarified this issue in

Crawford:

> Finally, we reiterate that, when the declarant appears for cross-examination at trial,
> the Confrontation Clause places no constraints at all on the use of his prior
> testimonial statements. . . .  The Clause does not bar admission of a statement so long
> as the declarant is present at trial to defend or explain it.  (The Clause also does not
> bar the use of testimonial statements for purposes other than establishing the truth
> of the matter asserted.)

Crawford v. Washington, 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9 (citations omitted).  Bashir's trial

testimony and availability for cross examination eliminated any confrontation concerns.

Jamison's argument that the 911 calls were prejudicial hearsay (regardless of their

testimonial nature) fails as well.

"In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502

U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'").  Thus, a habeas petitioner must demonstrate that the allegedly-erroneous state court evidentiary rulings violated an identifiable constitutional right.  See, e.g., Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) ("The [habeas] court must determine whether the exclusion [of testimony] was an error of constitutional dimension . . . ."); Taylor v. Curry, 708 F.2d 886, 890-91 (2d Cir.) ("Erroneous [state court] evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus.  Rather, the writ would issue only where petitioner can show that the error deprived her of a fundamentally fair trial."), cert. denied, 464 U.S. 1000, 104 S. Ct. 503 (1983).

That is a "heavy burden, for 'generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation.'"  Bonet v. McGinnis, 98 Civ. 6529, 2001 WL 849454 at *2 (S.D.N.Y. July 27, 2001).

The first step in this analysis is to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule could not be unconstitutional.[40]  See, e.g., Brooks v. Artuz, 97 Civ. 3300, 2000 WL 1532918 at *6, *9 (S.D.N.Y. Oct. 17, 2000) (petitioner did not demonstrate an error under state

---

[40]  This assumes that the petitioner has not attacked the constitutionality of the state evidentiary rule itself.  See, e.g., Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006) (distinguishing between cases where the trial court deprived the petitioner of a fair trial by improperly applying the state evidentiary rule and cases addressing the constitutionality of the state evidentiary rule itself), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Jones v. Stinson, 94 F. Supp. 2d 370, 387 n.19 (E.D.N.Y.) (distinguishing between cases "where an evidentiary rule was correctly applied as a matter of state law, but is either unconstitutional on its face or violates a constitutional right as applied," and cases where the petitioner took no exception to the constitutionality of the state evidentiary rule, but asserted that the state court decision misapplied the state rule, resulting in a constitutional violation), rev'd on other grounds, 229 F.3d 112 (2d Cir. 2000).

evidentiary law, "much less" an error of constitutional magnitude); Jones v. Stinson, 94 F. Supp. 2d

at 391-92 (once the habeas court has found that the state court ruling was not erroneous under state

law, there is no need to apply a constitutional analysis).[41]

Second, the petitioner must allege that the state evidentiary error violated an

identifiable constitutional right. This necessarily eliminates consideration of purely state evidentiary

errors not cognizable in the federal system. See, e.g., Landy v. Costello, No. 97-2433, 141 F.3d

1151 (table), 1998 WL 105768 at *1 (2d Cir. Mar. 9, 1998) ("To the extent [petitioner's] claim is

based on a Rosario violation, it must fail, because a habeas petition can only be granted to remedy

some violation of federal law; the obligation to turn over Rosario material arises under state law.

Thus, the only question is whether the prosecution violated Brady."); Arocho v. Walker, 01 Civ.

1367, 2001 WL 856608 at *3 (S.D.N.Y. July 27, 2001); Ayala v. Hernandez, 712 F. Supp. 1069,

1074 (E.D.N.Y. 1989).

Third, an erroneous state evidentiary ruling that is asserted to be a constitutional

violation will merit habeas relief only "'where [the] petitioner can show that the error deprived [him]

---

[41] See also, e.g., Williams v. Walker, No. 00-CV-5912, 2001 WL 1352105 at *3 (E.D.N.Y. Oct. 31, 2001) (habeas court must first determine if ruling was erroneous under state law, and then whether ruling was of a constitutional magnitude); Coleman v. Greiner, No. 97-CV-2409, 1999 WL 320812 at *5 (E.D.N.Y. May 19, 1999); Till v. Miller, 96 Civ. 4387, 1998 WL 397848 at *4 (S.D.N.Y. July 16, 1998); Mitchell v. Herbert, 97 Civ. 5128, 1998 WL 186766 at *5-6 (S.D.N.Y. Apr. 20, 1998) (Chin, D.J.); Copes v. Schriver, 97 Civ. 2284, 1997 WL 659096 at *3 (S.D.N.Y. Oct. 22, 1997); Simmons v. Ross, 965 F. Supp. 473, 480 (S.D.N.Y. 1997); Dey v. Scully, 952 F. Supp. 957, 969 (E.D.N.Y. 1997) ("[T]he Court engages in a two part analysis, examining 1) whether the exclusion [of evidence] was error under state law, and 2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial."); see generally Davis v. Strack, 270 F.3d 111, 123-24 (2d Cir. 2001) (in determining whether failure to give state jury charge violated federal constitution, first question for habeas court is whether the charge was required under New York law, and only if so, was the failure to give the charge of constitutional dimension).

of a <u>fundamentally fair</u> trial.'" <u>Rosario</u> v. <u>Kuhlman</u>, 839 F.2d at 925.[42/] The test for "'fundamental

fairness'" is whether the excluded or improperly admitted evidence, "'evaluated in the context of the

entire record,'"[43/] "'create[d] a reasonable doubt [regarding petitioner's guilt] that did not otherwise

exist.'" <u>Taylor</u> v. <u>Curry</u>, 708 F.2d at 891 (quoting the materiality standard defined in <u>United States</u>

v. <u>Agurs</u>, 427 U.S. at 112-13, 96 S. Ct. at 2401-02).[44/]

The "'fundamental fairness'" standard applies to the erroneous exclusion or admission

of evidence. <u>See, e.g.</u>, <u>Dowling</u> v. <u>United States</u>, 493 U.S. 342, 352, 110 S. Ct. 668, 674 (1990) (The

introduction of improper evidence does not violate due process unless the evidence "is so extremely

unfair that its admission violates 'fundamental conceptions of justice.'"); <u>McKinnon</u> v.

<u>Superintendent, Great Meadow Corr. Facility</u>, 422 F. App'x 69, 73 (2d Cir. 2011) ("[U]nless the

challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those

---

[42/] <u>See also</u>, <u>e.g.</u>, <u>Jones</u> v. <u>Stinson</u>, 229 F.3d at 120; <u>Dunnigan</u> v. <u>Keane</u>, 137 F.3d 117, 125 (2d Cir.) ("The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'"), <u>cert. denied</u>, 525 U.S. 840, 119 S. Ct. 101 (1998); <u>Collins</u> v. <u>Scully</u>, 755 F.2d 16, 18 (2d Cir. 1985) ("In order to prevail on a [habeas] claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial . . . .").

[43/] "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." <u>United States</u> v. <u>Agurs</u>, 427 U.S. 97, 112-13, 96 S. Ct. 2392, 2402 (1976).

[44/] <u>Accord</u>, <u>e.g.</u>, <u>Bell</u> v. <u>Ercole</u>, 368 F. App'x 216, 218 (2d Cir. 2010); <u>Rasmussen</u> v. <u>Filion</u>, 164 F. App'x 56, 57 (2d Cir. 2006); <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 244; <u>Jones</u> v. <u>Stinson</u>, 229 F.3d at 120; <u>Justice</u> v. <u>Hoke</u>, 90 F.3d 43, 47 (2d Cir. 1996); <u>Johnson</u> v. <u>Ross</u>, 955 F.2d 178, 181 (2d Cir. 1992); <u>Blissett</u> v. <u>Lefevre</u>, 924 F.2d 434, 439 (2d Cir.), <u>cert. denied</u>, 502 U.S. 852, 112 S. Ct. 158 (1991); <u>Collins</u> v. <u>Scully</u>, 755 F.2d at 19; <u>Rosario</u> v. <u>Kuhlman</u>, 839 F.2d at 925.

proceedings, the claims are not properly reviewable . . . ."), cert. denied, 132 S. Ct. 1151 (2012); Young v. McGinnis, 319 F. App'x 12, 13 (2d Cir. 2009) ("Improperly admitted evidence can constitute a due process violation where it 'is so extremely unfair that its admission violates fundamental conceptions of justice.'"); Cordon v. Greiner, 225 F. App'x 13, 15 (2d Cir. 2007); Vega v. Portuondo, 120 F. App'x 380, 382 (2d Cir.) ("[T]he admission even of unfairly prejudicial evidence does not violate due process unless, taken in light of the record as a whole, it was sufficiently material to have removed a reasonable doubt that would otherwise have existed as to defendant's guilt."), cert. denied, 546 U.S. 836, 126 S. Ct. 66 (2005); Dunnigan v. Keane, 137 F.3d at 125 ("For the erroneous admission of . . . unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" (quoting Johnson v. Ross, 955 F.2d at 181)); Rodriguez v. O'Keefe, No. 96-2699, 122 F.3d 1057 (table), 1997 WL 557622 at *2 (2d Cir. Sept. 9, 1997), cert. denied, 522 U.S. 1123, 118 S. Ct. 1068 (1998); Collins v. Scully, 755 F.2d at 18-19; Roldan v. Artuz, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000).[45/]

---

[45/]    For the reasons stated by Judge Block in Dey v. Scully, "[h]armless error analysis is simply inapplicable to [trial] error that only attains constitutional significance when considered in the context of the entire trial because such analysis inheres in the initial finding that the error was constitutionally significant. A determination that such error was not harmless, after having already concluded that it denied the defendant a fundamentally fair trial, would be tautological." Dey v. Scully, 952 F. Supp. at 974; see also, e.g., Kyles v. Whitley, 514 U.S. 419, 436, 115 S. Ct. 1555, 1567 (1995) ("Agurs . . . opted for its formulation of materiality . . . only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under Kotteakos."); Washington v. Schriver, 255 F.3d 45, 56-57 (2d Cir. 2001) ("The creation of otherwise non-existent reasonable doubt [under Agurs] satisfies the 'substantial and injurious' standard" under Brecht. (quoting Jones v. Stinson, 229 F.3d at 120)); Coleman v. Greiner, 1999 WL 320812 at *4-5.

The final question is how to apply the AEDPA in the context of a fundamental fairness analysis, an issue addressed by the Second Circuit in <u>Jones</u> v. <u>Stinson</u>, 229 F.3d at 120-21. In <u>Jones</u>, the state appellate court decided that the trial court's evidentiary rulings had not denied the defendant a fair trial. <u>Id.</u> at 116. The Second Circuit held that, although it might have found, under the <u>Agurs</u> standard, that one of the trial court's rulings "'create[d] a reasonable doubt that did not otherwise exist,'" the Second Circuit could not conclude that the excluded testimony "would so certainly have created new ground for reasonable doubt that the appellate division's decision [affirming the trial court's ruling] was objectively unreasonable." <u>Id.</u> at 120. The Second Circuit thus denied habeas relief based on the AEDPA's deferential review standard. <u>Id.</u> at 120-21.

The admission of the 911 calls was not a constitutional violation. Bashir testified about his observations after the robbery including the need to obtain medical attention for Mitchell. The calls—used to corroborate Bashir's testimony—were cumulative of other properly admitted evidence. (<u>Compare</u> Tr: 459-61, <u>with</u> Bashir: Tr. 467-488.) Hernandez witnessed the assault on Mitchell and the perpetrators running from 1166 Grand Concourse. (<u>See</u> page 8 above.) Mitchell described the assault that led to his hospitalization. (<u>See id.</u>) Jamison was free to cross examine Bashir on any inconsistencies between his testimony and the calls, and Jamison's counsel seized on that opportunity. (Tr. 495-98.) Moreover, the trial court provided a limiting instruction prior to playing the tapes (Tr. 483), after Jamison's counsel expressed concern about Bashir's use of the words "robbery" and "assault" during the calls (Tr. 462). Justice Stadtmauer told the jury:

> The CD is a recording of what Mr. Bashir has testified was his call to 911. It's not being offered for the truth of what's contained in what Mr. Bashir said to 911 because the best evidence of that is the witness sitting right here. However, you may listen to it in order to glean whatever inferences you find you should draw from that.

(Tr. 483.)  Assuming the calls were improperly admitted (which Jamison has not shown), the error did not impact the fundamental fairness of the proceedings.

The State argues that Jamison's challenge to paramedic Perez' hearsay testimony was not presented in federal constitutional terms on appeal.  (Dkt. No. 15: State Opp. Br. at 65 n.18.) Rather, Jamison argued on appeal that the trial court made an improper evidentiary ruling by admitting hearsay "medical notations" contained in the ambulance report.  (See Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 55.)  Jamison did not explicitly argue that Perez' testimony violated the Confrontation Clause, or that the erroneous evidentiary ruling deprived him of due process. Although Jamison was not required to cite specific provisions of the Constitution to fairly present his federal claim to the state court, his reliance on two New York cases in his supplemental appeal brief would not have put the First Department on notice of the constitutional dimensions of his claim.  (Id., citing People v. Taylor, 80 N.Y.2d 1, 586 N.Y.S.2d 545 (1992), & Jemmott v. Lazofsky, 5 A.D.3d 558, 772 N.Y.S.2d 840 (2d Dep't 2004).); see Daye v. Attorney Gen. of State of N.Y., 696 F.2d 186, 194 (2d Cir. 1982).  Neither case employed relevant "constitutional analysis in like fact situations" and Jamison cited no other federal case law or constitutional provisions to support his argument.  Daye v. Attorney Gen. of State of N.Y., 696 F.2d at 194.  Because Jamison failed to present this record-based claim on his direct appeal, it is deemed exhausted but procedurally defaulted.  CPL § 440.10(2)(c); see, e.g., Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); Reyes v. Keane, 118 F.3d 136, 139-40 (2d Cir. 1997).  The Court accordingly finds that Jamison's claim is barred from federal habeas review.

In any event, this claim is meritless.  The ambulance report presents a potential confrontation issue because paramedic Perez testified that he only wrote half of the report, while his partner drafted the other half.  (Perez: Tr. 388.)  While Jamison was unable to cross examine the

73

author of a portion of the admitted report, there is no evidence that the report was anything but a record generated in the usual course of treating an injured individual, making it non-testimonial and not subject to confrontation restrictions.  See Melendez-Diaz v. Massachusetts, 557 U.S. at 324, 129 S. Ct. at 2539-40.  Assuming arguendo that the report was testimonial and/or was improperly admitted hearsay, its admission would not warrant federal habeas relief.

Jamison's counsel objected to the admission of Perez' testimony not because it was prejudicial to the defense, but because it was irrelevant to the issue of guilt.  (Tr. 377-78, 387.)  The trial court limited the prosecution's examination of paramedic Perez to the reason Jamison was transported to the hospital.  (Tr. 395-96.)  Neither Perez' testimony nor the ambulance report itself had any bearing on the critical question in the case:  whether Jamison was correctly identified as the perpetrator.  The prosecutor did not mention the ambulance report or Perez' testimony during summation.  (See generally Tr. 661-87.)  During the defense summation, Jamison's counsel emphasized that paramedic Perez' testimony was relevant to "[a]bsolutely nothing whatsoever," and "whether the defendant had a seizure or not has absolutely no bearing on what happened" on the day of the robbery.  (Tr. 650-51.)  Admission of  the "hearsay" portion of the ambulance report did not impact the fundamental fairness of the proceedings, and any Confrontation Clause violation was harmless.  See, e.g., Munford v. Graham, 09 Civ. 7899, 2010 WL 644435 at *19 (S.D.N.Y. Feb. 24, 2010) (Peck, M.J.) ("It is black letter law, undisputed by the parties here, that Confrontation Clause violations are subject to harmless error analysis.") (& cases cited), R. & R. adopted, 2010 WL 2720395 (S.D.N.Y. June 29, 2010), aff'd, 467 F. App'x 18 (2d Cir. 2012).

## C.     Hernandez' Allegedly Perjured Testimony

Jamison argues that the prosecution knowingly elicited false testimony from Hernandez.  (Dkt. No. 2: Pet. ¶ 13.)  Hernandez testified at trial that he had a brief conversation with

Jamison a week prior to the robbery.  (See page 8 above.)  But when Hernandez was asked before the grand jury if he had "ever met either one of those individuals [i.e., Jamison and his accomplice] prior to" October 2, 2007, Hernandez answered, "No."  (Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 20.)

"A petitioner's claim that his conviction was based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment."  Duncan v. Fischer, 410 F. Supp. 2d 101, 116 (E.D.N.Y. 2006) (citing Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959)); accord, e.g., Drake v. Portuondo, 553 F.3d 230, 240 (2d Cir. 2009) ("Supreme Court holdings have long 'established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'" (quoting Napue v. Illinois, 360 U.S. at 269, 79 S. Ct. at 1177)).[46]

"Under this standard, the [Supreme] Court has said that the conviction must be set aside if (1) 'the prosecution knew, or should have known, of the perjury,' and (2) 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) (fn. omitted) (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976)).[47]  "The petitioner has the burden of demonstrating, by

---

[46]    See also, e.g., Zahrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000) ("It has also long been established that a prosecutor who knowingly uses false evidence at trial to obtain a conviction acts unconstitutionally."); Deberry v. Spitzer, No. 05 CV 5286, 2011 WL 1239999 at *8 (E.D.N.Y. Feb. 17, 2011) ("It is well established that a defendant's due process rights are violated if the prosecutor knowingly uses perjured testimony to obtain a conviction."), R. & R. adopted, 2011 WL 1211969 (E.D.N.Y. Mar. 30, 2011).

[47]    Accord, e.g., Graham v. Greiner, 123 F. App'x 436, 437 (2d Cir. 2005); Thompson v. Artuz, No. 06-CV-0254, 2011 WL 736060 at *9 (W.D.N.Y. Jan. 4, 2011) ("A conviction must be set aside if the prosecutor knew, or should have known, of the perjury and there is any reasonable likelihood that the false testimony affected the verdict."),  R. & R. adopted, 2011 (continued...)

a preponderance of evidence, that the witness committed perjury, and, in determining whether perjury occurred, a court must 'weigh all the evidence of perjury before it.'" Zimmerman v. Burge, 492 F. Supp. 2d at 196 (quoting Ortega v. Duncan, 333 F.3d 102, 106-07 (2d Cir. 2003)).

        The Second Circuit has made clear that a "witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001) (citing United States v. Dunnigan, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993)), cert. denied, 535 U.S. 1042, 122 S. Ct. 1808 (2002). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." United States v. Monteleone, 257 F.3d at 219; see, e.g., Torres v. Ercole, 06 Civ. 0674, 2009 WL 4067281 at *15 (S.D.N.Y. Nov. 24, 2009) (denying habeas relief on false testimony claim because "'any discrepancy between [witness'] testimony at the first trial and at the Huntley hearing resulted from his lack of recollection.'"), aff'd, 421 F. App'x 6 (2d Cir. 2011); Jackson v. Artus, 07 Civ. 1114, 2008 WL 4386826 at *20 (S.D.N.Y. Sept. 22, 2008) ("[T]here is no evidence that Siskey's testimony was perjurious, because the inconsistencies between Siskey's trial testimony, her complaint report, and Ince's statement to the police are minor.").

        There is no evidence that Hernandez willfully provided false testimony at trial. Jamison cannot show that the discrepancies between Hernandez' grand jury and trial testimony resulted from outright lies rather than "confusion, mistake, or faulty memory." United States v. Monteleone, 257 F.3d at 219. Jamison's claim that he "had not even been in the City of New York"

---

[47]/     (...continued)
WL 720074 (W.D.N.Y. Feb. 23, 2011); Zimmerman v. Burge, 492 F. Supp. 2d 170, 196 (E.D.N.Y. 2007); Duncan v. Fischer, 410 F. Supp. 2d at 116.

on the Sunday prior to the robbery might suggest misidentification, but not perjury.  (Jamison Supp.

Pro Se 1st Dep't Br. at 19.)  The Court cannot conclude that the First Department unreasonably

applied Napue and its progeny to deny Jamison's claim.

## V.    JAMISON'S BRADY CLAIMS ARE MERITLESS

Jamison makes a number of arguments that the prosecution violated its duty to

disclose exculpatory evidence under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963).  He

argues the prosecution should have turned over the following evidence, but failed to do so:

1)    Mitchell's medical records that allegedly prove he was struck with the crowbar on the right side of his head, not the left as he testified at trial, and that he had a prior wound on the left side of his head;

2)    Hernandez' updated criminal history and psychiatric treatment records;

3)    The surveillance tape that purportedly shows Jamison entering 230 E. 167th Street in the Bronx between approximately 10:09 a.m. and 10:30 a.m.;

4)    The Assistant District Attorney's "write ups" of the criminal case and other notations on the "white folder";

5)    Property clerk invoice vouchers that allegedly prove evidence tampering by the police; and

6)    Erma Ramos' identity and the police reports related to the second robbery at 230 E. 167th Street that prove Jamison was at that location when the robbery at 1166 Grand Concourse occurred.[48]

---

[48]    To the extent that Jamison grounds his claims in the prosecution's violation of People v. Rosario, 9 N.Y.2d 286, 289-91, 213 N.Y.S.2d 448, 450-52, cert. denied, 368 U.S. 866, 82 S. Ct. 117 (1961), which requires the prosecutor to disclose any prior written or recorded statements made by a prosecution witness, those claims "must fail, because a habeas petition can only be granted to remedy some violation of federal law; the obligation to turn over Rosario material arises under state law."  Landy v. Costello, No. 97-2433, 141 F.3d 1151 (table), 1998 WL 105768 at *1 (2d Cir. Mar. 9, 1998); see also, e.g., Harris v. Smith, 06 Civ. 7824, 2011 WL 781128 at *7 (S.D.N.Y. Jan. 5, 2011) (Rosario claims "are grounded in state case-law and statute; as such, they are not cognizable on federal habeas review."), R. & R. adopted, 2011 WL 797492 (S.D.N.Y. Mar. 7, 2011); Shomo v. Zon, 05 Civ. 10337, 2008
(continued...)

(Ex. 15: 1/20/10 CPL § 440.10 Motion Reply Br. at 4-5; Ex. 17: 1/20/10 CPL § 440.10 Motion Surreply Br. at 3; Ex. 19: Jamison 1st Dep't Br. at 31-37; Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 28 n.5; Ex. 22: Jamison Pro Se 1st Dep't Reply Br. at 7-8; Ex. 24: 1/11/12 CPL § 440.10 Motion at 5-20; Ex. 33: 2/18/14 CPL § 440.10 Motion at 19-21, 26-27, 36-37; Ex. 39: 2/18/14 CPL § 440.10 Motion Reply Br. at 9-11.)

### A.    The Brady v. Maryland Standard

Under Brady v. Maryland and its progeny, state as well as federal prosecutors must turn over exculpatory and impeachment evidence, whether or not requested by the defense, where the evidence is material either to guilt or to punishment.  See, e.g., Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948 (1999); United States v. Bagley, 473 U.S. 667, 676, 682, 105 S. Ct. 3375, 3380, 3383-84 (1985); United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976); Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963).[49/]  The Brady rule also encompasses

---

[48/]    (...continued)
WL 2981555 at *10 n.5 (S.D.N.Y. Aug. 1, 2008) ("Although Brady violation claims are subject to federal review, Rosario claims are not because they are based solely on state law."); Mitchell v. Artus, 07 Civ. 4688, 2008 WL 2262606 at *34 n.52 (S.D.N.Y. June 2, 2008) (Peck, M.J.) ("Although [petitioner] claims that the prosecution committed both a Brady and Rosario violation . . . , this Court only will discuss [petitioner's] Brady claim because Rosario is a state law matter."), R. & R. adopted, 2008 WL 3884373 (S.D.N.Y. Aug. 21, 2008); Van Stuyvesant v. Conway, 03 Civ. 3856, 2007 WL 2584775 at *21 (S.D.N.Y. Sept. 7, 2007) (Rosario violation claim is not cognizable on habeas review because it "does not implicate a federal constitutional right."); Ellis v. Phillips, 04 Civ. 7988, 2005 WL 1637826 at *27 (S.D.N.Y. July 13, 2005) (Peck, M.J.) ("While the federal Brady rule . . . and New York's Rosario rule . . . overlap considerably, they are not identical, and Rosario (as opposed to Brady) claims are not cognizable on habeas review." (citing cases)).

[49/]    See also, e.g., United States v. Jackson, 345 F.3d 59, 70 (2d Cir. 2003), cert. denied, 541 U.S. 956, 124 S. Ct. 1705 (2004); Shabazz v. Artuz, 336 F.3d 154, 161-62 (2d Cir. 2003); United States v. Gil, 297 F.3d 93, 101, 103 (2d Cir. 2002); In re United States v. Coppa, 267 F.3d 132, 135, 139 (2d Cir. 2001); United States v. Diaz, 176 F.3d 52, 108 (2d Cir.), cert. denied, 120 S. Ct. 181 (1999); Tankleff v. Senkowski, 135 F.3d 235, 250 (2d Cir. 1998);
(continued...)

78

evidence known only to the police:  "In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'"  Strickler v. Greene, 527 U.S. at 281, 119 S. Ct. at 1948 (quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995)).

The Brady rule does not require a prosecutor to "deliver his entire file to defense counsel," but only to disclose those items which are material to the defendant's guilt or punishment. United States v. Bagley, 473 U.S. at 675, 105 S. Ct. at 3380; accord, e.g., Kyles v. Whitley, 514 U.S. at 437, 115 S. Ct. at 1567 ("We have never held that the Constitution demands an open file policy."); United States v. Agurs, 427 U.S. at 108-09, 96 S. Ct. at 2400.[50/]

"There are three components of a true Brady violation:  [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  Strickler v. Greene, 527 U.S. at 281-82, 119 S. Ct. at 1948.[51/]

## B.    Application to Jamison's Claims

### 1.    Mitchell's Medical Records

---

[49/]    (...continued)
Orena v. United States, 956 F. Supp. 1071, 1090-92 (E.D.N.Y. 1997) (Weinstein, D.J.).

[50/]    See also, e.g., In re United States v. Coppa, 267 F.3d at 135; Tate v. Wood, 963 F.2d 20, 25 (2d Cir. 1992); United States v. Gaggi, 811 F.2d 47, 59 (2d Cir.), cert. denied, 482 U.S. 929, 107 S. Ct. 3214 (1987); Hoover v. Leonardo, No. 91-CV-1211, 1996 WL 1088204 at *2 (E.D.N.Y. June 11, 1996).

[51/]    See also, e.g., Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1250, 1272 (2004); Moore v. Illinois, 408 U.S. 786, 794-95 , 92 S. Ct. 2562, 2568 (1972); United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004); United States v. Jackson, 345 F.3d at 71; United States v. Gil, 297 F.3d at 101; In re United States v. Coppa, 267 F.3d at 140; United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995), cert. denied, 516 U.S. 1165, 116 S. Ct. 1056 (1996); Orena v. United States, 956 F. Supp. at 1090.

79

Jamison argued in his third CPL § 440.10 motion that the prosecution suppressed Mitchell's impeaching medical records.  (Ex. 39: 2/18/14 CPL § 440.10 Motion Reply Br. at 9-11.) The medical records indicate that Mitchell reported being hit by the crowbar on the right side of his forehead, but he testified at trial that Jamison hit him on the left side.  (2/18/14 CPL § 440.10 Motion Reply Br. at 9-11; compare Mitchell: Tr. at 320, with Ex. 36: Discovery Packet at 10, 12, 14, 19.)  The medical records also suggest, Jamison argues, that Mitchell had suffered a previous injury to the left side of his head.  (2/18/14 CPL § 440.10 Motion Reply Br. at 10.)  According to Jamison, Mitchell purposely misled the jury by pointing to the left side of his head where there is a visible wound from the prior injury.  (Id. at 10-11.)

The court found Jamison's allegation that he never received Mitchell's medical records to be "wholly unsubstantiated." (Ex. 43: 9/16/14 Order at 4.)  This Court must defer to this factual determination unless Jamison presents clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); see also cases cited at page 27 above.  The State claims that Mitchell's medical records were in fact given to Jamison pre-trial as part of a discovery packet. (Dkt. No. 15: State Opp. Br. at 81.)  Jamison presents no contrary evidence or argument.

Assuming arguendo that the medical records were not disclosed, however, they are not material for Brady purposes.  The suppression of exculpatory documents does not violate a defendant's constitutional rights unless the documents are "material."  Boyette v. Lefevre, 246 F.3d 76, 91 (2d Cir. 2001).  Under Brady, "information is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (quoting Pennsylvania v.

Ritchie, 480 U.S. 39, 57, 107 S.Ct. 989, 1001 (1987)), cert. denied, 546 U.S. 1115, 126 S. Ct. 1080 (2006).   A reasonable probability is one "'sufficient to undermine confidence in the outcome.'" Pennsylvania v. Ritchie, 480 U.S. at 57, 107 S. Ct. at 1001; see also Banks v. Dretke, 540 U.S. 668, 698, 124 S. Ct. 1256, 1276 (2004) ("Kyles instructed that the materiality standard for Brady claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'") (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995)).   The impact of the suppressed evidence is evaluated "in light of the evidence as a whole."   United States v. Jackson, 345 F.3d 59, 74 (2d Cir. 2003), cert. denied, 541 U.S. 956, 124 S. Ct. 1705 (2004).

The medical records admittedly have some impeachment value because they contradict Mitchell's trial testimony as to where he was hit.   Impeachment evidence has been found to be material where the particular witness "supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case."   United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995) (citation & quotations omitted).   The allegedly withheld medical records do not undermine the critical element of the prosecution's case, i.e., that Mitchell was attacked with a crowbar.   The records confirm that Mitchell was "hit with [a] metal object in the head by robbers" during an "on the [j]ob [a]ssault with pain to head."   (Ex. 36: Discovery Packet at 17.)   Mitchell's testimony was corroborated by Hernandez and Bashir who testified that they witnessed Jamison's crowbar assault on Mitchell.   (See page 8 above.)   Moreover, Jamison's counsel used the prosecution's failure to put Mitchell's medical records into evidence to his advantage, arguing that there was no way to prove beyond a reasonable doubt that Mitchell was physically injured.   (Tr. 651.)   Jamison's attempt to bolster the materiality of the withheld medical records by arguing that Mitchell perjured himself

when he pointed to some visible pre-existing injury is entirely unsupported.[52]   The allegedly withheld evidence is not "material."

### 2.   Hernandez' Criminal History and Psychiatric Treatment Records

Jamison maintains that the prosecution did not disclose Hernandez' full criminal history, including police reports from prior arrests, or his psychiatric treatment records.  (Dkt. No. 2: Pet. ¶¶ 13, 13B; Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 28 n.5; Ex. 24: 1/11/12 CPL § 440.10 Motion at 15-20; Ex. 33: 2/18/14 CPL § 440.10 Motion at 36-37.)

### a.   The Rap Sheet, Police Reports and Undisclosed Arrest

Jamison claimed on appeal that the prosecution "refused to turn over a copy of an updated criminal history/rap-sheet of Hernandez in violation of Brady v. Maryland."  (Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 28 n.5.)  The First Department found this claim meritless. People v. Jamison, 96 A.D.3d 571, 572, 946 N.Y.S.2d 569, 570 (1st Dep't 2012); see pages 14-15 above.

The prosecutor represented that he turned over "every conviction" Hernandez had listed on his "rap sheet." (Tr. 231-32.)  It is unclear whether the rap sheet itself was disclosed.  (See id.)  Jamison's counsel devoted a good portion of his cross-examination to Hernandez' convictions; Hernandez admitted that he was convicted in January 2007 of selling crack cocaine, for which he was sentenced to five years' probation and evicted from his apartment at 1166 Grand Concourse. (Hernandez: Tr. 172-73, 221-26, 240.)  Police found twenty-six bags of crack cocaine and a .32 caliber revolver in Hernandez' apartment.  (Hernandez: Tr. 223-25.)  Hernandez also testified that

---

[52]   For substantially the same reasons set forth in section IV.C. above, Jamison's claim that the trial prosecutor knowingly elicited "false and perjurious testimony" (Pet. ¶ 13) from Mitchell is unsupported and meritless.

he was convicted of various gambling offenses in 1959, 1960 and 1970, and for possession of a weapon at an unspecified time.  (Hernandez: Tr. 226-27, 233-34.)

      Suppressed impeachment evidence that "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable" generally does not warrant a new trial.  United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995).  Jamison offers no evidence that the rap sheet, or the police reports related to Hernandez' convictions, actually contain any undisclosed information.  See, e.g., Mallet v. Miller, 432 F. Supp. 2d 366, 378 (S.D.N.Y. 2006) ("[M]ere speculation that exculpatory evidence was withheld is not sufficient under Brady, and the Court cannot compel the production of evidence that is not known to exist."); Ferguson v. Walker, 00 Civ.1356, 2002 WL 31246533 at *13 (S.D.N.Y. Oct. 7, 2002) (Swain, D.J. & Peck, M.J.) ("Nowhere has [petitioner] indicated what evidence the prosecution withheld.  Thus, his claim of withheld Brady material is without evidence and speculative and must be rejected."); Franza v. Stinson, 58 F. Supp. 2d 124, 154 (S.D.N.Y. 1999) (Kaplan, D.J. & Peck, M.J.) ("Franza's claim of withheld Brady material is speculative, conclusory and unsupported, and thus must be rejected." (citing cases)).  If these documents contained additional information, there is no evidence that it would have further impeached Hernandez' credibility.  Hernandez testified that he was currently on probation and had committed a number of offenses since the 1960s involving gambling, illegal weapon possession, and narcotics dealing.  The First Department reasonably found this claim meritless.

      Jamison made a similar claim in his third § 440.10 motion that he located "Arrest No. B0765882" that allegedly was pending against Hernandez at the time of trial.  (Ex. 33: 2/18/14 CPL § 440.10 Motion at 36-37.)  Jamison had information from an unspecified source that the arrest would be dismissed if Hernandez testified against Jamison.  (Id.)  Jamison, however, admits he

received the following response to his Freedom of Information Request seeking information on this

alleged arrest:

> Your request for "the 'date of arrest' for Arrest Number B0765882 and the crime(s) initially charged against former principal prosecution witness Justino Hernandez" is denied.  On January 10, 2014, I searched the Bronx District Attorney's Office computer database for Arrest Number B0765882 and found no case.  Again, an agency cannot disclose what does not exist or what it does not possess.

(Ex. 33: 2/18/14 CPL § 440.10 Motion Ex. 1: 1/10/14 Letter at 2.)   There is no evidence of a

prosecution agreement or that the above arrest even exists.  This claim is completely speculative

and, therefore, meritless.

**b.      Hernandez' Psychiatric History**

Jamison's additional argument, raised in his second CPL § 440.10 motion (Ex. 24:

1/11/12 CPL § 440.10 Motion at 15-20), that the prosecution should have disclosed Hernandez'

psychiatric history, is meritless.  Justice Livote held that Jamison had "not offered a scintilla of

evidence that the prosecution was aware of any such evidence," and that "the prosecution does not

have any general duty to investigate a witness' psychiatric history."  (Ex. 27: 9/28/12 Order at 4.)

As evidence that Hernandez received psychiatric counseling, Jamison relies on a letter he received

from the New York State Office of Mental Health that reads:  "According to our records, this patient

[i.e., Hernandez] has never been at Bronx Psychiatric Center.  He received treatment at Central NY."

(Ex. 24: 1/11/12 CPL § 440.10 Motion Ex. AJ-6: 1/5/11 Letter.)  Hernandez testified at trial that he

was not under the care of a psychiatrist and had never been treated for "psychiatric problems."

(Hernandez: Tr. 220.)

Jamison cites no case law to suggest that knowledge of Brady material contained in

psychiatric or other medical records can be imputed to the prosecution regardless of its source.  See,

e.g., United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001) (noting that "the Government should

actively seek <u>Brady</u> material in its files and in the files of related agencies reasonably expected to have possession of such information"); <u>Chandras</u> v. <u>McGinnis</u>, No. 01 CIV. 2519, 2002 WL 31946711 at *6 (E.D.N.Y. Nov. 13, 2002) (prosecutor has no duty to investigate witness's psychiatric history).  There is no evidence that the prosecution was aware that Hernandez had any preexisting psychiatric condition, and Jamison has not shown that the prosecution suppressed any impeachment or exculpatory evidence in this regard.

### 3.    The Surveillance Tape

Jamison argues that the prosecution suppressed an exculpatory surveillance video that allegedly shows him at 230 E. 167th Street between 10:09 and 10:30 a.m. around the time of the robbery at 1166 Grand Concourse.  (Dkt. No. 2: Pet. ¶ 13M; Ex. 19: Jamison 1st Dep't Br. at 31-37.)[53/]  Jamison initially was charged with another, unrelated burglary that occurred the morning of October 2, 2007 at 230 E. 167th Street.  (<u>See</u> page 2 above.)  These charges were dismissed when the prosecution determined that the surveillance tape could not establish Jamison's identity.  (<u>See</u> <u>id.</u>)  At Jamison's arraignment, the prosecutor referenced the tape and stated it "will be available to the defense if they provide us with a copy," <u>i.e.</u>, a blank tape.  (Dkt. No. 18: Arraignment Transcript at 3.)  On December 3, 2007, Jamison filed a pro se omnibus motion requesting discovery with regard to the robbery and burglary charges that included the "facts and circumstances of the crime(s) charged . . . including . . . [v]ideotapes."  (Ex. 5: 12/3/07 Omnibus Motion at 19-20.)  The

---

[53/]    Jamison also challenges the still photos pulled from the surveillance footage because they are allegedly false and misleading and were never provided during the state court proceedings.  (Pet ¶ 13M; Dkt. No. 35: Jamison Reply Br. at 26.)  It is not clear what Jamison is arguing.  It appears that he wishes the Court to disregard "these highly suspect," "obviously fabricated" photographs.  (Jamison Reply Br. at 27.)  If, as Jamison contends, the photos were not introduced at trial, and he does not claim that they constitute <u>Brady</u> material, there is nothing for the Court to adjudicate.

prosecution responded on January 2, 2008 that it was "not in possession of any recordings related to this matter" and that "[a]nything else is . . . not applicable to this case." (Ex. 6: 1/2/08 State Opp. Br. at 2-3.) On August 4, 2008, defense counsel informed the court that Jamison wished to address some discovery issues. (P. 24.) Jamison's only reference to the surveillance video, however, suggested his belief that the tape was irrelevant to the matter at bar: "The surveillance that the D.A. just mentioned has to do with another burglary case that was dismissed, your Honor. It's not the [case] before your Honor." (P. 32.)

Jamison's appellate counsel argued that the surveillance tape was exculpatory because there was a factual dispute as to when the robbery at 1166 Grand Concourse occurred. (Jamison 1st Dep't Br. at 36-37.) Jamison's appellate counsel noted that, at trial, Hernandez testified that he encountered the perpetrators at 10:00 a.m. outside of 1166 Grand Concourse. (Id. at 31.) Counsel argued that the video might support an argument that Jamison could not have been at 1166 Grand Concourse at the time of the robbery because he was at 230 E. 167th Street. (Id. at 37.) The First Department rejected this claim and held:

> By failing to make any effort to obtain an allegedly exculpatory videotape after the People informed him of it and offered to make it available to him, defendant abandoned the claim that the People failed to disclose it. The People disclosed the existence of this tape at defendant's arraignment, but defendant made no mention of the tape before or during trial, except for a general reference to videotapes made in a discovery motion. Defendant never alerted the court to any claim that this videotape had not been produced. In any event, the record refutes defendant's assertion that the tape may have been exculpatory.

People v. Jamison, 96 A.D.3d 571, 571-72, 946 N.Y.S.2d 569, 569-70 (1st Dep't 2012) (citations omitted); see page 14 above. The State argues that abandonment is an independent and adequate state ground that precludes federal habeas review. (Dkt. No. 15: State Opp. Br. at 4.)

### a.      The Independent and Adequate State Ground Doctrine

The Supreme Court has made clear that the "adequate and independent state ground

doctrine applies on federal habeas," such that "an adequate and independent finding of procedural

default will bar federal habeas review of the federal claim, unless the habeas petitioner can show

cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the

federal claim will result in a fundamental miscarriage of justice." Harris v. Reed, 489 U.S. 255, 262,

109 S. Ct. 1038, 1043 (1989) (citations & internal quotations omitted).[54/]

"[I]n order to preclude federal review [under the adequate and independent doctrine],

the last state court to render judgment must 'clearly and expressly state . . . that its judgment rest[ed]

on a state procedural bar.'" Jones v. Vacco, 126 F.3d at 415 (quoting Glenn v. Bartlett, 98 F.3d at

724). The Second Circuit has made clear that "federal habeas review is foreclosed when a state

court has expressly relied on a procedural default as an independent and adequate state ground, even

where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez

v. Leonardo, 898 F.2d at 9; accord, e.g., Harris v. Reed, 489 U.S. at 264 n.10, 109 S. Ct. at 1044

n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding.

By its very definition, the adequate and independent state ground doctrine requires the federal court

to honor a state holding that is a sufficient basis for the state court's judgment, even when the state

court also relies on federal law."). [55/]  Thus, "as long as the state court explicitly invokes a state

---

[54/]    See also, e.g., Walker v. Martin, 562 U.S. 307, 316, 131 S. Ct. 1120, 1127 (2011); Schlup
v. Delo, 513 U.S. 298, 314-16, 115 S. Ct. 851, 860-61 (1995); Coleman v. Thompson, 501
U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991); Murray v. Carrier, 477 U.S. 478, 485-88, 496,
106 S. Ct. 2639, 2644-45, 2649-50 (1986); Garcia v. Lewis, 188 F.3d 71, 76-77 (2d Cir.
1999); Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997); Reyes v. Keane, 118 F.3d 136,
138-40 (2d Cir. 1997); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996), cert. denied, 520
U.S. 1108, 117 S. Ct. 1116 (1997); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

[55/]    See, e.g., Garcia v. Lewis, 188 F.3d at 77-82; Glenn v. Bartlett, 98 F.3d at 724-25; see also,
(continued...)

procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas." Harris v. Reed, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10.

> State courts are not required to use any particular language:
>
> > We encourage state courts to express plainly, in every decision potentially subject to federal review, the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim – every state appeal, every denial of state collateral review – in order that federal courts might not be bothered with reviewing state law and the record in the case.

Coleman v. Thompson, 501 U.S. at 739, 111 S. Ct. at 2559.

The Supreme Court has established that "the procedural bar doctrine only precludes habeas review when the state procedural ground is firmly established and regularly followed by the state courts." Simpson v. Portuondo, 01 Civ. 8744, 2002 WL 31045862 at *4 (S.D.N.Y. June 4, 2002) (citing James v. Kentucky, 466 U.S. 341, 348-49, 104 S. Ct. 1830, 1835 (1984)); accord, e.g., Walker v. Martin, 562 U.S. at 316, 131 S. Ct. at 1128 ("To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'"); see, e.g., Lee v. Kemna 534 U.S. 362, 376, 122 S. Ct. 877, 885 (2002) ("[V]iolation of 'firmly established and regularly followed' state rules . . . [are] adequate to foreclose review of a federal claim.").[56]

---

[55]    (...continued)
e.g., Santiago v. People, 97 Civ. 5076, 1998 WL 803414 at *4 (S.D.N.Y. Oct. 13, 1998) ("When the state court rejects a claim both on the merits and because it was waived under the state's procedural law, review of the claim on a federal habeas corpus petition is barred.").

[56]    See also, e.g., Clark v. Perez, 510 F.3d 382, 391 (2d Cir.) ("To determine whether a state procedural bar is 'adequate to support the judgment,' a federal habeas court should look to whether 'the state rule at issue . . . is firmly established and regularly followed.'" (citations omitted)), cert. denied, 555 U.S. 823, 129 S. Ct. 130 (2008); Murden v. Artuz, 497 F.3d 178, (continued...)

Even if a state rule is discretionary, it can serve as an adequate and independent state

ground, as the Supreme Court has made clear:

> We hold that a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review.  Nothing inherent in such a rule renders it inadequate for purposes of the adequate state ground doctrine.  To the contrary, a discretionary rule can be "firmly established" and "regularly followed" – even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.

Beard v. Kindler, 558 U.S. 53, 60-61, 130 S. Ct. 612, 618 (2009); accord, e.g., Walker v. Martin,

562 U.S. at 311, 131 S. Ct. at 1125 (In Beard, the Supreme "Court clarified that a state procedural

bar may count as an adequate and independent ground for denying a federal habeas petition even

if the state court had discretion to reach the merits despite the default.").

Jamison's surveillance tape claim is procedurally barred.  The last reasoned opinion

of the First Department explicitly held that Jamison had abandoned his claim to the tape.[57]  The First

Department cited People v. Graves, 85 N.Y.2d 1024, 630 N.Y.S.2d 972 (1995), where the defendant

argued that his conviction should be reversed because the prosecutor had failed to turn over certain

Rosario material.  People v. Graves, 85 N.Y.2d at 1027, 630 N.Y.S.2d at 973.  The existence of the

material was revealed at trial, although the court deferred further discussion about the prosecution's

---

[56]  (...continued)
192 (2d Cir. 2007) (To be "adequate," the state procedural requirement must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case."), cert. denied, 552 U.S. 1150, 128 S. Ct. 1083 (2008); Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003) ("'[S]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims.'"); Nunez v. Conway, 07 Civ. 7560,  2010 WL 234826 at* 9 (S.D.N.Y. Jan. 20, 2010); Roldan v. Ercole, 08 Civ. 6548, 2009 WL 2191176 at *3 (S.D.N.Y. July 20, 2009).

[57]  See Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594 (1991) ("[W]here, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.").

disclosure obligations.  Id.  "Counsel did not mention the report again and no sanction either for its

belated disclosure or for its nonproduction was sought," so the Court of Appeals deemed the claim

abandoned.  Id.  Thus, here, the First Department relied on clear state precedent recognizing a theory

of abandonment.  The First Department's holding "[i]n any event" on the merits does not impact the

applicability of the procedural bar.  See, e.g., Velasquez v. Leonardo, 898 F.2d at 9.

   The procedural bar invoked by the First Department also was "adequate."

Abandonment is firmly established and regularly followed in New York.  See, e.g., Prendergast v.

Rivera, No. 06 CIV. 5314, 2011 WL 4899945 at *4 (E.D.N.Y. Oct. 13, 2011) ("Abandonment is an

independent and adequate state procedural ground which ordinarily bars federal habeas review.")

Bailey v. Ercole, 06 Civ. 5811, 2007 WL 4707738 at *8 (S.D.N.Y. Aug. 17, 2007) ("As a procedural

mechanism, abandonment is firmly established and regularly enforced in New York courts." (citing

cases)); Marrero v. Senkowski, 01 Civ. 5867, 2003 WL 21750137 at *9 (S.D.N.Y. July 28, 2003);

People v. Rodriguez, 123 A.D.3d 495, 495, 998 N.Y.S.2d 186, 187 (1st Dep't 2014); People v.

Williams, 273 A.D.2d 79, 80, 709 N.Y.S.2d 72 (1st Dep't 2000).  The theory clearly applies to this

case because Jamison was informed of the surveillance tape early on but did not continue to seek

its disclosure after the burglary charges were dismissed.  (See pages 84-85 above.)  Jamison's Brady

claim therefore is procedurally barred because the First Department relied on an independent and

adequate state ground to deny relief.

  **b.** **Jamison Has Not Shown Cause And Prejudice or a Fundamental Miscarriage of Justice**

   Because there is an adequate and independent finding by the First Department that

Jamison abandoned his Brady claim, Jamison would have to "show 'cause' for the default and

'prejudice attributable thereto,' or demonstrate that failure to consider the federal claims will result

in a 'fundamental miscarriage of justice.'" Harris v. Reed, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989) (citations omitted). Jamison demonstrates no cause for the abandonment of his claim. Nothing prevented him or his attorney from obtaining the tape that was made known to the defense months before the trial. Because Jamison has not shown cause, the Court need not consider the prejudice prong. See, e.g., Brown v. Ercole, 353 F. App'x 518, 520 (2d Cir. 2009); see also, e.g., Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [petitioner] showed prejudice.")[58/]

      Nor can Jamison establish a fundamental miscarriage of justice. The Supreme Court has explained that the fundamental miscarriage of justice exception is "tied . . . to [a] petitioner's innocence" and exists to protect those who are "actually innocent." Schlup v. Delo, 513 U.S. 298, 321, 324, 115 S.Ct. 851, 864, 865 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623-24, 118 S.Ct. 1604, 1611 (1998); accord, e.g., Sweet v. Bennett 353 F.3d 135, 142 (2d Cir. 2003); Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House v. Bell, 547 U.S. 518, 536-37, 126 S. Ct. 2064, 2076-77 (2006) (emphasis added); see also, e.g., Schlup v. Delo, 513 U.S. at 324-27, 115 S. Ct. at

---

[58/]    See also, e.g., Lisojo v. Rock, 09 Civ. 7928, 2010 WL 1223086 at *27 (S.D.N.Y. Mar. 31, 2010) (Peck, M.J.), R. & R. adopted, 2010 WL 1783553 (S.D.N.Y. Apr. 29, 2010); Bonilla v. Burge, 06 Civ. 4755, 2009 WL 4884092 at *10 (S.D.N.Y. Dec. 17, 2009); Galusha v. Duncan, No. 02 CV 1602, 2007 WL 4198272 at *14 (N.D.N.Y. Nov. 21, 2007); D'Alessandro v. Fischer, 01 Civ. 2551, 2005 WL 3159674 at *9 n.10 (S.D.N.Y. Nov. 28, 2005).

865-67 (fundamental miscarriage of justice must be demonstrated by showing through "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."); <u>Johnson</u> v. <u>Bellnier</u>, 508 F. App'x 23, 25 (2d Cir.) ("Establishing actual innocence is not easy.  To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." (quotations omitted)), <u>cert. denied</u>, 133 S. Ct. 2864 (2013); <u>Murden</u> v. <u>Artuz</u>, 497 F.3d 178, 194 (2d Cir. 2007) ("'To demonstrate actual innocence a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'  This requires 'a stronger showing' than the showing of prejudice necessary to prevail on an ineffective assistance claim.  Actual innocence requires 'not legal innocence but factual innocence.'") (citations omitted)), <u>cert. denied</u>, 552 U.S. 1150, 128 S. Ct. 1083 (2008).

Jamison has not presented any evidence, new or otherwise, that would allow the Court to find "'it is more likely than not that no reasonable juror would have convicted him.'" <u>Sweet</u> v. <u>Bennett</u>, 353 F.3d at 142 (quoting <u>Bousley</u> v. <u>United States</u>, 523 U.S. at 623, 118 S. Ct. at 1611); <u>see also</u>, <u>e.g.</u>, <u>Dominique</u> v. <u>Artus</u>, 25 F. Supp. 3d 321, 332 (E.D.N.Y. 2014) ("'Petitioner does not rely on or present any "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," that was not presented at trial.'"); <u>Grant</u> v. <u>Bradt</u>, 10 Civ. 394, 2012 WL 3764548 at *5 (S.D.N.Y. Aug. 30, 2012) ("[B]ecause [petitioner] has offered no new evidence as to his innocence that was not presented at trial, the Court finds that [he] has failed to demonstrate the actual innocence necessary to satisfy the fundamental miscarriage of justice exception.").

**c.    Application of the Procedural Bar was not Exorbitant**

"Ordinarily, violation of 'firmly established and regularly followed' state rules . . .

will be adequate to foreclose review of a federal claim.  There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." Lee v. Kemna, 534 U.S. 362, 376, 122 S. Ct. 877, 885 (2002) (citations omitted).  The Supreme Court noted three factors to consider in determining whether a "case falls within the small category of cases in which asserted state grounds are inadequate to block adjudication of a federal claim." Lee v. Kemna, 534 U.S. at 381, 122 S. Ct. at 888.  As summarized by the Second Circuit, the three factors are:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003).[59/]  While not a test to determine the adequacy of a state procedural bar, these factors should be used "as guideposts in 'evaluat[ing] the state interest in a procedural rule against the circumstances of a particular case.'" Cotto v. Herbert, 331 F.3d at 240 (quoting Lee v. Kemna, 534 U.S. at 381-85, 122 S. Ct. at 888-90).[60/]

Under the factors enumerated in Cotto v. Herbert, 331 F.3d at 240, the First Department's application of abandonment was not exorbitant.  The first Cotto factor has little application here because the trial court did not actually rely on an abandonment theory to deprive Jamison of the surveillance tape.  See Clark v. Perez, 510 F.3d 382, 391 n.4 (2d Cir. 2008) ("The

---

[59/]   Accord, e.g., Donaldson v. Ercole, No. 06-5781, 2009 WL 82716 at *1-2 (2d Cir. Jan. 14, 2009); Clark v. Perez, 510 F.3d 382, 391 (2d Cir.), cert. denied, 555 U.S. 823, 129 S. Ct. 130 (2008); Garvey v. Duncan, 485 F.3d 709, 714 (2d Cir. 2007).

[60/]   Accord, e.g., Donaldson v. Ercole, 2009 WL 82716 at *1; Clark v. Perez, 510 F.3d at 391; Garvey v. Duncan, 485 F.3d at 714.

first guidepost has no bearing here because the failure altogether to raise an issue cannot be 'actually relied on' because no court has been notified that the issue even exists."); Garvey v. Duncan, 485 F.3d 709, 719 (2d Cir. 2007) ("In this case the alleged procedural violation was the defendant's failure to raise a specific issue before the trial court. It is therefore meaningless to ask whether the alleged procedural violation was actually relied on in the trial court—the violation only first occurred when defendant raised an argument on appeal that he had not raised earlier.").

The second factor, whether state law "indicated that compliance with the rule was demanded in the specific circumstances," Cotto v. Herbert, 331 F.3d at 240, disfavors Jamison.  New York courts routinely demand that litigants preserve their non-disclosure objections or risk a finding of abandonment.  See, e.g., People v. Bryant, 298 A.D.2d 845, 846, 748 N.Y.S.2d 628, 628 (4th Dep't 2002) ("Defendant failed to seek sanctions based on the People's failure to provide him with the videotape that allegedly constitutes Brady material and therefore failed to preserve his contention for our review."); People v. Sebak, 270 A.D.2d 166, 166, 706 N.Y.S.2d 322, 322 (1st Dep't 2000) ("The record fails to contain any indication that the court ever ruled on defendant's Brady request and defendant failed to raise the issue again.  In view of this, . . . defendant's Brady claim is not preserved for review." (citations omitted)); People v. Jackson, 236 A.D.2d 628, 629, 654 N.Y.S.2d 691, 691 (2d Dep't 1997) ("The defendant failed to preserve for appellate review his claims of Rosario and Brady violations.").

The third factor, which asks whether Jamison "substantially complied" with the state procedural rule, also weighs against him.  Jamison was notified of the surveillance tape in October 2007, yet never objected to the tape's absence in the months that followed.  Jamison further neglected to seek a ruling from Justice Stadtmauer compelling the tape's disclosure at a hearing in August 2008 (days before trial) despite addressing the court at length "to outline on the record what

is still outstanding in terms of discovery." (Jamison: P. 25.) Jamison did not at all comply with the state court preservation rules which precluded review of his claim on appeal. The surveillance tape Brady claim thus is barred from habeas review.

### 4.    The "White Folder" Information

Jamison argues that the prosecution suppressed its "white folder" "write ups" containing impeachment evidence related to Hernandez and Kaane's identifications on the day of the robbery. (See Dkt. No. 2: Pet. ¶ 13.) At trial, Hernandez testified that he pointed to Jamison outside of 1056 Sherman Avenue, at which time he was arrested. (See page 9 above.) The police subsequently conducted a show-up identification with Kaane at 1056 Sherman Avenue, who was able to identify his green shirt, but not Jamison. (See id.) The white folder, however, states that Hernandez did a "point out" identification the day of the robbery at "10:50 AM" after Kaane participated in a "show up" identification the same day at "10:49 AM." (Ex. 24: 1/11/12 CPL § 440.10 Motion Ex. AJ-5: White Folder.)

Justice Livote disposed of this claim in his ruling on Jamison's second CPL § 440.10 motion. (Ex. 27: 9/28/12 Order at 3.) No Brady violation had occurred, Justice Livote wrote, because information disclosed at arraignment was the "same information written on the white folder." (Id.) The prosecutor stated at Jamison's arraignment that two separate identifications had occurred on October 6, 2007 at 1056 Sherman Avenue: one "point-out" by the "complaining witness from incident number one" at 10:50 a.m. and one "show-up" by the "complainant at the second incident" at 10:14 a.m. (Dkt. No. 18: Arraignment Transcript at 4.) The white folder information does not completely mirror that disclosed at Jamison's arraignment.

Nonetheless, the prosecutor's statements revealed her belief that the show-up had occurred before the point-out—the essential fact contradicting the trial evidence. Justice Livote

therefore did not unreasonably apply clearly established law in finding that no <u>Brady</u> violation had occurred.  <u>See</u> <u>Leka</u> v. <u>Portuondo</u>, 257 F.3d 89, 100 (2d Cir. 2001) ("Evidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." (quotations omitted)).  Nor was the decision an "unreasonable determination of the facts" despite the inconsistencies between the prosecutor's statements at arraignment and the white folder notations.  Justice Livote reasonably found that the arraignment transcript and the white folder documented that the show-up happened before the point-out, which is the key fact Jamison could have relied on to impeach the contradictory trial evidence. <u>Compare</u>, <u>e.g.</u>, <u>Cardoza</u> v. <u>Rock</u>, 731 F.3d 169, 178 (2d Cir. 2013) ("'[T]he state court's finding might represent an 'unreasonable determination of the facts' where, for example, reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding, or where the court ignored highly probative and material evidence." (citations omitted)).

Even if the information provided at arraignment was insufficient to permit Jamison to take advantage of the alleged <u>Brady</u> material, his claim is meritless.  There is no indication that the white folder information could have been imputed to Hernandez or Kaane to impeach their testimony, or that a reasonable probability otherwise exists that the order of the identifications would have produced a different result at trial when considered with the record as a whole.  The evidence thus is not "material" as defined by <u>Brady</u> and its progeny.

Jamison next argued that the write ups contain two witness information sheets that show the prosecution interviewed Hernandez and Kaane.  (Ex. 24: 1/11/12 CPL § 440.10 Motion at 10.)  Hernandez' interview sheet lists the name of an interpreter.  (1/11/12 CPL § 440.10 Motion Ex. AJ-5: Witness Information Sheets.)  Jamison claimed these forms were <u>Rosario</u> material, which

is not a subject for federal habeas review.  (See cases cited on page 76 n.48 above.)  The information

(including the name of Hernandez' interpreter) is not Brady material either.  The forms are redacted

but it is evident that the questions concerned Hernandez and Kaane's contact and other personal

background information.  (See 1/11/12 CPL § 440.10 Motion Ex. AJ-5: Witness Information

Sheets.) Jamison makes no cogent argument why this information would be relevant to his defense.

On Hernandez' interview sheet there is a diagonal line through half the page that

includes the question, "DO YOU HAVE CHILDREN?"  (1/11/12 CPL § 440.10 Motion Ex. AJ-5:

Witness Information Sheets.) Jamison believes that the line proves Hernandez must have responded

that he had no children, contradicting his trial testimony.  (1/11/12 CPL § 440.10 Motion at 11.)

Justice Livote held: "This argument is without merit.  The obvious implication of the diagonal line

is that the questions in that section were not asked."  (9/28/12 Order at 3.)  Jamison's argument is

not just without merit, it is absurd.

### 5.    The Property Clerk Vouchers

Jamison argues that the prosecution suppressed multiple property clerk vouchers that

prove an inadequate chain of custody and evidence tampering by the police.  (Dkt. No. 2: Pet. ¶ 13.)

### a.    Voucher N845627 and Officer Concepcion

The white folder describes property clerk voucher "N845627 crowbar, screwdriver,

bag, etc. (originally recovered by P.O. Frank Rodriguez at lobby)."  (Ex. 24: 1/11/12 CPL § 440.10

Motion Ex. AJ-5: White Folder.)  Officer Rodriguez testified that he retrieved a bag in the lobby of

1166 Grand Concourse, which he gave to Officer Gonzalez at the precinct.  (See page 10 above.)

The bag contained "clothing items and a crowbar."  (See id.)  The property was logged under

voucher numbers N845775 and N845776.  (See id.)  Voucher N845775 lists a crowbar, screwdriver,

black bag and several other items, and voucher N845776 lists multiple items of clothing, some of

which are not listed on voucher N845627.  (<u>Compare</u> Ex. 53: Property Clerk Invoices at 2-3, <u>with</u>

Ex. 37: Addt'l Property Clerk Invoices at 3.)  Voucher N845627 was not referenced or introduced

at trial.  Justice Livote held:

> There is no indication that the N845627 number was ever disclosed to the defense.
> Furthermore, this information is impeaching because it is inconsistent.  With respect
> to prejudice, there is no indication that this inconsistency is anything more than a
> typographical error.   Accordingly, there is no reasonable probability that this
> information would have changed the outcome of the trial and, therefore, the failure
> to disclose it does not constitute a <u>Brady</u> violation.

(Ex. 27: 9/28/12 Order at 4.)

Justice Livote reasonably concluded that voucher N845627 was not material under

<u>Brady</u>.  The voucher does not undercut the items' chain of custody or remotely suggest that the

police tampered with or fabricated the evidence.  A "new trial is generally not required when the

testimony of the witness is corroborated by other testimony." <u>United States</u> v. <u>Payne</u>, 63 F.3d 1200,

1210 (2d Cir. 1995) (quotations omitted).  The evidence obtained at both crime scenes and its chain

of custody was established at trial by multiple witnesses.  (<u>See</u> pages 10-11 above.)  No testimony

was presented that the sealed evidence bag or the items themselves were mishandled by the police.

The evidence supports Justice Livote's reasonable conclusion that the allegedly missing voucher was

nothing more than the product of a "typographical error," and that no prejudice resulted.

Jamison further argued that the white folder notation, "PO Carlos Concepcion,"

written in the section labeled "PROPERTY RECOVERED (EVIDENCE), INCLUDING

CIRCUMSTANCES OF RECOVERY" (1/11/12 CPL § 440.10 Motion Ex. AJ-5: White Folder),

proved that Officer Concepcion (whose name was not disclosed to the defense) was involved in the

recovery of the red shirt and the crowbar found in Kaane's apartment (1/11/12 CPL § 440.10 Motion

at 14-15).  Justice Livote held that there was no evidence that Officer Concepcion possessed any

98

impeaching or exculpatory information, and thus no evidence of a Brady violation.  (9/28/12 Order

at 4.)  It is pure speculation that Officer Concepcion aided with the recovery of property at either

crime scene.  Justice Livote reasonably concluded that no Brady violation occurred.

## 2.    Voucher N846200

Voucher N846200, which corresponds to the items recovered at 1056 Sherman

Avenue and the green shirt, was introduced at trial.  (See pages 10-11 above.)  A voided copy of that

same voucher, however, was not.  In his third CPL § 440.10 motion, Jamison argued that he never

received the voided voucher.  (Ex. 33: 2/18/14 CPL § 440.10 Motion at 19-21.)  Jamison argued that

the word "VOID" written across the voucher somehow meant the evidence itself was voided, or that

it proved "misconduct regarding the chain of custody and the 'vouchering' of the three items" listed

on the invoice.  (Id.)  Without explicitly mentioning the voided copy, Justice Dawson held that the

record was clear that Jamison received voucher N846200 "and that said voucher was introduced at

trial."  (Ex. 43: 9/16/14 Order at 4.)  The State maintains that Jamison received the voided voucher

before and during trial.  (Dkt. No. 15: State Opp. Br. at 94-95.)

Jamison argued in the same motion that he did not receive a copy of the Evidence

Transmittal Report.  (2/18/14 CPL § 440.10 Motion at 26.)  The report, used for transmitting

evidence to a lab for analysis (State Opp. Br. at 99), lists voucher N846200, a description of the

evidence and the laboratory number (2/18/14 CPL § 440.10 Motion Ex. 2: Evid. Transmittal Rpt.).

The report contains three signature blocks for the "Supervisor," "Borough Messenger" and

"Laboratory Official Receiving Evidence."  (Id.)  Sergeant Toczek, Officer Gonzalez and an

unspecified laboratory official's names are listed.  (Id.)

The report is Brady material, Jamison argues, because Officer Gonzalez and Sgt.

Toczek failed to comply with the form's instructions when they signed out the evidence.  (2/18/14

CPL § 440.10 Motion at 26-27.)  Sgt. Toczek's signature is missing and Officer Gonzalez allegedly did not list his rank in the appropriate box.  (2/18/14 CPL § 440.10 Motion Ex. 2: Evid. Transmittal Rpt.)  Jamison believes these alleged errors "conclusively confirm . . . that the proper 'vouchering process'" was not complied with.  (2/18/14 CPL § 440.10 Motion at 27.)  Justice Dawson found Jamison's allegation that he never received the Evidence Transmittal Form to be "wholly unsubstantiated." (9/16/14 Order at 4.)  The State maintains that Jamison received the report pre-trial.  (State Opp. Br. at 93-94.)

Even if Jamison did not receive the voided voucher or the Evidence Transmittal Report (which he has not shown), his claims nonetheless are meritless.  The clean copy of voucher N846200 introduced at trial is identical to the voided copy insofar as it lists the same items logged with the property clerk.  (Compare Ex. 53: Property Clerk Invoices at 1, with Ex. 37: Addt'l Property Clerk Invoices at 4.)  It also corresponds with the white folder notations next to voucher number N846200.  (Ex. 24: 1/11/12 CPL § 440.10 Motion Ex. AJ-5: White Folder ("N846200 crowbar, red T shirt, green T shirt (originally recovered by P.O. Campbell")."))  The Evidence Transmittal Report lists the same items logged under voucher number N846200.  (2/18/14 CPL § 440.10 Motion Ex. 2:  Evid. Transmittal Rpt.)  There are no material discrepancies among these documents.

The property recovered at 1056 Sherman Avenue had a clear chain of custody.  Officer Campbell recovered the red shirt and crowbar from Kaane's apartment.  (See page 9 above.)  Officer Barnes retrieved the green shirt from Jamison at the hospital.  (See id.)  Officer Gonzalez vouchered the evidence.  (See pages 10-11 above.)  Chin and Ishii examined the sealed packages for tampering before testing the items.  (See page 11 above.)  Moreover, Hernandez, Mitchell and Kaane identified the crowbar and the red shirt at trial, and Hernandez and Kaane identified the green shirt.  (See page 11 above.)

The well-established chain of custody, corroborated by multiple witnesses, undermines any argument as to evidence tampering or mishandling.  The probative value of the voided voucher was minimal when considered in context with the trial record; it was not material under Brady.

### 6.     Erma Ramos' Identity and the Police Report from the Burglary

Jamison argues that the prosecution suppressed Erma Ramos' identity along with the police arrest and complaint reports pertaining to the burglary at 230 E. 167th Street.  (Dkt. No. 2: Pet. ¶ 13.)  Ramos allegedly identified Jamison in a photo array as the man she saw at 230 E. 167th Street on October 2, 2007 between 10:09 a.m. and 10:30 a.m.  (Ex. 15: 1/20/10 CPL § 440.10 Motion Reply Br. at 4-5; Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 62-63; Ex. 22: Jamison Pro Se 1st Dep't Reply Br. at 7-8.)  The police report states that a burglary occurred at 10:09 a.m. on October 2, 2007 and lists Jamison as the perpetrator.  (1/20/10 CPL § 440.10 Motion Reply Br. Ex. A-11: Complaint Rpt.)  The arrest report refers to a burglary at East 169th Street and states Jamison wore green outerwear.  (Id. at Ex. A-11: Arrest Rpt.)

Jamison believes this evidence is relevant to his alibi defense because Hernandez testified that immediately before the robbery he told Jamison and his accomplice that the time was 10:00 a.m.  (Hernandez: Tr. 174, 242; see page 7 above.)  Jamison contends that Ramos and the reports place him at the scene of another location wearing his green shirt at the time of the robbery.  (Jamison Pro Se 1st Dep't Reply Br. at 7-8.)  The First Department found this claim meritless. People v. Jamison, 96 A.D.3d 571, 572, 946 N.Y.S.2d 569, 570 (1st Dep't 2012); see pages 14-15 above.

The photo array does not support Jamison's arguments whatsoever.  It does not reference a particular crime, a time frame, a location, or the individual who viewed the array.

(1/20/10 CPL § 440.10 Motion Reply Br. Ex. A-12: Photo Array.)  Jamison can only speculate that

Ramos would have testified that she saw him in the short time window beneficial to his alibi.[61]

Jamison's reading of the complaint report suffers from the same flaw.  Jamison seems to suggest that

the report mentions the green shirt because an unnamed witness to the burglary must have seen him

wearing the shirt before 10:30 a.m.  (See 1/20/10 CPL § 440.10 Motion Reply Br. at 4-5.)  Yet, as

an arrest report, it more likely corroborates the trial testimony that Jamison was arrested in the green

shirt.  The exculpatory value of this evidence is speculative as are Jamison's arguments.

The complaint report provides little detail beyond the time of the burglary.  (1/20/10

CPL § 440.10 Motion Reply Br. Ex. A-11: Complaint Rpt.)  Before the burglary charge was

dismissed, a criminal complaint, 2007 BX 061217, was generated by Detective Matthew Crowley

that lists the time of the crime between "approximately 10:09 AM and . . . 10:30 AM" inside 230

E. 167th Street, Apartment 3J in the Bronx.  (Ex. 13: 1/20/10 CPL § 440.10 Motion Ex. A-2: 10/3/07

Compl.)  The criminal complaint contains the same pertinent details as the report that Jamison

claims would support his alibi defense.  Jamison received a copy of the complaint well before trial

because he referenced it in his December 3, 2007 omnibus discovery motion.  (Ex. 5: 12/3/07

---

[61]   The Court notes the State's argument that Jamison was aware he had been identified via photo array before trial.  (Dkt. No. 15: State Opp. Br. at 50.)  On August 4, 2008, the prosecution stated that Jamison and his accomplice were believed to have been "involved in a number of other [burglaries] in that same area within that same period of time." (P. 31.)  The prosecution stated that Jamison was identified "via photo array, and also on video surveillance." (Id.)  Jamison acknowledged that he received this evidence pretrial, stating: "The People also concealed evidence of the 'photo-array selection' of defendant by Erma Ramos placing defendant at 230 East 167th Street until–for the first time–at the August 4th, 2008 proceedings." (Ex. 23: 8/2/12 Letter at 6 n.6); see Layton v. Phillips, 340 F. App'x 687, 689 (2d Cir. 2009) ("Evidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." (quotations omitted)).

Omnibus Motion at 10.)  By Jamison's account, he even attempted to use it during the grand jury proceedings to "severely discredit the prosecution's case and discredit the police version of the case regarding this defendant having" committed the crimes at 1166 Grand Concourse.  (Id.)  Jamison knew that the prosecution had pinned him to a particular window of time at another location that conflicted with Hernandez' version of events.  See Layton v. Phillips, 340 F. App'x at 689; United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998) (undisclosed evidence that is cumulative is not material).  Jamison failed to take advantage of this allegedly exculpatory information.

Moreover, Officer Rodriguez testified that he responded to 1166 Grand Concourse at 10:30 a.m. and Bashir testified that he heard the robbery in progress at that time.  (Rodriguez: Tr. 158; Bashir: Tr. 466-69.)  There was no dispute that Bashir placed the first 911 call at 10:30 a.m. and the second call at 10:47 a.m.  (See page 8 above.)  Jamison conceded in his post-conviction briefs that the timeline of the robbery was well-established at trial:

> Defendant herein contends, that not only does every prosecution witness that has testified for the People in this case been precisely clear and certain that the actual time of the incident at [1166] Grand Concourse on the date October 2nd, 2007 . . . to have occurred at 10:30 a.m. that day, but the 911 "sprint report" as well that was generated in connection with this particular case likewise confirms this fact . . . [and] reflect[s] the precise time of the police clock's recording to be that of "10:30 a.m."

(Ex. 13: 1/20/10 CPL § 440.10 Motion at 28; see also Jamison Supp. Pro Se 1st Dep't Br. at 37.) The burglary evidence does not undermine the eyewitness identifications, or the other evidence tying Jamison to the crimes for which he was convicted.  The First Department reasonably concluded that Jamison's claim lacked merit.

## VI.    JAMISON'S REMAINING CLAIMS ARE EITHER MERITLESS, UNSUBSTANTIATED, OR NOT COGNIZABLE ON FEDERAL HABEAS REVIEW

### A.    The Green Shirt

Jamison argues that "numerous false misrepresentations" (presumably by the

prosecution) prejudiced his ability to have a pretrial suppression hearing regarding the seizure of his green shirt. (Dkt. No. 2: Pet. ¶ 13C; Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 48-49.) Jamison argued in his pro se supplemental brief on direct appeal that "[d]uring pretrial litigation . . . the trial prosecutor unequivocally represented that no physical property was taken from the person of defendant. Thus, appellant was misled as to the use of such green colored . . . shirt at the criminal trial." (Ex. 20: Jamison Supp. Pro Se 1st Dep't Br. at 48.) The First Department found this claim meritless. People v. Jamison, 96 A.D.3d 571, 572, 946 N.Y.S.2d 569, 570 (1st Dep't 2012); see pages 14-15 above.

Jamison appears to argue that the prosecution violated its disclosure obligations under state law, which prevented him from seeking a pretrial hearing to suppress the shirt. See C.P.L. § 240.20(1)(f) (on demand of defendant, prosecution must make available any "property obtained from the defendant"). The constitutional basis for this claim is unclear from the face of Jamison's brief. See Adams v. Khahaifa, No. 08-CV-0121, 2010 WL 2509970 at *7 (W.D.N.Y. June 16, 2010) ("Petitioner's alleged discovery violations involve only state law, and do not implicate or purport to run afoul of Brady . . . . Rather, petitioner's claims stem from C.P.L. Article 240 . . . and thus do not present federal constitutional questions upon which habeas relief can be granted.").

The claim also is meritless. The prosecution filed a motion on April 3, 2008 requesting a DNA sample from Jamison. (See Ex. 51: 5/19/08 Order.) In his May 19, 2008 order granting the motion, Justice Webber wrote that "[a] green shirt was recovered from the defendant's possession" that was "submitted to the Office of the Chief Medical Examiner, Forensic Biology Department for analysis." (Id. at 2.) The prosecution sought to compare Jamison's DNA to that found on the green shirt, red shirt and crowbar. (Id.) Jamison therefore had notice that the prosecution not only had seized the green shirt, but was actively testing it in the hope that it would

"corroborate [his] presence near the crime scene as well as his commission of the crimes charged."

(Id.)  Justice Webber issued his order well before the suppression hearing before Justice Stadtmauer.

Jamison's argument that he was ambushed by the prosecution's use of the green shirt or its seizure

is meritless.

### B.     The Jurors' Citizenship

Jamison argues that the trial court failed to determine whether the jurors were citizens

of the United States and residents of Bronx County.  (Dkt. No. 2: Pet. ¶ 13F.)  Jamison has not

presented evidence that any of the jurors were not citizens of the United States or Bronx County.

Nor is it apparent that juror alienage would necessarily result in a constitutional violation or impact

the validity of the verdict.  See Kohl v. Lehlback, 160 U.S. 293, 299-303, 16 S. Ct. 304, 306-07

(1895); United States v. Ragland, 375 F.2d 471, 475 (2d Cir. 1967) ("Failure to object to the

composition of the jury has long been held to result in a waiver of the right of the accused to be

heard by an impartial jury."), cert. denied, 390 U.S. 925, 88 S. Ct. 860 (1968); People v. Craver, 272

A.D. 181, 183, 70 N.Y.S.2d 513, 513 (1947) ("The Constitution does not prescribe the qualifications

of jurors. . . .   The [New York] Legislature has prescribed the qualifications of a juror, and

citizenship is one of these.  The lack of such a technical qualification, however, may be waived,

either with knowledge or by failure to make an inquiry when the juror is called and before he is

sworn."); People v. Foster, 100 A.D.2d 200, 203, 473 N.Y.S.2d 978, 978 (2d Dep't 1984) ("[A]

juror's intelligence or impartiality is not affected by the inability to meet the statutory requirements

of citizenship and residence."), aff'd as modified, 64 N.Y.2d 1144, 490 N.Y.S.2d 726 (1985).

Jamison's claim is meritless.

### C.     Hernandez' "Unsworn" Testimony

Jamison argues that he was convicted based on Hernandez' "'unsworn trial

testimony.'"  (Dkt. No. 2: Pet. ¶ 13.)  Hernandez, however, testified under oath.  (Hernandez: Tr.

170, 233.)  The Court presumes Jamison is referring to his claim in his first CPL § 440.10 motion,

that Hernandez' interpreter, J.J. Ramirez, was not sworn in.  (Ex. 13: 1/20/10 CPL § 440.10 Motion

at 32-34.)  Jamison's "claim that he was prejudiced because the court interpreter was not sworn

under oath does not warrant habeas corpus relief.  Some procedural irregularities, such as this one,

do not present constitutional issues."  Hou v. Walker, No. 96 CV 1365, 1996 WL 684442 at *3

(E.D.N.Y. Nov. 20, 1996); see also, e.g., German-yunga v. Racette, No. 14-CV-4537, 2016 WL

335865 at *6 (E.D.N.Y. Jan. 27, 2016) ("Petitioner's suggestion that his counsel's failure to object

to the interpreters' not being sworn in constitutes ineffective assistance is equally meritless.")  There

is no proof that Ramirez—an "official court interpreter" (Tr. 169)—fabricated testimony, translated

incorrectly, or was otherwise derelict in his or her duties.  See People v. Cortez, 115 A.D.3d 757,

758, 981 N.Y.S.2d 596, 596 (2d Dep't 2014) ("Although an interpreter must be sworn to interpret

properly and accurately, on appeal the presumption of regularity allows a court to assume that an

official or person acting under an oath of office will not do anything contrary to his or her official

duty or omit to do anything which his or her official duty requires to be done." (quotations omitted)).

Jamison's claim does not rise to a constitutional violation.

### D.   The Post-Trial Motions

Jamison argues that he should have been afforded evidentiary hearings on all of his

post-trial motions.  (Dkt. No. 2: Pet. ¶ 13.)  "As the Supreme Court has recognized, the Constitution

does not compel states to provide post-conviction proceedings for relief."  Word v. Lord, 648 F.3d

129, 131 (2d Cir. 2011); see Lackawanna Cty. Dist. Attorney v. Coss, 532 U.S. 394, 402, 121 S. Ct.

1567, 1573 (2001) ("[E]ach State has created mechanisms for both direct appeal and state

postconviction review, even though there is no constitutional mandate that they do so." (citation

omitted)).  "[A]lleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief."  Word v. Lord, 648 F.3d at 132.  No relief is available for the trial court's failure to hold evidentiary hearings.  See, e.g., Millington v. Lee, 11 Civ. 499, 2015 WL 1402133 at *10 (S.D.N.Y. Mar. 26, 2015) ("This Court cannot review Petitioner's claim that, by failing to hold an evidentiary hearing during post-conviction proceedings to resolve his ineffective-assistance claims, the trial court violated his due process rights.  In this circuit, such a claim is not cognizable in a federal habeas proceeding.");  Green v. Haggett, No. 13-CV-0016, 2014 WL 3778587 at *8 (N.D.N.Y. July 31, 2014) ("Petitioner's claim is that there was a procedural defect in the conduct of a state post-conviction proceeding, because the trial court failed to hold a hearing, and federal habeas relief is not available for such alleged defects.");  Smalls v. Bradt, No. 11-CV-0915, 2012 WL 3722222 at *10 (W.D.N.Y. Aug. 27, 2012) ("Petitioner's claim that the trial court erred in denying his CPL § 330.30 motion without conducting a hearing does not implicate federal law and is not cognizable for habeas review.").

### E.      The § 710.30 Notice

Jamison argues that the prosecution "presented false and misleading facts to petitioner regarding the manner in which any out-of-court 'identifications had occurred, as well as the time and place and police officers involved.'"  (Dkt. No. 2: Pet. ¶ 13.)  Jamison casts this claim as a due process violation "separate and apart" from the CPL § 710.30 notice claim he raised on direct appeal.  (Id.)  The due process claim, however, is intertwined with the allegedly misleading CPL § 710.30 notices that Jamison challenged after the suppression hearing.  (See pages 5-6 above.) No other support exists for an allegation of prosecutorial misconduct in this regard.

Defective CPL § 710.30 notices do not present a constitutional issue subject to

federal habeas corpus review.  See, e.g., Brown v. Harris, 666 F.2d 782, 785 (2d Cir. 1981) ("Next, appellant claims that it was reversible error to admit the identification testimony without giving him advance notice [under § 710.30]. . . .  Brown cites no case indicating that this statute, or that a notice requirement in general, is constitutionally mandated."), cert. denied, 456 U.S. 948, 102 S. Ct. 2017 (1982); Scrubb v. LaValley, No. 10-CV-3286, 2015 WL 4251238 at *3 (E.D.N.Y. July 13, 2015) ("[C]ourts have routinely concluded that a '[v]iolation of the notice requirement of New York Criminal Procedure Law § 710.30 is purely a matter of state law and raises no constitutional issues for a habeas court to review.'"); Dotson v. Ercole, 06 Civ. 7823, 2009 WL 1615997 at *2 (S.D.N.Y. June 9, 2009) ("Even if the admission of the testimony at issue did contravene CPL § 710.30(1), such an admission does not constitute a constitutional violation.  The Constitution does not guarantee a right to advance notice of identification testimony."); Roberts v. Scully, 875 F. Supp. 182, 191 (S.D.N.Y. 1995) (violation of § 710.30 does not "reflect a claim of constitutional magnitude"), aff'd, 71 F.3d 406 (2d Cir. 1995).

## CONCLUSION [62]/

 For the reasons discussed above, Jamison's habeas corpus petition should be DENIED in its entirety, and a certificate of appealability should not be issued.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

 Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be

---

[62]/ If Jamison requires copies of any of the cases reported only in Westlaw, he should request copies from the State's counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.

filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable

P. Kevin Castel, 500 Pearl Street, Room 1020, and to my chambers, 500 Pearl Street, Room 1370.

Any requests for an extension of time for filing objections must be directed to Judge Castel (with

a courtesy copy to my chambers).   Failure to file objections will result in a waiver of those

objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-

CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115

S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298,

300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human

Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);

McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72.


Dated:        New York, New York
              April 27, 2016


                                        Respectfully submitted,

                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge


Copies to:    Adam Jamison (mail)
              All Counsel (ECF)
              Judge P. Kevin Castel (ECF)